## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF LOUISIANA
## MONROE DIVISION

THE STATE OF LOUISIANA,
By and through its Attorney General, JEFF
LANDRY;

THE STATE OF ALABAMA,
By and through its Attorney General, STEVE
MARSHALL;

THE STATE OF ALASKA,
By and through its Attorney General, TREG R.
TAYLOR;

THE STATE OF ARIZONA,
By and through its Attorney General, MARK
BRNOVICH;

THE STATE OF ARKANSAS,
By and through its Attorney General, LESLIE
RUTLEDGE;

THE STATE OF FLORIDA,
By and through its Attorney General, ASHLEY
MOODY;

THE STATE OF GEORGIA,
By and through its Attorney General, CHRIS-
TOPHER CARR;

THE STATE OF INDIANA,
By and through its Attorney General, TODD
ROKITA;

THE STATE OF IOWA;
By and through its Attorney General;

THE STATE OF KANSAS,
By and through its Attorney General, DEREK
SCHMIDT;

THE COMMONWEALTH OF KENTUCKY,
By and through its Attorney General, DANIEL
CAMERON;

CIVIL ACTION NO. _____

THE STATE OF MISSISSIPPI,
By and through its Attorney General, LYNN
FITCH;

THE STATE OF MISSOURI
By and through its Attorney General, ERIC S.
SCHMITT;

THE STATE OF MONTANA,
By and through its Attorney General, AUSTIN
KNUDSEN;

THE STATE OF NEBRASKA,
By and through its Attorney General, DOUG-
LAS J. PETERSON;

THE STATE OF NORTH DAKOTA,
By and through its Attorney General, Wayne
Stenehjem;

THE STATE OF OHIO,
By and through its Attorney General, Dave
Yost;

THE STATE OF OKLAHOMA,
By and through its Attorney General, JOHN M.
O'CONNOR;

THE STATE OF SOUTH CAROLINA,
By and through its Attorney General, ALAN
WILSON;

THE STATE OF SOUTH DAKOTA,
By and through its Attorney General, JASON
R. RAVNSBORG;

THE STATE OF TENNESSEE,
By and through its Attorney General, HER-
BERT H. SLATERY III;

THE STATE OF UTAH,
By and through its Attorney General, SEAN D.
REYES;

THE STATE OF WEST VIRGINIA,

By and through its Attorney General, PAT-
RICK MORRISEY;

THE STATE OF WYOMING,
By and through its Attorney General, BRID-
GET HILL;

PLAINTIFFS,

v.

XAVIER BECERRA, in his official capacity as
Secretary of Health and Human Services;

THE U.S. DEPARTMENT OF HEALTH AND
HUMAN SERVICES;

ADMINISTRATION FOR CHILDREN AND
FAMILIES;

JOOYEUN CHANG, in her official capacity as
Principal Deputy Assistant for Children and
Families;

BERNADINE FUTRELL, in her official capac-
ity as the director of the Office of Head Start.

DEFENDANTS.

## **COMPLAINT**

The States of Louisiana, Alabama, Alaska, Arkansas, Arizona, Florida, Georgia, Indiana,

Iowa, Kansas, Kentucky, Mississippi, Missouri, Montana, Nebraska, North Dakota, Ohio, Okla-

homa, South Carolina, South Dakota, Tennessee, Utah, Wyoming, and West Virginia bring this

civil action against the above-listed Defendants for declaratory and injunctive relief and allege as

follows:

## INTRODUCTION

1.    The Biden Administration has quadrupled down on its lawless mandates. Facing a barrage of court orders enjoining its first three vaccine mandates, the Administration has not begun to rethink its "sledgehammer" approach. *BST Holdings, L.L.C. v. Occupational Safety & Health Admin., United States Dep't of Lab.*, 17 F.4th 604, 612 (5th Cir. 2021). Instead it enacted a new Mandate materially similar to—and in some ways more draconian than—its first three. The Head Start Mandate applies to all preschool programs funded by the federal Head Start program, regulating hundreds of thousands of staff, volunteers, and preschool students nationwide. It forces vaccinations on staff, volunteers, and others in contact with Head Start students and forces masks on everyone age two and up. It includes few exceptions, is projected to lead to tens of thousands of Head Start agency staff losing their jobs, and will cause programs to close or reduce capacity— achieving the very *opposite* result of its purported goal. The Department of Health and Human Services enacted the Head Start Mandate 82 days after announcing its intent to do so, but made the Mandate effective immediately and (like the other three federal vaccine mandates) bypassed notice and comment.

2.    The Head Start Mandate is unlawful. It exceeds the executive's statutory authority; is contrary to law; illegally bypassed notice and comment; is arbitrary and capricious; constitutes an exercise of legislative power in violation of the Nondelegation Doctrine; and violates the Congressional Review Act, the Tenth Amendment, the Anti-Commandeering doctrine, the Spending Clause, and the Treasury and General Government Appropriations Act of 1999.

## PARTIES

3.    Plaintiff State of Louisiana is a sovereign State of the United States of America. Jeff Landry is the Attorney General of the State of Louisiana. He is authorized by Louisiana law

to sue on the State's behalf and to protect the interests of its citizens as *parens patriae*. His offices are located at 1885 North Third Street, Baton Rouge, Louisiana 70802, and the Northeast Louisiana State Office Building, 24 Accent Drive, Suite 117, Monroe, Louisiana, 71202.

4.      Plaintiff State of Alabama is a sovereign State of the United States of America. Plaintiff Steve Marshall is the Attorney General of the State of Alabama. He is authorized by Alabama law to sue on the State's behalf and to protect the interests of its citizens as *parens patriae*. His offices are located at 501 Washington Avenue, Montgomery, AL 36104.

5.      Plaintiff State of Alaska is a sovereign State of the United States of America. Michael J. Dunleavy is the Twelfth Governor of the State of Alaska and is authorized to bring suit in the name of the State to enforce compliance with any constitutional or legislative mandate. Alaska Const. art. III, §16. Treg R. Taylor is the Attorney General of the State of Alaska, and is authorized by Alaska law to bring suit in the name of the State to protect the U.S. and Alaska Constitutions. Alaska Stat. §44.23.020(b)(1), (9). His offices are located at 1031 West 4th Ave., Suite 200, Anchorage, AK 99501.

6.      Plaintiff State of Arizona is a sovereign State of the United States of America. Plaintiff Mark Brnovich is the Attorney General of the State of Arizona. He is authorized by Arizona law to sue on the State's behalf and to protect the interests of its citizens as *parens patriae*. His offices are located at 109 State Capitol, Cheyenne, WY 82002.

7.      Plaintiff State of Arkansas is a sovereign State of the United States of America. Plaintiff Leslie Rutledge is the Attorney General of the State of Arkansas. She is authorized by Arkansas law to sue on the State's behalf and to protect the interests of its citizens as *parens patriae*. Her offices are located at 323 Center St., Suite 200, Little Rock, AR 72201.

8.      Plaintiff State of Florida is a sovereign State of the United States of America. Plaintiff Ashley Moody is the Attorney General of the State of Florida. She is authorized by Florida law to sue on the State's behalf and to protect the interests of its citizens as *parens patriae*. Her offices are located at the Florida Capitol, Pl-01, Tallahassee, FL 32399.

9.      Plaintiff State of Georgia is a sovereign State of the United States of America. Plaintiff Christopher Carr is the Attorney General of the State of Georgia. He is authorized by Georgia law to sue on the State's behalf and to protect the interests of its citizens as *parens patriae*. His offices are located at 40 Capitol Square, SW, Atlanta, GA 30334.

10.      Plaintiff State of Indiana is a sovereign State of the United States of America. This action is brought by the State in its sovereign capacity through its Attorney General Todd Rokita who is authorized to bring legal actions to protect the interests of the State of Indiana and its citizens as *parens patriae*. His offices are located at 302 W. Washington Street, 5th Floor, Indianapolis, IN 46204.

11.      Plaintiff State of Iowa is a sovereign State of the United States of America. The Attorney General of Iowa is authorized by law to prosecute legal actions on behalf of the State of Iowa and its citizens when requested to do so by the Governor. The office of the Attorney General is located at 1305 E. Walnut Street, Des Moines, IA 50319.

12.      Plaintiff State of Kansas is a sovereign State of the United States of America. Plaintiff Derek Schmidt is the Attorney General of the State of Kansas. He is authorized by Kansas law to bring legal actions on behalf of the State of Kansas and its citizens. He sues to vindicate its sovereign, quasi-sovereign, proprietary, and *parens patriae* interests. The office of the Attorney General is located at 120 SW 10th Ave, 2d Fl., Topeka, KS 66612.

13.     The Commonwealth of Kentucky is a sovereign State of the United States of America. Daniel Cameron is the Attorney General of the Commonwealth and is authorized by law to bring actions on its behalf and that of its citizens. He is "charged with the duty of protecting the interest of all people," *Hancock v. Terry Elkhorn Mining Co.*, 503 S.W.2d 710, 715 (Ky. 1973), including ensuring that government actors perform their duties lawfully. *Commonwealth ex rel. Beshear v. Bevin*, 498 S.W.3d 355, 362 (Ky. 2016). His office is located at 700 Capital Avenue, Suite 118, Frankfort, Kentucky 40601.

14.     Plaintiff State of Mississippi is a sovereign State of the United States of America. Lynn Fitch is the Attorney General of the State of Mississippi. She is authorized by Mississippi law to sue on the State's behalf and to protect the interests of its citizens as *parens patriae*. Her offices are located at 550 High Street, Jackson, MS 39201.

15.     The State of Missouri is a sovereign State of the United States of America, and it is not a citizen of any state. This action is brought by Missouri in its sovereign capacity in order to protect its interests and those of its citizens as *parens patriae*, by and through Eric S. Schmitt, the Attorney General of Missouri. Attorney General Schmitt acts under his authority to "institute, in the name and on the behalf of the state, all civil suits and other proceedings at law or in equity requisite or necessary to protect the rights and interests of the state." Mo. Rev. Stat. §27.060. His offices are located at 207 High Street, P. O. Box 899, Jefferson City, MO 65102.

16.     Plaintiff State of Montana is a sovereign State of the United States of America. This action is brought by the State in its sovereign capacity through its Attorney General Austin Knudsen, who is authorized to bring legal actions to protect the interests of the State of Montana and its citizens as *parens patriae*. His offices are located at 215 N. Sanders St., Helena, MT 59601.

17.     Plaintiff State of Nebraska is a sovereign State of the United States of America. Douglas J. Peterson is the Attorney General of the State of Nebraska. He is authorized by Nebraska law to sue on the State's behalf and to protect the interests of its citizens as *parens patriae*. His offices are located at 2115 State Capitol, Lincoln, NE 68509.

18.     Plaintiff State of North Dakota is a sovereign State of the United States of America. Wayne Stenehjem is the North Dakota Attorney General, and he is authorized by law to bring legal actions on behalf of the State of North Dakota and its citizens. N.D. Cent. Code 54-12-02. The office of the Attorney General is located at 600 E. Boulevard Ave., Bismarck, ND 58505.

19.     Plaintiff State of Ohio is a sovereign State of the United States of America. This action is brought by the State in its sovereign capacity through its Attorney General Dave Yost, who is authorized to bring legal actions to protect the interests of the State of Ohio and its citizens as *parens patriae*. His offices are located at 30 Broad St., 14th Fl., Columbus, OH 43215.

20.     Plaintiff State of Oklahoma is a sovereign State of the United States of America. Plaintiff John M. O'Connor is the Attorney General of the State of Oklahoma. He is authorized by Oklahoma law to sue on the State's behalf and to protect the interests of its citizens as *parens patriae*. Okla. Stat. tit. 74, §18b(A)(2)-(3). His offices are located at 313 N.E. 21st Street, Oklahoma City, OK 73105.

21.     Plaintiff State of South Carolina is a sovereign state of the United States of America. Plaintiff Alan Wilson is the Attorney General of the State of South Carolina. He is authorized by South Carolina law to sue on the State's behalf and to protect the interests of its citizens as *parens patriae*. His offices are located at 1000 Assembly St, Columbia, SC 29201.

22.      The State of South Dakota is a sovereign State of the United States of America. This action is brought by the State in its sovereign capacity in order to protect the interests of the

State of South Dakota and its citizens as *parens patriae*, by and through Jason R. Ravnsborg, the South Dakota Attorney General. The Attorney General is acting pursuant to his authority to appear for the State and prosecute any civil matter in which the State is a party or interested when, in his judgment, the welfare of the State demands. SDCL §1-11-1(2). His offices are located at 1302 E. Hwy 14, Suite 1, Pierre SD 57501-8501.

23.     Plaintiff State of Tennessee is a sovereign State of the United States of America. Herbert H. Slatery III is the Attorney General and Reporter of the State of Tennessee. Attorney General Slatery is authorized to bring legal actions on behalf of the State of Tennessee and its citizens. His offices are located at 500 Dr. Martin L. King Jr. Blvd., Nashville, TN 37243, and his mailing address is P.O. Box 20207, Nashville, TN 37202-0207.

24.     Plaintiff State of Utah is a sovereign State of the United States of America. Sean D. Reyes is the Attorney General of Utah. Attorney General Reyes is authorized to bring legal actions on behalf of the State of Utah and its citizens. His offices are located at 350 North State Street, Suite 230, Salt Lake City, Utah 84114.

25.     Plaintiff State of Wyoming is a sovereign State of the United States of America. This action is brought by Wyoming in order to protect its interests and those of its citizens as *parens patriae*, by and through Bridget Hill, the Attorney General of Wyoming. Attorney General Hill is authorized to bring legal actions on behalf of the State of Wyoming and its citizens. Wyo. Stat. Ann. §9-1-603(a). Her offices are located at 109 State Capitol, Cheyenne, WY 82002.

26.     Plaintiff West Virginia is a sovereign State of the United States of America. Patrick Morrisey is the Attorney General of the State of West Virginia. He is authorized by West Virginia law to sue on the State's behalf and to protect the interests of its citizens as *parens patriae*. His offices are located at the State Capitol Complex, Bldg. 1, Room E-26 Charleston, WV 25305.

27.     Defendants are officials of the United States government and United States governmental agencies responsible for promulgating or implementing the Head Start Mandate.

28.     Defendant Xavier Becerra is the Secretary of Health and Human Services. He oversees, among other things, the Administration for Children and Families and the Office of Head Start. He is sued in his official capacity.

29.     Defendant United States Department of Health and Human Services is an executive department of the United States Government headquartered in Washington, D.C., and responsible for the Head Start program.

30.     Defendant Jooyeun Chang is the Principal Deputy Assistant for Children and Families. She is sued in her official capacity.

31.     Defendant Administration for Children and Families is a division within HHS that is headquartered in Washington, D.C., and administers the Head Start program.

32.     Defendant Bernadine Futrell is the director of the Office of Head Start. She is sued in her official capacity.

## JURISDICTION AND VENUE

33.     This Court has subject-matter jurisdiction over this case because it arises under the Constitution and laws of the United States. *See* 28 U.S.C. §§1331, 1346, 1361; 5 U.S.C. §§701-06. An actual controversy exists between the parties within the meaning of 28 U.S.C. §§2201(a), and this Court may grant declaratory relief, injunctive relief, and other relief under 28 U.S.C. §§2201-02, 5 U.S.C. §§705-06, and its inherent equitable powers.

34.     Defendants' publication of the Mandate in the Federal Register on November 30, 2021 constitutes a final agency action that is judicially reviewable under the APA. 5 U.S.C. §§704, 706.

35.     Venue is proper in this Court under 28 U.S.C. §1391(e)(1) because (1) Defendants are United States agencies or officers sued in their official capacities, (2) the State of Louisiana is a resident of this judicial district, (3) no real property is involved, and (4) a substantial part of the events or omissions giving rise to the Complaint occur within this judicial district. *See Atlanta & F.R. Co. v. W. Ry. Co. of Ala.*, 50 F. 790, 791 (5th Cir. 1982); *Ass'n of Cmty. Cancer Ctrs. v. Azar*, 509 F. Supp. 3d 482 (D. Md. 2020).

## BACKGROUND

### I.     The Head Start Program.

36.     Through the Head Start program, the Department of Health and Human Services provides funding for educational and related services to low-income families of preschool-age children. *See* 42 U.S.C. §§9831 et seq.; *see, e.g.*, *Doe v. Woodard*, 912 F.3d 1278, 1286 n.2 (10th Cir. 2019) ("Head Start primarily functions as an educational institution for very young children"); *Morse v. N. Coast Opportunities, Inc.*, 118 F.3d 1338, 1339 (9th Cir. 1997) ("The Head Start program is devoted to providing quality pre-school education to needy children").

37.     The statutorily-defined purpose of the Head Start program is "to promote the school readiness of low-income children by enhancing their cognitive, social, and emotional development[.]" 42 U.S.C. §9831.

38.     Studies have shown that Head Start "improves educational outcomes—increasing the probability that participants graduate from high school, attend college, and receive a post-secondary degree, license, or certification." Diane Whitmore Schanzenbach and Lauren Bauer, *The long-term impact of the Head Start program*, Brookings (Aug. 19, 2016), https://brook.gs/3lQ6JNY.

39.     The Head Start program funds public, non-profit, and for-profit agencies that provide preschool education. 42 U.S.C. §§9833, 9836(a).

40.     The Administration for Children and Families, a federal agency within the Department of Health and Human Services, has primary responsibility for overseeing the Head Start program.

41.     The Biden Administration has described Head Start educators as "essential workers who have been on the frontlines in the pandemic." *See* President Biden Announces Vaccine Priority for Child Care, Head Start, and Early Childhood Settings, Office of Head Start, Mar. 3, 2021, https://bit.ly/3rCcMJz.

42.     States have direct and indirect interests in the Head Start grant program. Some States, like Georgia and Utah directly participate as grantees. PI Exs. B, O. They are directly regulated by the Head Start Mandate and must either comply at considerable expense or lose their funding.

43.     Some States also enforce Head Start standards. *Id.* They will "be required to collect individual health information on staff that are funded through this grant," an endeavor for which the federal government provides no additional funding. PI Ex. B at 2.

44.     All States have Head Start programs, which are important safety-net education programs for pre-school aged children that improve educational readiness for entry into Kindergarten, but also provide critical health care and social support resources to families that States would have to find funding to backfill.

45.     State funding is often blended into funding for these programs, and this program funding is often blended into school district funding. Losing federal funding will upset local school

district budgets and place new demands on local and state governments to find funding to support these programs to keep them open. *See* PI Ex. P.

46.     Head Start funds sometimes go directly to public schools that have preschool programs. *See* PI Exs. C, G, P. These Head Start programs are often "funded with different sources of state, federal, and local dollars." PI Ex. P at 2.

47.     At these public schools, qualifying low-income students are funded by Head Start and others are funded locally. These public schools anticipate that the Head Start Mandate will mean that they will have to segregate the low-income students and force them to wear masks while the other students are allowed to breathe freely. PI Ex. I at 2. In other words, as one Head Start Director explained, "the Head Start children, mostly 'disadvantaged or poverty level,' children would be the only children in the school wearing masks. Not only is this stigmatizing them, but it is also a form of segregation." *Id.*

48.     States have deeply entrenched and intertwined interests in the Head Start Program.

49.     For example, Head Start programs have been operating in Alaska since 1965. There are currently 17 Head Start and Early Head Start programs in Alaska. These Head Start programs belong to one of two regions: Region X (Alaska, Washington, Oregon, and Idaho) and Region XI, which is specifically for Native populations (12 Tribal Grantees). The Alaska Department of Education and Early Development is charged with the statutory duty to exercise general supervision over pre-elementary schools that receive direct state or federal funding. Alaska Stat. §14.07.020(a)(8).

50.     The Alaska Department of Education and Early Development also has the regulatory authority to review and approve applications for Head Start programs seeking to operate in

Alaska and the authority to conduct onsite or remote monitoring of pre-elementary schools, including Head Start programs. 4 AAC 60.036; 4 AAC 60.039.

51.    The Commonwealth of Kentucky has approximately 400 Head Start centers operating within its borders, many of which partner with public schools districts staffed by public employees. *See* Head Start Center Locator, *available* at https://perma.cc/CS9D-NBCA; Head Start in Kentucky, *available* at https://perma.cc/668A-CL4D. According to the Kentucky Head Start Association, Kentucky Head Start programs received $185,763,527 in federal funds in fiscal year 2021. These funds support the attendance of 15,167 children in Head Start programs and approximately 2,402 children at Early Head Start programs. *See id.* These programs also employ 4,631 paid staff who work in 1,151 classrooms throughout Kentucky. *Id.*

52.    Kentucky also commits state funding to pre-school programs. Each year, school districts and Head Start programs enter into full utilization agreements to coordinate services to eligible children to avoid duplication of preschool services with the goal of serving as many children as possible. The Head Start Mandate threatens to upset this balance and place more burden on Kentucky to fund pre-school programs with state funds.

53.    According to the Department of Health and Human Services' Tracking Accountability in Government Grants System website, entities in Ohio, including the Ohio Department of Education, received more than $392 million in Head Start funding in fiscal year 2021. Tracking Accountability in Government Grants System, https://taggs.hhs.gov/ (select "Advanced Search" and enter award title "Head Start" and Legal Entity State "Ohio"). As of 2019, more than 34,000 low-income Ohio children enrolled in Head Start funded programs. *See*, Head Start Program Facts: Fiscal Year 2019, Department of Health and Human Services, https://bit.ly/3J3Jytq (last visited Dec. 16, 2021).

54.     States have long relied on Head Start as an integral part of their safety net and education services. *See, e.g.*, PI Ex. C.

55.     Nearly every State has an office that works with the federal government, pursuant to the creation of State and National Collaboration Offices authorized by Section 642B(a)(2)(A) of the Head Start Act, 42 U.S.C. 9837b. According to the Head Start Collaboration 2016 Annual Report, 22 States had Head Start Collaboration Offices inside their Departments of Education, while 15 were located in State Departments of Human or Social Services, 3 were in Departments of Commerce or Workforce Development, and 7 were in other State offices. *See*, Head Start Collaboration Annual Report 2016, https://bit.ly/3dSiuyW.

56.     Louisiana's Early Childhood Care and Education Advisory Council, for example, was created though 2014 La. Acts 868 to inform policies related to the unification launched by 2021 La. Acts. 3, which unified expectations for child care, Head Start, and pre-kindergarten programs.

57.     States also have *parens patriae* interests in protecting some of the most vulnerable people in their communities: children in poverty.

58.     Congress charged the Secretary of Health and Human Services with certain administrative responsibilities related to the Head Start program. *See id.* §9836a.

59.     Specifically, Congress delegated to the Secretary limited authority to "modify" Head Start performance standards. *Id.* §9836a(a)(1). The Secretary's power to modify standards includes—as invoked here—the authority to "modify, as necessary, program performance standards by regulation … including … administrative and financial management standards; standards relating to the condition and location of facilities … and … such other standards as the Secretary finds to be appropriate." *Id.* §9836a(a)(1)(C)-(E).

60.     Congress expressly prohibited the Secretary, in modifying standards, from doing anything that "result[s] in the elimination of or any reduction in quality, scope, or types of … services required to be provided" under the law as of 2007. *Id. §*9836a(a)(2)(C)(ii).

61.     Congress also required the Secretary to "take into consideration ... the unique challenges faced by individual programs, including those programs that are seasonal or short term and those programs that serve rural populations." *Id.* §9836a(a)(2)(B)(x).

## II.     The Biden Administration's Vaccine and Mask Policy.

62.     As President-Elect, Mr. Biden promised he "d[id]n't think [vaccination] should be mandatory" and "wouldn't demand it be mandatory." Jacob Jarvis, *Fact Check: Did Joe Biden Reject Idea of Mandatory Vaccines in December 2020*, Newsweek (Sept. 10, 2021), https://bit.ly/3ndyTn5. Once he took office, his Administration's policy was: "The government is not now, nor will we be supporting a system that requires Americans to carry a [vaccine] credential." *See* Press Briefing by Press Secretary Jen Psaki, April 6, 2021, https://bit.ly/3rBJVoL. At the time, the Administration conceived of the federal executive's role as ensuring that "Americans' privacy and rights [were] protected" and that the vaccine rollout is "not used against people unfairly." *Id.* Even as recently as this summer the Biden Administration continued to disclaim authority to mandate that Americans get a COVID-19 vaccine. *See, e.g*., Press Briefing by Press Secretary Jen Psaki, July 23, 2021, https://bit.ly/3pWnJVr (mandating vaccines "not the role of the federal government").

63.     Mr. Biden also took the position that the federal executive power to mandate masks was narrow. He explained that, as President, "I cannot mandate people wearing masks." *Transcript of CNN Presidential Town Hall with Joe Biden*, CNN, Sept. 17, 2020, https://cnn.it/3rFcxNZ. Rather, he said the President could mandate masks only on federal property and in federal buildings:

"On Federal land, I'd have the authority. If you're on Federal land, you must wear a mask. In a Federal building, you must wear a mask and we could have a fine for them not doing it." *Id.*; *see also Read the full transcript of Joe Biden's ABC News town hall*, ABC News, Oct. 15, 2020, https://abcn.ws/3dpbidj. ("you can't mandate a mask"). As President-Elect, Mr. Biden explained that he would, upon taking office, "require masks *everywhere I can*," which meant only on federal land. Joe Biden (@JoeBiden), Twitter (Dec. 9, 2020, 8:59 a.m.), https://bit.ly/3dmWYC4 (emphasis added); *see also Executive Order 13991 of January 20, 2021: Protecting the Federal Workforce and Requiring Mask-Wearing*, 86 Fed. Reg. 7045 (Jan. 25, 2021).

64.     As Defendants acknowledge, the Administration for Children and Families "initially chose, among other actions, to allow Head Start programs to decide whether or not to require staff vaccination rather than require vaccination." 86 Fed. Reg. at 68054.

65.     But as time passed, the President announced that his "patience" began "wearing thin" with those "who haven't gotten vaccinated." White House, Remarks by President Biden on Fighting the COVID-19 Pandemic (Sept. 9, 2021), https://bit.ly/3Ey4Zj6. He expressed similar disdain for those who opposed mask mandates, calling their concerns "ugly" and "wrong." *Id.*

66.     So, in early September 2021, the Administration abandoned persuasion for brute force and announced an unprecedented series of federal mandates, aimed at compelling most of the adult population of the United States to get a COVID-19 vaccine and at expanding mask mandates. *Id.* His program sought to "increase vaccinations among the unvaccinated with new vaccination requirements" and to "increas[e] masking." *Id.*; *see also* The White House, *Path Out of the Pandemic: President Biden's Covid-19 Action Plan*, https://bit.ly/3adkMXx; The White House, *Vaccination Requirements Are Helping Vaccinate More People, Protect Americans from COVID-19, and Strengthen the Economy* (Oct. 7, 2021), https://bit.ly/3lorbp0.

67.     In part, those vaccine and masking requirements include the policy challenged here. In his September address, President Biden announced that he would impose—through unilateral executive action—a vaccine mandate on "all of nearly 300,000 educators" in Head Start programs. Biden Sept. 9, 2021 Remarks, *supra*.

68.     In announcing those mandates, President Biden declared that he was "tak[ing] on elected officials and states" and that he would "use my power as President to get them out of the way." *Id.*

## III.    The Head Start Mandate.

69.     Over two months later, on November 30, 2021, HHS published an interim final rule requiring (1) vaccination of Head Start staff, volunteers, and anyone else who comes in contact with Head Start children and (2) masking of all Head Start children two years or older and all adults. *See Vaccine and Mask Requirements To Mitigate the Spread of COVID–19 in Head Start Programs*, 86 Fed. Reg. 68052 (Nov. 30, 2021).

70.     The Head Start Mandate's vaccine requirement demands that a wide range of Head Start personnel—all staff, all contractors who come into contact with or provide direct services to children and families, and all volunteers in classrooms or working directly with children—submit to full Covid vaccination. 86 Fed. Reg. at 68101; 45 C.F.R. §§1302.93(a)(1), 1302.94(a)(1). It adopts the moving standard of "fully vaccinated" as defined by the CDC, which currently means the primary doses of an approved vaccine. *See* 86 Fed. Reg. at 68060.

71.     Other than those who can establish a medical exception and those entitled to accommodation under existing federal law, the Mandate provides no alternative to vaccination. 45 C.F.R. §§1302.93(a)(1); 1302.94(a)(1). The Mandate does not offer a testing alternative for those unwilling to submit to vaccination. *See id.* For those who qualify for an exemption, the Program must conduct, track, and document testing weekly (at least) and is not provided funds to do so.

72.     The Head Start Mandate's masking requirement forces all children two years old and older, and all adults, to wear masks (1) "indoors in a setting when Head Start services are provided," (2) "for those not fully vaccinated"—which includes all preschool-age children—"outdoors in crowded settings or during activities that involve sustained close contact with other people," and (3) in a Head Start vehicle with another person. 86 Fed. Reg. at 68101; 45 C.F.R. §1302.47(b)(5)(vi). The mask must cover the person's chin, mouth, and nose. 86 Fed. Reg. at 68060 ("the Toddler Mask Mandate").

73.     Children and adults may take off their masks only when eating, drinking, or napping. 45 C.F.R. §1302.47(b)(5)(vi). They may not show their faces to each other in any other circumstances. *See id.*

74.     Programs are required to provide masks using existing funds or American Rescue Plan funds (while they last), which may not have been distributed to them.

75.     Effective "immediately" as of publication of the Mandate, teachers are required to enforce the Toddler Mask Mandate with corrective measures under threat of teacher discipline. Specifically, the Mandate dictates that teachers implement "reminders and reinforcements to comply with this new practice," while also abiding "by the Standards of Conduct outlined in 1302.90 Personnel Policies in the Head Start Program Performance Standards, namely that staff, consultants, contractors, and volunteers implement positive strategies to support children's well-being and do not use harsh disciplinary practices that could endanger the health and safety of children." 86 Fed. Reg. 68060.

76.     All adults and toddlers must submit to the mask requirement unless they are already protected by federal disability law, a religious exemption, or "a child's health care provider advises

an alternative face covering to accommodate the child's special health care needs." *Id.* §1302.47(b)(5)(vi)(C)-(D).

77.    Beyond that, the Toddler Mask Mandate requires anyone at a Head Start program—including parents visiting, dropping their children off, or picking them up—to wear masks.

78.    The Head Start Mandate includes no exception for people with natural immunity.

79.    The Head Start Mandate includes no exception for people who test negative for Covid before entering school each day. While those who fall into preexisting exceptions must submit to testing, anybody else who tests negative—no matter how often—must nonetheless submit to the vaccine and masking requirements.

80.    HHS made the Mandate's masking requirements enforceable immediately and the vaccine requirements enforceable on January 31, 2022. 86 Fed. Reg. at 68052. A person is considered fully vaccinated two weeks after completing a primary vaccination series, which can itself take several weeks to complete. *Id.* at 68060.

81.    The Office of Head Start is advising staff and volunteers who want to keep their jobs to get their first Moderna shot by January 3, their first Pfizer shot by January 10, or their single Johnson & Johnson shot by January 31. *Vaccine and Mask Requirements to Mitigate the Spread of COVID-19 in Head Start Programs* at 15, Office of Head Start (Dec. 2, 2021), https://bit.ly/3Gw4Sp8.

82.    And while the deadlines are fixed, issues arising with these vaccines continues to develop. Notably, within days from the time this Mandate was issued, the CDC conducted an emergency meeting to review new data and update recommendations on the Johnson & Johnson vaccine. That meeting resulted in a committee of advisors to the CDC recommending against using

the Johnson & Johnson vaccine due to concerns about blood clots. The CDC has also, as of December 14, 2021, updated its Fact Sheet on the risks of this vaccine to individuals 18 years and older. *See* Coronavirus (COVID-19) Update: December 14, 2021; https://bit.ly/3qadGux.

83.     The definition of fully vaccinated depends on the CDC's definition, so it could soon include more shots—and, as noted above, may exclude some shots. *See id.*; *see also* Lexi Lonas, *Fauci says changing definition of fully vaccinated to include boosters is 'on the table'*, The Hill (Nov. 24, 2021), https://bit.ly/3Iyczgp.

84.     If a Head Start provider does not comply with the Mandate, the Secretary must initiate proceedings to terminate its funding. 42 U.S.C. §9836a(e)(1)(C).[1]

## IV.     HHS's Bypass of Notice and Comment.

85.     In enacting the Mandate, HHS evaded the APA's notice-and-comment requirements. *Id.* at 68058.

86.     HHS invoked the following reasons for evading the APA's notice-and-comment requirements:

a.     HHS cited the number of Covid cases, particularly of the Delta variant. *Id.* at 68058. Specifically, HHS said that Covid cases, hospitalizations, and deaths were higher than they were at some point about six months earlier, although it acknowledged a "trend downward" in recent months. *Id.* HHS also pointed to "potential increases" in some states—particularly "northern states." *Id.*

---

[1] The governing provision states that "[i]f the Secretary determines … that a Head Start agency … fails to meet the standards described in subsection (a)(1) … the Secretary shall … initiate proceedings to terminate the designation of the agency unless the agency corrects the deficiency." The "standards described in subsection (a)(1)" are those that HHS purports to be making in enacting the Mandate. *See* 86 Fed. Reg. 68053.

    b.   HHS pointed to the "large COVID–19 wave in the winter of *2020*," combined with the fact that "30 percent of people aged 12 years and older" were not fully vaccinated as of November 2021. *Id.* at 68058 (emphasis added).

    c.   HHS invoked certain data concerning vaccine effectiveness. *Id.* HHS repeatedly emphasized its view that "COVID–19 vaccines are a key component in controlling the COVID–19 pandemic" and are "highly effective." *Id.* at 68059. It also emphasized that the vaccines are effective against the Delta variant. *Id.*

    d.   HHS cited the vaccines' effectiveness against asymptomatic infection, as demonstrated in a study ending on August 14, 2021, along with "[e]merging evidence" that vaccinated people "have the potential to be less infectious" in transmitting the Delta variant. *Id.* at 68059.

    e.   HHS relied on the "failure to achieve sufficiently high levels of vaccination based on voluntary efforts and patchwork requirements, potential harm to children from unvaccinated staff, continuing strain on the health care system, and known efficacy and safety of available vaccines." *Id.*

87.    HHS acknowledged that the Mandate derived from President Biden's September speech, which was 82 days before it published the Mandate. *Id.* at 68069.

**V.    HHS's Claimed Statutory Authority.**

88.    HHS purports to derive the authority for the Mandate from a single statutory provision. *See* 86 Fed. Reg. 68053; 42 U.S.C. §9836a(a)(1)(C)-(E). In truth, that statutory provision gives HHS only limited administerial power to modify performance standards.

89.    That sole provision relied on by HHS states that:

The Secretary shall modify, as necessary, program performance standards by regulation applicable to Head Start agencies and programs under this subchapter, including …

(C) administrative and financial management standards;

(D) standards relating to the condition and location of facilities (including indoor air quality assessment standards, where appropriate) for such agencies, and programs, including regulations that require that the facilities used by Head Start agencies (including Early Head Start agencies and any delegate agencies) for regularly scheduled center-based and combination program option classroom activities … shall meet or exceed State and local requirements concerning licensing for such facilities; and … shall be accessible by State and local authorities for purposes of monitoring and ensuring compliance, unless State or local laws prohibit such access; and

(E) such other standards as the Secretary finds to be appropriate.

*Id.* §9836a(a)(1)(C)-(E).

90.     The statute expressly forbids HHS to modify standards in any way that reduces the quality or scope of any Head Start services. As the statute provides, the Secretary, "[i]n developing any modifications to standards," must "ensure that any such revisions in the standards will not result in the elimination of or any reduction in quality, scope, or types of health, educational, parental involvement, nutritional, social, or other services required to be provided under such standards as in effect on December 12, 2007." *Id.* §9836a(a)(2)(C)(ii).

## VI.   HHS's Omissions.

91.     HHS did not address why it delayed its rulemaking for 82 days after the President's speech.

92.     HHS does not explain whether the "substantial health benefits," 86 Fed. Reg. at 68064, it accounts for the effects of vaccines over time. *See* Barbara A. Cohn, *SARS-Cov-2 vaccine protection and deaths among US veterans during 2021*, Science (2021), https://bit.ly/307PLCP (reporting that within six months, efficacy of vaccines against infection declined to 13% (Johnson & Johnson), 43% (Pfizer), and 58% (Moderna)). *See also* Ex. S.

93.     HHS did not explain why it did not require toddlers to wear masks in the Head Start program before now, including when case numbers were higher and everybody was unvaccinated and despite President-elect Biden stating in December 2020, that he would require masks "everywhere [he] can." Joe Biden (@JoeBiden), Twitter (Dec. 9, 2020, 8:59 a.m.), https://bit.ly/3dmWYC4. HHS also did not explain why it would require masks now despite the fact that such a requirement was not mentioned in President Biden's COVID-19 action plan. That plan described mandatory vaccination in Head Start and increased penalties for failing to abide by other mask mandates. *See* The White House, *Path Out of the Pandemic: President Biden's Covid-19 Action Plan*, https://bit.ly/3adkMXx.

94.     HHS did not explain why it failed to consider the alternative of natural immunity. Emerging studies and experts support the conclusion that natural immunity can afford benefits comparable to or better than vaccination. *See* PI Ex. S at 19-22; *see also*, e.*g.,* Sivan Gazit et al., *Comparing SARS-CoV-2 natural immunity to vaccine-induced immunity: reinfections versus breakthrough infections*, Medrxiv (Aug. 25, 2021), https://bit.ly/3DnKzIZ ("This study demonstrated that natural immunity confers longer lasting and stronger protection against infection, symptomatic disease and hospitalization caused by the Delta variant of SARS-CoV-2, compared to the BNT162b2 two-dose vaccine-induced immunity. And it is unclear if vaccination of an individual who has natural immunity will provide any perceptible benefit in fighting future infection.").

95.     HHS acknowledged that closing programs harms children and families, even resulting in increased incidents of domestic violence, but did not acknowledge that many programs have been open for months and would close or lose capacity to serve their existing enrollment of children *as a result of the Mandate*. In light of the Mandate's identification of which programs

closed and when they reopened and how, HHS appears to have readily available information regarding the impact of the Mandate on already-open programs, but did not engage with this issue at all.

96.     HHS acknowledged Head Start is a critical feature of early childhood education but did not acknowledge that States' have relied upon and aligned their early childhood educations programs with Head Start programming. *See, e.g.* Louisiana's Birth to Five Early Learning & Development Standards, Dep't of Education, https://bit.ly/3p0JRwQ (discussing the importance of early childhood for school readiness and later school success).

97.     HHS did not evaluate impairment to children who are English as a Second Language learners, or the corresponding impact on the public school systems caused to this population when programs close due to the Mandate.

98.     HHS did not consult with States or acknowledge that closure of programs due to the Mandate will cause children to lose critical early childhood educational opportunities, which will impair academic and social performance and retention rates and increase referrals to special education, all of which will cause short term and long term harm to the State's most vulnerable residents and will cost the States more in remediating for these lost programs.

99.     HHS did not engage with research that shows that unnecessary corrective and negative interaction with Toddlers, as it acknowledges will likely occur with two and three years olds due to the Toddle Mask Mandate, results in a loss of teaching time and impairs the bonding relationship between the teacher and the child.

100.     HHS did not address or engage with hygiene issues created by requiring two and three year olds to wear masks.

101.     HHS did not engage with the actual cost or accessibility of tests in the short or long term, and the likely impairment to Programs caused by the diversion of funds or inability to backfill the lack of or eventual loss of funds to pay for masks or tests.

102.     Though several rulings had already been issued raising serious constitutional concerns about federal vaccine mandates, HHS did not engage at all with this series of recent decisions enjoining these mandates as unlawful.[2]

103.     HHS did not address its legal basis for adding new conditions to a pre-existing grant program without any directive from Congress.

## VII.  The Targeted Workers and Children.

104.     According to HHS, the Head Start Mandate targets 273,000 staff, up to one million volunteers, and up to 864,289 children at America's 20,717 Head Start Centers. 86 Fed. Reg. at 68068-69, 68077. It applies to the staff regardless of whether they work in-person or remotely.

105.     HHS's "baseline scenario" estimated that 55,121 staff were unvaccinated. *Id.* at 68078. On that assumption, combined with HHS's estimate of 29,953 staff who would submit to the Mandate, 25,169 staff would remain unvaccinated. Even with HHS's assumption that 13,650 staff would receive an exemption, *id.* at 68094, the Mandate would cause Head Start programs to fire 11,519 staff. If those same proportions held as to volunteers, the Mandate would cause Head Start programs to banish 42,000 volunteers. (The National Head Start Association Survey provides data suggesting Head Start programs may lose 50% of their staff, or up to 60,000 people.)

---

[2] *See BST Holdings, L.L.C. v. Occupational Safety & Health Admin., United States Dep't of Lab.*, 17 F.4th 604 (5th Cir. 2021) (enjoining OSHA vaccine mandate); *Missouri v. Biden*, No. 4:21-CV-01329-MTS, 2021 WL 5564501 (E.D. Mo. Nov. 29, 2021) (enjoining CMS vaccine mandate); *Louisiana v. Becerra*, No. 3:21-CV-03970, 2021 WL 5609846 (W.D. La. Nov. 30, 2021) (enjoining CMS vaccine mandate); *Kentucky v. Biden*, No. 3:21-CV-00055-GFVT, 2021 WL 5587446, (E.D. Ky. Nov. 30, 2021) (enjoining federal-contractor vaccine mandate); *Georgia v. Biden*, No. 1:21-CV-163, 2021 WL 5779939 (S.D. Ga. Dec. 7, 2021).

106.    HHS's "lower-bound scenario" estimated that 30 percent of staff are unvaccinated, five percent would be entitled to exemptions, and ten percent would submit to the Mandate. *Id.* at 68077-78. The remaining 45,500 paid staff would be fired and 151,500 willing volunteers would be banished from Head Start programs. *Id.* This "lower-bound" estimate that 30 percent of staff are unvaccinated is based on data showing that among adult Americans, 30 percent are unvaccinated. *See id.*

107.    On either assumption, the Head Start Mandate's vaccine requirements would force tens of thousands of staff and volunteers to submit to the vaccination against their wishes—or, as HHS puts it, become "fully vaccinated attributable to the interim final rule." *Id.* at 68078. And on either assumption, the Head Start Mandate prohibit tens of thousands of staff and volunteers from providing critical services to vulnerable children.

108.    The National Head Start Association surveyed Head Start programs and found that at 20% of Head Start programs, less than half of the staff is vaccinated. PI Ex. A at 3. At another 31% of Head Start programs, between 50% and 70% of the staff is vaccinated. *Id.*

109.    The National Head Start Association's survey showed that over one-fourth of Head Start programs anticipate losing more than 30% of their staff. *Id.* All told, the results indicated that "Head Start programs stand to lose between 46,614 and 72,422 staff." *Id.*

110.    Because the Head Start Mandate's vaccine requirements will apply to everybody who the CDC considers to be not "fully vaccinated," it could soon apply to hundreds of thousands more staff and volunteers. Only about 25 percent of American adults have chosen to take a third shot, and none have received a fourth shot. *See* Ed Browne, *Americans Aren't Getting Enough Booster Shots, and It's Causing a Serious Problem* (Dec. 7, 2021), https://bit.ly/3IB7zYr. Meanwhile, the Toddler Mask Mandate would force practically all of the 864,289 children subject to it

to either submit to masking, expend funds they may not have to obtain medical exemptions, or surrender their preschool education.

111.     The Head Start Mandate creates conflicts between programs' compliance with State and federal laws, and requires participants to give up rights protected by State law.

112.     For example, in Louisiana, parents and students would be denied their State law right to opt-out of a vaccine requirement for any reason. *See* La. R.S. 17:150(E). In other States, such as Montana, Alabama, and Florida, Programs would be placed in direct conflict with state law prohibitions on vaccine mandates. *See, e.g.*, Mont. H.B. 702 (2021); Ala. Act. 2021-493 §1(a); Fla. H.B. 1B (2021).

113.     The Mandate conflicts with Alaska Constitution and Alaska statutes. Alaskans' fundamental right to privacy is enshrined in Alaska Constitution Article I, Section 22. The Alaskan's fundamental right to privacy protects their ability to make decisions about medical treatment for themselves and their minor children unless there is no less restrictive alternative. Further, the State of Alaska enacted a statute that grants its citizens the right to refuse COVID-19 vaccination based on religious, medical, and other grounds, and no person may require documentation or justification for the refusal. Sec. 17, ch. 2, SLA 2021. *See also,* §§381.00317, 112.0441, 381.00319.

114.     And the Head Start Mandate would force all of the 273,000 staff and nearly one million volunteers to either submit to masking or leave Head Start. HHS did not estimate or apparently even examine how many children, staff, or volunteers would leave the program due to the Head Start Mandate.

115.     As Defendants admit, enforcing the Toddler Mask Mandate will require frequent staff physical corrective intervention: "It should be noted that like all new skills, children will need to be taught the proper way to put a mask on and keep a mask on. While children are adaptable,

they are still in the early stages of development and may need reminders and reinforcements to comply with this new practice." 86 Fed. Reg. at 68,060. Reports from those on the frontlines confirm the obvious: "It is extremely difficult and labor-intensive to enforce a mask mandate on three and four year old children, who are very active and do not understand why they should wear a mask." PI Ex. C. at 3.

**VIII.    The Implications for Children and Families.**

116.    As a result of the Head Start Mandate, staff and volunteers will likely leave the Head Start program. As a natural and foreseeable result, certain providers will close and children from low-income families in affected areas will be denied access to the preschool education that Congress guaranteed them and children who are denied access to preschool education will miss out on crucial years of development. Those programs that do not close entirely still may have to decrease enrollment capacity to meet teacher-student ratios. Parents will have to leave their jobs or hire others to take care of them. And States and local school boards will have to immediately address the impairment to early-childhood education program alignment with entry into Kindergarten programs.

117.    The National Head Start Association's survey of Head Start programs found that the closures would be worse than the Mandate anticipated. "When asked if classrooms would need to close if the vaccine mandate was implemented on January 31," as it is scheduled to be, a full 50% of respondents said "yes." PI Ex. A at 3. Another 32% were "unsure." *Id.* Only 18% said no. *Id.* As the survey acknowledged, if even just the first 50% of programs "have to close classrooms when the mandate goes into effect, the survey results suggest that 1,324 classrooms will close." *Id.*

118.    Staff, public school superintendents, and Head Start Directors bear witness to the extent of destruction that the Mandate will cause.

119.    Many Head Start staff across America are like Lisa Sanburn. Ms. Sanburn, a Head Start Teacher's Assistant, has worked at the same Head Start program in Grant Parish for 17 years. *See* PI Ex. M at 1. She and her fellow teachers "love this program," and "work on our own time, after hours to better provide for our students." *Id.* at 2. "Like a lot of teachers, we don't stop caring for and worrying about our students when the bell strikes at the end of the day. We take them home with us in our hearts." *Id.* But when the Head Start Mandate was announced, both Sanburn and the lead teacher in her program "applied for and were denied religious exemptions from the vaccine mandate." *Id.* They are the only two teachers at their program and now, unless the Mandate is enjoined, will be fired before Christmas. *Id.* "Those students who are under our care will either return from Christmas break to teachers they do not know or they won't be able to return at all." *Id.* And for what? "We don't want anything more than to be able to do our jobs." *Id.*

120.    Tammie Slayter, a Head Start Teacher, has worked for Head Start for twenty years. PI Ex. N at 1. She "do[es] not feel comfortable receiving" the COVID-19 vaccine. *Id.* at 2. She applied for a religious exemption and was effectively denied when she was told that she would be placed on administrative leave or "considered to have voluntarily resigned" if she had not submitted to the first dose of a vaccine by December 17, 2021. *Id.* Her firing is all the more arbitrary in light of the fact that her program remains *closed* due to damage that it sustained in Hurricane Laura. *Id.*

121.    Amanda Gros, a Head Start Teacher, reports that her job and the job of the only other Head Start staff at her center have already been posted for new applicants because the two of them will not submit to the Mandate. PI Ex. L at 1-2. "[W]e are being told to choose between

our jobs where we serve kids that we love and our principles which are our right to believe in," and as a result, "the center will likely temporarily close." *Id.*

122.    Jami Jo Thompson is a public school superintendent with extensive Head Start partnerships, including Head-Start-funded students within her public schools. PI Ex. C at 1. "Immediately upon notification of this possible mandate, staff indicated that they would not take the vaccine and that they believe it is a violation of their human rights for us to try to force the vaccine on them." *Id.* at 2. She anticipates that her staff will either resign or be fired. *Id.* "Ultimately, if we cannot staff our program, we cannot keep it running." *Id.* She also worries that her program may receive its $178,000 in annual federal funding. *Id.*

123.    Jeff Powell, Superintendent of the Rapides Parish School Board, which serves 628 Head Start children, explained that "[a]pproximately twenty percent of my staff members and volunteers currently do not meet the mandate" and "[t]he loss of just one of these staff members means that we will not be able to provide the same amount and quality of care to our families and students as before the rule." PI Ex. E at 2.

124.    Similarly, Wes Watts, Superintendent of the West Baton Rouge Parish School System, explained that the Mandate "is likely to achieve the exact opposite" of its stated purpose of "ensur[ing that early childhood centers safely remain open." PI Ex. D at 2. He anticipates that the Mandate will force programs to exclude needy children due to staff shortages. *Id.*

125.    Head Start Directors report that "Staff members and volunteers have advised [them] that they are prepared to quit should their exemptions from vaccination not be granted," PI Ex. F at 2, and that "a number of vital staff … have decided not to be vaccinated and may not meet an exemption or be agreeable to weekly testing" and have "advised [them] that they are prepared to resign due to this mandate," PI Ex. I at 3; *see also* PI Ex. Q at 3. They predict that they will lose

around "35% of staff due to this mandate." PI Ex. I at 3. In the end, they "will have to shut down classrooms and, in some cases, entire centers[.]" PI Ex. J at 2. One Head Start Director reports that "the program sees the potential of losing approximately 42-49% of its staff" due to the Mandate unless they all receive exemptions. PI Ex. G at 2.

126.    Another Director reports that the program has already "lost three staff members since the mandate was shared with the staff" and if the Mandate goes into full effect, they "will lose between 27-30% of our existing families and children [they] serve." PI Ex. H at 2; *see also* PI Ex. O at 5-6 ("To date at least 3 full time staff have submitted resignations based on the Biden Administration Head Start COVID 19 vaccine and mask requirements. More resignations are anticipated.").

127.    A recent news report highlighted a Head Start preschool serving 164 children, where "[m]ore than half of the licensed teaching staff has told [the principal] they will not get vaccinated." Chad Frey, *Vaccine mandate affecting Newton Head Start staff*, The Kansan (Nov. 9, 2021), https://bit.ly/3oB1dQL. The principal anticipated that such an exodus would force the preschool to close. *Id.*

128.    A recent survey of 28 Head Start grantees from the Executive Director of the Kentucky Head Start Association returned alarming results. Approximately 35% of those grantees reported that they had 89% or less of their full staffing levels. Grantees surveyed anticipated firing approximately 17% of the staff who will refuse to be vaccinated and not qualify for an exemption, creating or exacerbating staffing shortages. The 14 grantees responding to the survey also estimated that approximately 40% of contractors and other service providers—*e.g.* specialist mental health providers, and occupational therapist—will not comply with the Head Start Mandate by the

January 31, 2022 deadline causing a deterioration of the quality and scope of services offered to Head Start children.

129.     With only 54% of the Kentucky population vaccinated and no state or school vaccination mandates, the Head Start Mandate will cause staffing shortages at Head Start Programs in Kentucky and the loss of critical services to some of Kentucky's most vulnerable citizens, particularly in rural areas where rates are lower than the state average. *See* Kentucky Covid-19 Vaccination Dashboard, https://perma.cc/V9RL-9GY5 (click on "View Dashboard") (last visited Dec. 14, 2021).

130.     The Head Start Mandate will also impact many Kentucky school districts partnering with Head Start grantees for on-site classrooms and services. These school districts employ support staff, including cafeteria workers, bus drivers and janitorial staff that come into contact with children in Head Start programs. These employees are not currently subject vaccination requirements, and some will not voluntarily agree to get a vaccine. In fact, Kentucky grantees surveyed stated that around 50% of the school district partners will refuse to comply with the Head Start Mandate, and approximately 34% may withdraw from current contracts, agreements or MOUs with Head Start programs. Consequently, a significant number of Head Start programs at these school district locations cannot continue to offer Head Start services if forced to comply with the Head Start Mandate.

131.     These programs will not be able to replace these teachers. The requirements for being hired by Head Start are often more strenuous than those for being hired by a public school, but the pay is lower. *See* PI Exs. C, D, E, F, Q. The process for hiring new staff takes considerable time at any time, let alone in the middle of the school year. *See* PI Exs. F at 3, G at 3; R at 5. Furthermore, many Head Start programs already are suffering from a tight labor market and were

unable to fill open positions before the Mandate. PI Exs. G. at 2; J at 3; P at 4; R at 4. When they finally find teachers to whom they want to offer jobs, those teachers sometimes refuse to accept specifically because of the Mandate. *See* PI Ex. G at 2.

132.    As the superintendent of the Iberville Parish School System, Arthur M. Joffrion, Jr., attested, "[w]e cannot, as Head Start representatives cavalierly suggested to us a zoom call about this new rule, 'just get rid of the ones who won't get vaccinated and use their salaries to advertise for someone better to fill their position.' That is a ridiculous suggestion on its face and especially in light of the teacher shortage across the nation." PI Ex. P at 4. In fact, his district has "the highest starting salaries of any Parish in Louisiana and yet there are still [preexisting] vacancies. Our teachers and assistants are not so easily replaced." *Id.*

133.    Even putting aside the exodus of irreplaceable teachers, the Mandate will cause Head Start programs to reduce their services or close because of the compliance costs that it imposes. The Head Start programs will have to make budget cuts to pay for gathering medical records, enforcing vaccination schedules, buying masks for the low-income children who will be forced to wear them, and supplying tests for their exempted staff and volunteers. *See, e.g.*, PI Ex. E. at 3 ("Whether we comply or not, centers will be forced to make drastic cuts on programming in order to implement the mandate from existing funds."); *id.* at 2 ("We cannot afford to spend that much money a week on testing 20% of our staff indefinitely."); *see also* PI Exs. D, E.

134.    As Joffrian explained, "the regulatory, logistical, and administrative costs associated with the development of policies and documentation of exemptions surrounding compliance would be sky high." PI Ex. P at 3. He anticipates being forced to "make drastic cuts on programming in order to implement the mandate from existing funds or risk losing our funds entirely if we don't comply." *Id.* at 4. Because his programs "would be forced to comply or lose funding," and

because compliance itself is so costly, "that is really just a choice between slowly shutting down and shutting down immediately." *Id.* <u>at 3.</u>

135.    As HHS acknowledges, these hardships will fall disproportionately on members of minority communities. In 2019, "37% of Head Start children were Hispanic or Latino," "30% were Black or African American, 10% were biracial or multiracial, 4% were American Indian or Alaska Native, and 2% were Asian." 86 Fed. Reg. at 68098. Affected non-student populations are similarly diverse: "71 percent of families, and 69 percent of staff, self-identify as Hispanic/Latino, Black/African American, American Indian, or Alaska Native." *Id.* at 68056.

136.    Some parents will likely remove their child from Head Start programs due to the Toddler Mask Mandate. When New York imposed a similar mask mandate in September, parents "withdr[ew] their children from the [covered] day care and [were] looking other options to avoid masking." *See* Tyler Brown, *Day care says parents are removing kids due to state masking mandate*, ABC/WHAM (Sept. 16, 2021), https://bit.ly/3y8ltMU. In other places, parents have quit their jobs to homeschool their children to ensure that the children are not forced to mask. *See, e.g.*, Kailey Schuyler, *Parents pulling students out of school systems due to mask mandates*, WAFF/NBC (Aug. 15, 2021).

137.    Head Start directors explain that "[i]t is not only the vaccine mandate that would cause an exit of staff and children, but the federal masking mandate as well." PI Ex. I at 3. "Many parents," they report, "are upset about the masking mandate." PI Ex. G at 3. Thus, "many parents have threatened to remove their children from SUU Head Start if the Biden Administration requirements become mandatory." PI Ex. O at 6. And as one director explained, "[t]he majority of our parents do not want their young children masked and no schools in our local service area masked children below middle school." PI Ex. I at 3.

138.    For those who are required to comply, the Toddler Mask Mandate may cause psychological and health problems. As Pediatric Nurse Anthony Luczak attests, it is "fundamentally important in development for children to see the faces of their peers and caregivers," "I have had to treat cases of children with mask related medical issues," and "reinforcement of wearing masks because of the threat of the pandemic is a reinforcement of fear that directly is triggering a toxic stress in children's lives." PI Ex. T at 3-4.

139.    The World Health Organization itself has concluded that "based on the safety and overall interest of the child and the capacity to appropriately use a mask," "children aged 5 years and under should not be required to wear masks." *Coronavirus disease (COVID-19): Children and masks*, World Health Organization (Aug. 21, 2020), https://bit.ly/3Gxzg2n.

140.    Studies show that masking children is not effective in stemming the spread of Covid-19 and poses other risks to children, especially toddlers. *See, e.g.,* Krista Conger, *Surgical masks reduce COVID-19 spread, large-scale study shows*, Stanford Medicine (Sept. 1, 2021), https://stan.md/3s9nkjs (showing no statistically significant difference in wearing cloth masks vs. nothing at all); Suresh K. Sharma et al., *Efficacy of cloth face mask in prevention of novel coronavirus infection transmission: A systematic review and meta-analysis*, 9 J. Educ. Health Promot. 192 (2020), https://bit.ly/3E0F8jk ("Cloth masks show minimum efficacy in source control"); *Coronavirus disease (COVID-19): Children and masks*, World Health Organization (Aug. 21, 2020), https://bit.ly/3Gxzg2n. ("An international and multidisciplinary expert group brought together by WHO reviewed evidence on COVID-19 disease and transmission in children and the limited available evidence on the use of masks by children. Based on this and other factors such as childrens' psychosocial needs and developmental milestones, WHO and UNICEF advise the following: Children aged 5 years and under should not be required to wear masks.").

141.    By requiring masks, the Toddler Mask Mandate will inhibit speech or language-impaired children, autistic children, deaf children, staff, and volunteers—who rely on seeing the faces of those with whom they interact in order to communicate—from experiencing a complete and inclusive preschool education. *See* PI Ex. T; *also, e.g.*, Deepa Shivaram, *New normal of masks is an 'added barrier' for deaf and hard-of-hearing community*, NBC News (May 23, 2020), https://nbcnews.to/3pHBply.

142.    At the end of the day, children will lose their teachers, their educational development will be set back, low-income parents will be forced to quit their jobs, and communities will suffer the effects for a long time to come. *See* PI Exs. F at 3, J at 3, K at 2-3; O at 6; T at 3-4.

## IX.    Harm to the Plaintiff States.

143.    Plaintiff States repeat and incorporate by reference each of the Complaint allegations stated above. The Head Start Mandate causes irreparable harm to the States' most vulnerable residents: underprivileged children in Head Start programs. It threatens the jobs of trained and certified Head Start teachers, who cannot be easily replaced, and it threatens irreparable harm to the Plaintiff States, who have all expended untold resources in support of early childhood education program alignment with educational standards for K-12 education.

144.    The Head Start Mandate will make it more difficult for States to "enhance collaboration and coordination of Head Start services by Head Start agencies with other entities providing early childhood education and development . . . , health care, mental health care, welfare, child protective services, education and community service activities, family literacy services, reading readiness programs (including such programs offered by public and school libraries), services relating to children with disabilities, other early childhood education and development for limited English proficient children and homeless children, and services provided for children in foster care

and children referred to Head Start programs by child welfare agencies." 42 U.S.C. §9837b(a)(4)(B)(i). That is because, among other reasons, many entities with which Head Start programs collaborate and coordinate, particularly in rural communities, do not impose vaccination and masking requirements as demanded by the Head Start Mandate.

145.    The Head Start Mandate will make it more difficult for States to "promote partnerships between Head Start agencies, State and local governments, and the private sector to help ensure that children from low-income families, who are in Head Start programs or are preschool age, are receiving comprehensive services to prepare the children for elementary school." 42 U.S.C. §9837b(a)(4)(C). That is because, among other reasons, many private, state, and local entities with which Head Start programs collaborate and coordinate, particularly in rural communities, do not impose vaccination and masking requirements as demanded by the Head Start Mandate.

146.    The Head Start Mandate will make it more difficult for States to "identify other resources and organizations (both public and private) for the provision of in-kind services to Head Start agencies." 42 U.S.C. §9837b(a)(4)(G). That is because, among other reasons, the Head Start Mandate will prohibit in-kind services from organizations that do not impose the same vaccination and masking requirements and from individuals (including volunteers) who do not comply with the same vaccination and masking requirements.

147.    Based on their own statements: School closures, heightened stress, loss of income, and social isolation are all stressors that increase the risk for child abuse and neglect, and program closures contribute to disruption of service access for Head Start children, "who often experience trauma and are most in need of the consistent care, education, and comprehensive services that Head Start provides." 86 Fed. Reg. 68057.

148.     According to the HHS, research also indicates Early Head Start can serve as a child abuse and neglect prevention program, and these programs are "known to help prevent child abuse" and "provide supports to families experiencing domestic violence (2.5 percent or 24,000 families in 2019 OHS data." *Id*. at 68057-58. The closure of Head Start programs in Plaintiff States, by HHS's own admission, increases risk of these irreparable harms to vulnerable children. Correspondingly, the burden is increased on State and local governments to respond to these societal harms.

149.     Plaintiff States also suffer irreparable harm from the loss of their ability to consult and comment before the imposition of a Mandate with such drastic implications for their educational systems and their citizens.

## CLAIMS FOR RELIEF

### COUNT I
### The Head Start Mandate Is Beyond the Executive Branch's Authority
### (5  U.S.C. §706)

150.     Plaintiff States repeat and incorporate by reference each of the Complaint allegations stated above.

151.     Courts must "hold unlawful and set aside agency action" that is "not in accordance with law" or "in excess of statutory ... authority." 5 U.S.C. §706(2)(A), (C).

152.     The Head Start Mandate is a final agency action.

153.     The Head Start Mandate is a federal action involving issues of major economic, social, and political significance. The Mandate affects approximately a million children and hundreds of thousands of staff and volunteers. It also impacts hundreds of millions of dollars in funding and disrupts the education of children at a critical developmental period in their lives and impairs alignment of early childhood education programs across the country and specifically in

Plaintiff States. Certainly, this is a decision of vast economic and political significance. *Louisiana v. Becerra*, 2021 WL 5609846, at \*11 (W.D. La. Nov. 30, 2021).

154.    Because the Mandate triggers the major questions doctrine, it must be authorized by a clear statement of unambiguous congressional intent. *Ala. Ass'n of Realtors v. Dep't of Health & Hum. Servs.*, 141 S. Ct. 2485, 2489 (2021); *BST Holdings, L.L.C. v. Occupational Safety & Health Admin.*, 17 F.4th 604, 617 (5th Cir. 2021). The Executive cannot "bring about an enormous and transformative expansion in [its] regulatory authority without clear congressional authorization." *Util. Air Regulatory Grp.*, 573 U.S. at 324; *see also Brown & Williamson Tobacco Corp.*, 529 U.S. at 159 (rejecting Executive claim to "jurisdiction to regulate an industry constituting a significant portion of the American economy" absent clear congressional authorization). Yet the Mandate does precisely that. This lack of statutory authorization is doubly fatal because "Congress does not casually authorize administrative agencies to interpret a statute to push the limit of congressional authority," *Solid Waste Agency of N. Cook Cty. v. U.S. Army Corps of Eng'rs*, 531 U.S. 159, 172-73 (2001), particularly when the Executive's action would threaten to alter "the constitutional balance between the National Government and the States," *Bond v. United States*, 572 U.S. 844, 862 (2014).

155.    Neither the Head Start Act nor any other provision of law contains the necessary clear statement to authorize the Head Start Mandate, which pushes the limits of congressional power under the Nondelegation Doctrine, exceeds the limits of congressional power under the Spending Clause, intrudes into an area of traditional State control, and implicates a question of major social, political, and economic importance.

156.    The provision of the Head Start Act that HHS cites as authority for the Mandate comes nowhere close to the clear statement needed to authorize this major federal action.

157.     HHS asserts that Section 641A of the Act authorizes the Mandate. But the cited provision only authorizes the Secretary to "modify, as necessary ... administrative and financial management standards," "standards relating to the condition and location of facilities (including indoor air quality assessment standards, where appropriate) for such agencies, and programs," and "such other standards as the Secretary finds to be appropriate." 42 U.S.C. §9836a(a)(1)(C)-(E). This provision does not grant express authority to impose the Head Start Mandate.

158.     Such a mandate is not an "administrative and financial management standard[]."

159.     It is not a "standard relating to the condition and location of facilities," which, as the specification of "indoor air quality assessment" demonstrates, refers to physical conditions and locations of Head Start facilities rather than conditions on participation, employment, and volunteer eligibility.

160.     Finally, the general "other standards as the Secretary finds to be appropriate" clause cannot be relied upon as authority given the major questions implicated and the difference between a vaccine and masking mandate and the other authorities specifically enumerated. *See Louisiana v. Becerra*, 2021 WL 5609846, at *10 (W.D. La. Nov. 30, 2021) ("Not only do the statutes not specify such superpowers, but principles of separation of powers weigh heavily against such powerful authority being transferred to a government agency by general authority."); *see also id.* at *7 ("The Court stated the Applicants had made a compelling argument that, although 29 U.S.C. 655 gave broad authority to OSHA, to avoid 'giving unintended breadth to Acts of Congress' the Court should use the principle of 'noscitur a sociis'—meaning, a word is known by the company it keeps—to limit OSHA's authority.") (quoting *BST Holdings*, 17 F.4th at 613).

161.     Furthermore, in enacting the Head Start Mandate, the Secretary is not "modifying, as necessary" any standards. *See* 42 U.S.C. §9836a(a)(1). The word "modify" refers to a much

more limited action. It means "(1) "To make somewhat different; to make small changes to (something) by way of improvement, suitability, or effectiveness;" (2) "To make more moderate or less sweeping; to reduce in degree or extent; to limit, qualify, or moderate;" or (3) "To describe the or limit the meaning of." *Modify*, Black's Law Dictionary (10th ed. 2014); *see also* Random House Dictionary of the English Language 1236 (2d ed. 1987) ("to change somewhat the form or qualities of; alter partially; amend"); Webster's Third New International Dictionary 1452 (1981) ("to make minor changes in the form or structure of: alter without transforming"); 9 Oxford English Dictionary 952 (2d ed. 1989) ("[t]o make partial changes in; to change (an object) in respect of some of its qualities; to alter or vary without radical transformation").

162. In *MCI Telecommunications Corp. v. American Telephone & Telegraph Co.*, 512 U.S. 218 (1994), the Supreme Court held that a statute authorizing the Federal Communications Commission to "modify any requirement" for tariff filing did not authorize the challenged regulation because it effected a fundamental change rather than a "modification." The Court relied heavily on the narrowing function of the word "modify" in the authorizing statute. It explained that "[v]irtually every dictionary we are aware of says that 'to modify means to change moderately or in a minor fashion." *Id.* at 225. It cited those dictionaries at length and then concluded that "'[m]odify,' in our view, connotes moderate change." *Id.* at 228. The Secretary here thus cannot claim to be acting pursuant to his authority to "modify" performance standards when he enacts sweeping and unprecedented mandates dictating the private medical decisions of hundreds of thousands of people and effectively exiling a substantial number of educators and children.

163. Because the Head Start Act does not clearly authorize the Head Start Mandate, the Executive Branch has acted "in excess" of its constitutional and statutory authority. 5 U.S.C. §706(2)(C).

## COUNT II
### The Head Start Mandate Is Contrary to Law
### (5  U.S.C. §706; 42 U.S.C. §9836a)

164.    Plaintiff States repeat and incorporate by reference each of the Complaint allegations stated above.

165.    Courts must "hold unlawful and set aside agency action" that is "not in accordance with law" or "in excess of statutory ... authority." 5 U.S.C. §706(2)(A), (C).

166.    The purpose of the Head Start program is "to promote the school readiness of low-income children by enhancing their cognitive, social, and emotional development." 42 U.S.C. §9831.

167.    The Head Start Act has been reauthorized several times for the purpose of expanding eligibility and enrollment. *See, e.g.*, Improving Head Start for School Readiness Act of 2007 (P.L. 110-134).

168.    The Head Start Mandate is contrary to the Head Start Act because it would decrease Programs and student enrollment, which would harm the school readiness of low-income children.

169.    The Head Start Mandate is contrary to the Head Start Act because it would decrease staff and volunteer levels, which would harm the school readiness of low-income children. *See* 42 U.S.C. §9831.

170.    The Mandate violates 42 U.S.C. §9836a(a)(2)(B)(x), which requires the Secretary to "take into consideration ... the unique challenges faced by individual programs, including those programs that are seasonal or short term and those programs that serve rural populations." Although the Secretary specifically included a statement regarding the Mandate's Tribal impact, the Secretary nowhere mentions the Mandate's impact on rural areas or States where programs will close or lose capacity as a result of the Mandate.

43

171.    The Mandate violates 42 U.S.C. §9836a(2)(A), which requires that the Secretary "shall consult with experts in the fields of child development, early childhood education, child health care, family services (including linguistically and culturally appropriate services to non-English speaking children and their families), administration, and financial management, and with persons with experience in the operation of Head Start programs." The Secretary did not do so. And his consultation with "experts in child health, including pediatricians, a pediatric infectious disease specialist, and the recommendations of the CDC and FDA," 86 Fed. Reg. at 68054, comes nowhere close to meeting §9836a(2)(A)'s specific requirements. HHS also failed to meet §9836a(2)(A)'s requirements because it failed to disclose who specifically it actually consulted.

172.    The Mandate violates 42 U.S.C. §9836a(a)(2)(C)(ii), which requires the Secretary to "ensure that any such revisions in the standards will not result in the elimination of or any reduction in quality, scope, or types of health, educational, parental involvement, nutritional, social, or other services required to be provided under such standards as in effect on December 12, 2007." By excluding children who do not comply with the Mandate and reducing eligible staff and volunteers, the Mandate will result in the reduction of the quality, scope, and types of health, education, parental involvement, nutrition, social, and other services provided to students.

173.    The Mandate violates 42 U.S.C. §9836a(b)(3)(B)'s fundamental command that measures promulgated under the authority of Section 641A "shall not be used to exclude children from Head Start programs." That is *precisely* the Mandate's design—the exclusion of children of parents who refuse to have their children comply with the masking requirement.

## COUNT III
## The Head Start Mandate Violates the APA's Notice-and-Comment Requirement
### (5  U.S.C. §706)

174.    Plaintiff States repeat and incorporate by reference each of the Complaint allegations stated above.

175.    A "reviewing court shall ... hold unlawful and set aside agency action ... found to be ... without observance of procedure required by law." 5 U.S.C. §706(2)(D).

176.    The Head Start Mandate is a final agency action and legislative rule that requires notice-and-comment rulemaking procedures under the APA.

177.    HHS acknowledges that the Mandate is a legislative rule that normally would have to go through the APA's notice-and-comment procedures. 86 Fed. Reg. at 68058.

178.    HHS acknowledges that the Mandate was promulgated without notice-and-comment procedures.

179.    HHS relies on the APA's "good cause" exception to exempt the Mandate from notice-and-comment rulemaking. 86 Fed. Reg. at 68058.

180.    An agency may employ the APA's good-cause exception only when notice-and-comment procedures are "impracticable, unnecessary, or contrary to the public interest." 5 U.S.C. §553(b)(3)(B).

181.    "The 'good cause' exception in 5 U.S.C. 553 is read narrowly to avoid providing agencies with an escape clause from the" APA's "notice and comment requirements." *Louisiana v. Becerra*, 2021 WL 5609846, at *9 (W.D. La. Nov. 30, 2021).

182.    "The good cause exception [is] 'meticulous and demanding,' 'narrowly construed,' 'reluctantly countenanced,' and evoked only in 'emergency situations.'" *Id.* (quoting *Sorenson Commc'ns Inc. v. F.C.C.*, 755 F.3d 702, 706 (D.C. Cir. 2014)).

183.    HHS's justification for avoiding notice and comment comes nowhere close to meeting the stringent good-cause standard. HHS states that although "COVID-19 cases, hospitalizations and deaths have begun to trend downward at a national level," notice and comment must be avoided because of the "threat to the country's progress on the COVID-19 pandemic" posed by the unvaccinated. 86 Fed. Reg. at 68058-59.

184.    HHS's justification amounts to no more than a generalized desire for immediate implementation of the Mandate. But this is precisely the justification court have repeatedly rejected. *See, e.g.*, *United States v. Johnson*, 632 F.3d 912, 929 (5th Cir. 2011) ("[T]he good cause exception should not be used to circumvent the notice and comment requirements whenever an agency finds it inconvenient to follow them."); *Ass'n of Cmty. Cancer Ctrs. v. Azar*, 509 F. Supp. 3d 482, 498 (D. Md. 2020) ("[A]n agency may not dispense with notice and comment procedures merely because it wishes to implement what it sees as a beneficial regulation immediately. Agencies presumably always believe their regulations will benefit the public. If an urgent desire to promulgate beneficial regulations could always satisfy the requirements of the good cause exception, the exception would swallow the rule and render notice and comment a dead letter.").

185.    This Court and the Fifth Circuit have rejected precisely the same claims of exemption from APA and other notice-and-comment requirements. *See BST Holdings*, 17 F.4th at 611-12 ("The Mandate's stated impetus—a purported "emergency" that the entire globe has now endured for nearly two years, and which OSHA itself spent nearly two months responding to—is unavailing as well."); *Louisiana v. Becerra*, 2021 WL 5609846, at *10 (W.D. La. Nov. 30, 2021) ("It took CMS almost two months, from September 9, 2021 to November 5, 2021, to prepare the interim final rule at issue. Evidently, the situation was not so urgent that notice and comment were not required. It took CMS longer to prepare the interim final rule without notice than it would have

taken to comply with the notice and comment requirement. Notice and comment would have allowed others to comment upon the need for such drastic action before its implementation."). Indeed, courts across the country have rejected agency reliance on the good-cause exception for COVID-19 measures. *See Florida v. Becerra*, 2021 WL 2514138, at *45 (M.D. Fla. June 18, 2021); *Regeneron Pharms., Inc. v. H.H.S*, 510 F. Supp. 3d 29, 48 (S.D.N.Y. 2020); *Chamber of Com. of the U.S. v. D.H.S.*, 504 F. Supp. 3d 1077, 1094 (N.D. Cal. 2020); *Ass'n of Cmty. Cancer Ctrs. v. Azar*, 509 F. Supp. 3d 482, 496 (D. Md. 2020).[3]

186.    As courts, including this Court and the Fifth Circuit, have consistently held, *see supra*, HHS's generalized desire to immediately publish the Mandate comes nowhere close to meeting the APA's good-cause standard. Accordingly, the Head Start Mandate is unlawful because it was promulgated without the notice-and-comment procedures required by the APA.

### COUNT IV
### The Head Start Mandate Is Arbitrary and Capricious
### (5  U.S.C. §706)

187.    Plaintiff States repeat and incorporate by reference each of the Complaint allegations stated above.

188.    Under the APA, a court must "hold unlawful and set aside agency action" that is arbitrary or capricious or otherwise not in accordance with law or contrary to the Constitution. 5 U.S.C. §706(2)(A).

189.    "Federal administrative agencies are required to engage in reasoned decision-making." *Louisiana v. Becerra*, 2021 WL 5609846, at *12 (W.D. La. Nov. 30, 2021).

---

[3] Further undermining HHS's emergency rationale is the fact that the Mandate was subjected to OIRA review under Executive Order 12866. That means HHS views compliance with an Executive Order as more important than compliance with the APA's mandatory statutory procedures for transparency and public involvement in rulemaking.

190.    "[A]gency action is lawful only if it rests on a consideration of the relevant factors" and "important aspects of the problem." *Michigan v. EPA*, 576 U.S. 743, 750-52 (2015) (requiring "reasoned decisionmaking"). This means agencies must "examine all relevant factors and record evidence." *Am. Wild Horse Pres. Campaign v. Perdue*, 873 F.3d 914, 923 (D.C. Cir. 2017).

191.    Further, agencies must actually analyze the relevant factors. "'Stating that a factor was considered ... is not a substitute for considering it.'" *Texas v. Biden*, 10 F.4th 538, 556 (5th Cir. 2021). The agency must instead provide more than "conclusory statements" to prove it considered the relevant statutory factors. *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2127 (2016).

192.    The Head Start Mandate is arbitrary and capricious for several independently sufficient reasons.

193.    *First*, the Mandate will decrease eligible students, staff, and volunteers, undermining the Head Start Act's focus on student enrollment, education, and wellbeing. *See* 42 U.S.C. §9831. Indeed, soon after the Mandate came out, the National Head Start Association conducted a survey to examine the Mandate's impact. The results: 26% of programs anticipate losing more than 30% of their staff and 60% anticipate losing from 10% to 20% of their staff. According to the NHSA survey, on average, Head Start could lose 22% of its total workforce, amounting to 60,000 staff and teachers. When asked if classrooms would need to close if the Mandate was implemented on January 31, 50% of the programs said yes. The survey results indicate 1,324 classrooms will close. *See* PI Ex. A.

194.    Each prong of the President's vaccination policy is aimed at the same overarching goal: increasing individual vaccination rates in society. *See* Remarks by President Biden on Fighting the COVID-19 Pandemic" (Sept. 9, 2021), https://bit.ly/3oI0pKr (Head Start Vaccine

Mandate part of President's plan to "increase vaccinations among the unvaccinated with new vaccination requirements"); The White House, *Path Out of the Pandemic: President Biden's Covid-19 Action Plan*, https://bit.ly/3adkMXx. This policy comes at the expense of exacerbating staff shortages. *Cf. Louisiana v. Becerra*, 2021 WL 5609846, at *12 ("The Plaintiff States further maintain the goal of the CMS Mandate is to increase individual vaccine rates, which will actually have the effect of harming patient well-being due to staff shortages of providers and suppliers.").

195.    As discussed above, the Mandate would cause Head Start programs to fire thousands of staff and ban thousands of volunteers from serving at Head Start programs. The staff and volunteer shortages caused by the Mandate will have a detrimental effect on child education. *See, e.g.*, Chad Frey, *Vaccine mandate affecting Newton Head Start staff*, The Kansan (Nov. 9, 2021), https://bit.ly/3oB1dQL; Adam Kurtz, *Mayville State University's Head Start program could be impacted by vaccine mandate*, Grand Forks Herald (Dec. 9, 2021), https://bit.ly/3oFENOA ("Van Horn said he was concerned about being able to maintain services for all of those children if the mandate remains in place.").

196.    Beyond that, the Toddler Mask Mandate would force practically all of the 864,289 children subject to it to either submit to masking or surrender participation in Head Start. And HHS did not indicate how many children, staff, or volunteers would leave the program due to the Mandate. The inevitable drop in students whose parents are unwilling to comply with the Mandate's requirements will undermine the Act's central focus on maintaining student enrollment. *See* 42 U.S.C. §9836a(b)(3)(B) ("Such measures shall not be used to exclude children from Head Start programs."); *See* Tyler Brown, *Day care says parents are removing kids due to state masking mandate*, ABC/WHAM (Sept. 16, 2021), https://bit.ly/3y8ltMU; Kailey Schuyler, *Parents pulling students out of school systems due to mask mandates*, WAFF/NBC (Aug. 15, 2021).

197.    The Mandate ignores that mask wearing is not in the best interest of children, and subordinates students' interests—the purpose of the Act—to the Administration's vaccination and masking rules. *Coronavirus disease (COVID-19): Children and masks*, World Health Org. (Aug. 21, 2020), https://bit.ly/3Gxzg2n.

198.    The Mandate also ignores the best interest of speech and language impaired, autistic, or deaf children from experiencing a complete preschool education. *See, e.g.*, Deepa Shivaram, *New normal of masks is an 'added barrier' for deaf and hard-of-hearing community*, NBC News (May 23, 2020), https://nbcnews.to/3pHBply. Indeed, the Mandate never once mentions the interests of deaf students and is generally dismissive of all impaired students and the disparate impact of the Mandate on this population. *But see* 42 U.S.C. §9836a(b)(2)(F) ("The measures under this subsection shall ... provide for appropriate accommodations for children with disabilities.").

199.    The Mandate also ignores another statutorily mandated factor—its disparate impact on rural areas. *See* 42 U.S.C. §9836a(a)(2)(B)(x) (the Secretary must "take into consideration ... the unique challenges faced by individual programs, including those programs that are seasonal or short term and those programs that serve rural populations").

200.    The Mandate ignores the disparate impact of program closures or limited opportunities on minorities.

201.    *Second*, HHS failed to consider or arbitrarily rejected obvious alternatives to vaccine and masking requirements.

202.    Emerging studies increasingly indicate natural immunity affords benefits comparable to or better than vaccination. Some experts have suggested that natural immunity is both superior to and more durable than the vaccines. *See, e.g.*, Sivan Gazit et al., *Comparing SARS-CoV-2 natural immunity to vaccine-induced immunity: reinfections versus breakthrough infections*,

Medrxiv (Aug. 25, 2021), https://bit.ly/3DnKzIZ ("This study demonstrated that natural immunity confers longer lasting and stronger protection against infection, symptomatic disease and hospitalization caused by the Delta variant of SARS-CoV-2, compared to the BNT162b2 two-dose vaccine-induced immunity. And it is unclear if vaccination of an individual who has natural immunity will provide any perceptible benefit in fighting future infection."); Yair Goldberg, et al., *Protection of previous SARS-CoV-2 infection is similar to that of BNT162b2 vaccine protection: A three-month nationwide experience from Israel*, Medrxiv (Apr. 24, 2021), https://bit.ly/3n8uXTe; *see also, e.g.*, Martin Kuldorff and Jay Bhattacharya, *The ill-advised push to vaccinate the young*, The Hill (June 17, 2021), https://bit.ly/2Z2ZpX6; R. R. Goel et al., *mRNA vaccines include durable immunity to SARS-CoV-2 and variants of concern*, Science (Oct. 14, 2021), https://bit.ly/3DXLS1K ("[B]oosting of pre-existing immunity from prior infection with mRNA vaccination mainly resulted in a transient benefit to antibody titers with little-to-no long-term increase in cellular immune memory."). And a highly reported study from Israel involving review of 74,000 cases of infection concluded that a person with natural immunity is 27 times less likely to be reinfected than a vaccinated person. *See* Sivan Gazit, Roei Shlezinger, et al., *Comparing SARS-CoV-2 natural immunity to vaccine-induced immunity: reinfections versus breakthrough infections*, MEDRXIV (Aug. 30, 2021), https://bit.ly/3FjArCG. Additional studies support this conclusion.[4]

---

[4] *See* Dr. Michel C. Nussenzweig, Senior Physician, *Natural infection versus vaccination: Differences in COVID antibody responses emerge*, THE ROCKEFELLER UNIV. (Aug. 24, 2021), https://bit.ly/3ojdfNz; Don W. Hackett, Robert Carlson, M.D., *Natural Immunity After Covid-19 Found Durable and Robust*, PRECISION VACCINATIONS (updated Aug. 2, 2021), https://bit.ly/30goyOE; Sharon Reynolds, *Lasting immunity found after recovery from COVID-19*, NAT'L INST. OF HEALTH (Jan. 26, 2021), https://bit.ly/3kPYFwb.

203.    HHS's Mandate is arbitrary because it fails to even consider or mention natural immunity as an alternative to vaccination or mask wearing. *Cf. Louisiana v. Becerra*, 2021 WL 5609846, at *13 ("The rejection of natural immunity as an alternative is puzzling."); *see also BST Holdings*, 17 F.4th at 615 ("[A] naturally immune unvaccinated worker is presumably at less risk than an unvaccinated worker who has never had the virus.").

204.    *Third*, the Head Start Mandate is arbitrary and capricious because its rationales are flagrantly pretextual. As recounted above, the President has stated several times that the Head Start Mandate is part of a broader program aimed at increasing vaccination rates throughout American society, writ large. The Mandate, however, eschews this rationale and tries (unsuccessfully and after-the-fact) to pigeonhole the Mandate into the Head Start Act's statutory factors. Such obvious regulatory reframing of the Mandate here leads to the inescapable conclusion that the Mandate's stated rationale is pretextual. And the presence of such blatant pretext is enough to render the Mandate arbitrary and capricious. *Dep't of Com. v. New York*, 139 S. Ct. 2551, 2575-76 (2019); *see also Louisiana v. Becerra*, 2021 WL 5609846, at *14 ("[T]he 46-page CMS Mandate does not even mention President Biden's declaration of a national vaccine mandate. The presence of pretext is enough to render a rule arbitrary and capricious."). What's more, as this Court has found, the Administration's shifting rationales across all vaccine mandates demonstrate pretext. *See Louisiana v. Becerra*, 2021 WL 5609846, at *14. For example, the OSHA ETS declares that vaccines are necessary to protect worker safety. And the CMS Mandate purported to focus on patient safety. But those rationales would not be sufficient under the Head Start Act. So HHS manufactured a new rationale to cram the mandate into the Head Start Act. Accepting HHS's description of the Head Start Mandate requires this Court to "'exhibit a naiveté from which ordinary citizens are free.'" *Dep't of Com. v. New York*, 139 S. Ct. at 2575-76.

205.   *Fourth*, the Head Start Mandate completely ignores State reliance interests. Plaintiff States have substantial reliance interests in the functioning of Head Start programs, which are often administered by public entities. Specifically, the Mandate ignores: (1) the Plaintiff States' reliance interests in public and private Head Start programs continuing to operate under existing rules without facing this new Mandate that threatens to cause significant harm to the States' children, particularly minorities and children in rural and low-income communities; (2) Head Start providers' similar reliance interests in staffing their facilities under the existing rules without facing this new Mandate that threatens their workforce, the services they provide, and their very existence; and (3) Head Start workers' reliance interests, especially the interests of workers in rural communities, in selecting a job and building a career under the existing rules. The Mandate is arbitrary and capricious because it utterly ignores these reliance interests. *See Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1913-14 (2020).

206.   *Fifth*, the Mandate fails to consider the uncertainty it imposes on providers due to the existence of potentially conflicting State provisions. The effects of such uncertainty are already being felt by providers. *See, e.g.*, Jeffrey S. Solochek, *Head Start providers caught in crossfire of conflicting mask, vaccine rules*, Tampa Bay Times (Dec. 9, 2021), https://bit.ly/3lT0NDA; Adam Kurtz, *Mayville State University's Head Start program could be impacted by vaccine mandate*, Grand Forks Herald (Dec. 9, 2021), https://bit.ly/3oFENOA. Due to the uncertainty surrounding the legality of the Head Start Mandate, particularly in the wake of other mandates being enjoined, providers—particularly smaller and rural providers without ready access to expert legal advice—face a conundrum about whether to follow State law or the likely void and illegal Head Start Mandate.

207.    *Sixth*, the Mandate is arbitrary and capricious because it "is staggeringly over-broad." *BST Holdings*, 17 F.4th at 615. Like the OSHA Mandate, the Head Start Mandate is "a one-size-fits-all sledgehammer that makes hardly any attempt to account for differences in" community measures, levels of transmissions, levels of hospitalization, levels of infection across communities. *Id.* at 612.

208.    *Seventh*, HHS fails to account for the fact that Head Start students often are blended with other public school students or attend school with students who are not in Head Start. Requiring Head Start toddlers to mask, while other children in the same school are unmasked, if programs remain open, will likely result in segregation of these children from others who are not subject to the Mandate, impairing the social interaction of the Head Start. This psychological and developmental impact is an important aspect of the problem that HHS failed to address.

**COUNT V**
**The Head Start Mandate Violates the Congressional Review Act**
**(5  U.S.C. §706)**

209.    Plaintiff States repeat and incorporate by reference each of the Complaint allegations stated above.

210.    The Congressional Review Act requires all rules to be submitted to Congress to allow it an opportunity to pass a resolution disapproving the rule. A "major rule" must also receive a report from the Government Accountability Office and its effective date must be delayed. 5 U.S.C. §801.

211.    HHS concedes that the Head Start Mandate is a "major rule" for purposes of the CRA. 86 Fed. Reg. at 68063. Yet it relies on the CRA's "limited exception[]" for rules which "an agency for good cause finds (and incorporates the finding and a brief statement of reasons therefor

in the rule issued) that notice and public procedure thereon are impracticable, unnecessary, or contrary to the public interest." 5 U.S.C. §808.

212.    For the reasons discussed as to the APA good-cause exception, HHS's dismissal of its CRA obligations comes nowhere close to meeting the exacting standards allowing a major rule to avoid the CRA's exacting procedures. *Sorenson Commc'ns*, 755 F.3d at 706 ("Deference to an agency's invocation of good cause—particularly when its reasoning is potentially capacious, as is the case here—would conflict with this court's deliberate and careful treatment of the exception in the past."); *see also* OMB, *Guidance on Compliance with the Congressional Review Act*, M-19-14 (Apr. 11, 2019) (noting APA good-cause standard applies in CRA context).

213.    Accordingly, the Head Start Mandate violates the Congressional Review Act.

## COUNT VI
### The Head Start Mandate Violates the Nondelegation Doctrine

214.    Plaintiff States repeat and incorporate by reference each of the Complaint allegations stated above.

215.    The Constitution vests Congress with all legislative powers it granted to the federal government. U.S. Const. art. 1, §1. "Congress is not permitted to abdicate or to transfer to others the essential legislative functions with which it is vested." *A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495, 529-30 (1935).

216.    If the Head Start Act authorizes the President to require Head Start programs to mandate vaccines and mask based on the amorphous term "such other standards as the Secretary finds to be appropriate," this provision lacks an intelligible principle and is thus an unconstitutional delegation of legislative power to the Executive. *See Louisiana v. Becerra*, 2021 WL 5609846, at *15 ("If CMS has the authority by a general authorization statute to mandate vaccines, they have authority to do almost anything they believe necessary, holding the hammer of termination of the

Medicare/Medicaid Provider Agreement over healthcare facilities and suppliers."). Because the word "appropriate" is not an intelligible principle, §9836a(1)(E) is an unconstitutional delegation of legislative power, is void, and therefore cannot justify the Mandate.

**COUNT VII**
**The Head Start Mandate Violates the Tenth Amendment**

217.    Plaintiff States repeat and incorporate by reference each of the Complaint allegations stated above.

218.    "The powers not delegated by the Constitution to the United States, nor prohibited by it to the States, are reserved to the States respectively, or to the people." U.S. Const. amend. X.

219.    No clause of the Constitution authorizes the federal government to impose the Head Start Mandate. Education and public health have long been recognized as an aspect of police powers reserved to the *States*, not the Federal Government. *See, e.g.*, *BST Holdings*, 17 F.4th at 617 ("[T]o mandate that a person receive a vaccine or undergo testing falls squarely within the States' police power."); *Louisiana v. Becerra*, 2021 WL 5609846, at *15; *see also Hillsborough Cty.*, 471 U.S. at 719 ("[T]he regulation of health and safety matters is primarily, and historically, a matter of local concern."); *S. Bay United Pentecostal Church v. Newsom*, 140 S. Ct. 1613 (2020) (Roberts, C.J., concurring in the denial of application for injunctive relief) (our Constitution principally entrusts "[t]he safety and the health of the people" to the politically accountable officials of the States "to guard and protect"); *United States v. Lopez*, 514 U.S. 549, 580, 115 S. Ct. 1624, 1640, 131 L. Ed. 2d 626 (1995) (Kennedy, J., concurring) ("it is well established that education is a traditional concern of the States"); *accord id.* at 564 (majority op.); *Missouri v. Jenkins*, 515 U.S. 70, 131-32 (1995) (Thomas, J., concurring) ("We have long recognized that education is primarily a concern of local authorities."); *Florida v. Becerra*, 2021 WL 2514138, at *15 (M.D. Fla. June 18, 2021)

("The history shows ... that the public health power ... was traditionally understood—and still is understood—as a function of state police power.").

220.    The Mandate expressly conflicts with State laws, rules, and policies. *See, e.g.*, Jeffrey S. Solochek, "Head Start providers caught in crossfire of conflicting mask, vaccine rules," Tampa Bay Times (Dec. 9, 2021), https://bit.ly/3lT0NDA. And as with the CMS Mandate, the Head Start Mandate purports to expressly preempt State and local provisions. 86 Fed. Reg. at 68063; *cf. Louisiana v. Becerra*, 2021 WL 5609846, at *5 ("The CMS Mandate specifically preempts state laws with regard to COVID-19 Vaccine requirements and/or exemptions.").

221.    By encroaching upon the States' traditional police powers over public health and education, particularly without clear authorization from Congress, Defendants have exceeded their authority and violated the Tenth Amendment. *See Louisiana v. Becerra*, 2021 WL 5609846, at *15 (W.D. La. Nov. 30, 2021) ("The Plaintiff States make a strong case that the CMS Mandate violates the States' police power.").

**COUNT VIII**
**The Head Start Mandate Violates the Anti-Commandeering Doctrine**

222.    Plaintiff States repeat and incorporate by reference each of the Complaint allegations stated above herein.

223.    The Tenth Amendment and structure of the Constitution deprive Congress of "the "the power to issue direct orders to the governments of the States," *Murphy v. NCAA*, 138 S. Ct. 1461, 1476 (2018), and do not tolerate the federal government commandeering State officers "into administering federal law," *Printz v. United States*, 521 U.S. 898, 928 (1997).

224.    State entities will be required to enforce the Head Start Mandate. *See, e.g.*, PI Ex. B.

225.     Accordingly, the Mandate clearly violates the anti-commandeering doctrine by re-quiring State entities to enforce the Mandate against students, employees, and volunteers.

## COUNT IX
## The Head Start Mandate Violates the Spending Clause

226.     Plaintiff States repeat and incorporate by reference each of the Complaint allegations stated above herein.

227.     "[I]f Congress intends to impose a condition on the grant of federal moneys, it must do so unambiguously," so "States [can] exercise their choice knowingly." *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981).

228.     The Head Start Act does not clearly authorize or unambiguously impose the Vac-cine Mandate or Mask Mandate. And there is no nexus whatsoever between Head Start grants and vaccine and mask requirements. *Cf. South Dakota v. Dole*, 483 U.S. 203 (1987).

229.     Accordingly, the Head Start Mandate is an unconstitutional new condition on the receipt of federal funds and is not authorized under the Spending Clause.

## COUNT X
## The Head Start Mandate Violates the Treasury and General Government Appropriations Act of 1999

230.     Plaintiff States repeat and incorporate by reference each of the Complaint allegations stated above herein.

231.     Section 654 of the Treasury and General Government Appropriations Act of 1999 requires that agencies "shall" prepare an impact assessment "[b]efore implementing policies and regulations that may affect family well-being." Public Law 105-277, 5 U.S.C. §601 note. Congress has mandated that the impact analysis meet several specific requirements including, among others, an assessment of whether the regulatory action "strengthens or erodes the authority and rights of parents in the education, nurture, and supervision of their children," whether "the action may be

carried out by State or local government or by the family," and whether "the action establishes an implicit or explicit policy concerning the relationship between the behavior and personal responsibility of youth, and the norms of society." 5 U.S.C. §601 note.

232.   HHS acknowledges that Section 654 applies to the Head Start Mandate. *See* 86 Fed. Reg. at 68062. But HHS arbitrarily rejects the need for an impact assessment with the conclusory claim that "it is not necessary to prepare a family policymaking assessment ... because [the Mandate] will not have *any* impact on the autonomy or integrity of the family as an institution." *Id.* (emphasis added).

233.   The Head Start Mandate explicitly affects "family well-being." It intrudes into fundamental decisions about whether a toddler must wear a mask at school. It also imposes obligations on parents picking children up from school. (And it is likely to result in numerous children not even having a school to attend.) It goes straight to the heart of the allocation of power between State and family.

234.   Because the Mandate affects family well-being and because HHS failed to prepare an impact analysis, the Mandate is contrary to Section 654 of the Treasury and General Government Appropriations Act of 1999 and must be vacated.

## PRAYER FOR RELIEF

**NOW, THEREFORE,** Plaintiffs request an order and judgment:

a.   Declaring, under 28 U.S.C. §2201, that the Head Start Mandate is arbitrary and capricious and unlawful under the APA;

b.   Declaring, under 28 U.S.C. §2201, that the Head Start Mandate is contrary to law and in excess of statutory authority under the APA;

c.  Declaring, under 28 U.S.C. §2201, that the Head Start Mandate violates the APA because it was promulgated without notice and comment;

d.  Declaring that the Head Start Mandate violates the Constitution;

e.  Holding the Head Start Mandate is unlawful and vacating it;

f.  Preliminarily and permanently enjoining, without bond, Defendants from imposing Head Start Mandate;

g.  Tolling the Head Start Mandate's compliance deadlines pending judicial review;

h.  Granting all other relief to which Plaintiff States are entitled, including but not limited to attorneys' fees and costs

Dated:   December 21, 2021

Respectfully submitted,

By:*/s/ Elizabeth B. Murrill*

ELIZABETH B. MURRILL (La #20685)
  Solicitor General
J. SCOTT ST. JOHN (La #36682)
  Deputy Solicitor General
MORGAN BRUNGARD*
JOSIAH KOLLMEYER (La #39026)
  Assistant Solicitors General
LOUISIANA DEPARTMENT OF JUSTICE
1885 N. Third Street
Baton Rouge, Louisiana 70804
Tel: (225) 326-6766
murrille@ag.louisiana.gov
stjohnj@ag.louisiana.gov
brungardm@ag.louisiana.gov
kollmeyerj@ag.louisiana.gov

*Counsel for the State of Louisiana*

STEVE MARSHALL
Alabama Attorney General
*/s/ Edmund G. LaCour Jr.*
Edmund G. LaCour Jr.*
  *Solicitor General*
Office of the Attorney General
State of Alabama
501 Washington Avenue
P.O. Box 300152
Montgomery, Alabama 36130-0152
Telephone: (334) 242-7300
Fax: (334) 353-8400
Edmund.LaCour@AlabamaAG.gov

*Counsel for the State of Alabama*

TREG R. TAYLOR
Attorney General of Alaska
*/s/ Charles E. Brasington*
Charles E. Brasington*
  *Assistant Attorney General*
State of Alaska
1031 West Fourth Avenue, Suite 200
Anchorage, AK 99501

AUSTIN KNUDSEN
Montana Attorney General
*/s/Kristin Hansen*
Kristin Hansen*
  *Lieutenant General*
David M.S. Dewhirst*
  *Solicitor General*
215 North Sanders
P.O. Box 201401
Helena, MT 59620-1401
Phone: 406-444-2026
Fax: 406-444-3549
david.dewhirst@mt.gov

*Counsel for the State of Montana*

DOUGLAS J. PETERSON
Nebraska Attorney General
*/s/ James A. Campbell*
James A. Campbell*
  *Solicitor General*
2115 State Capitol
Lincoln, NE 68509
Tel: (402) 471-2682

Phone: (907) 269-6612
charles.brasington@alaska.gov

*Counsel for the State of Alaska*

MARK BRNOVICH
Arizona Attorney General
*/s/ Robert J. Makar*
Robert J. Makar*
  *Assistant Attorney General*
2005 N. Central Ave.
Phoenix, AZ 85004
Tel: (602) 542-4389
Robert.Makar@azag.gov
ACL@azag.gov

*Counsel for the State of Arizona*

LESLIE RUTLEDGE
Arkansas Attorney General
*/s/ Dylan L. Jacobs*
Dylan L. Jacobs*
  *Assistant Solicitor General*
Office of the Arkansas Attorney General
323 Center St., Suite 200
Little Rock, AR 72201
(501) 682-2007
Dylan.Jacobs@arkansasag.gov

*Counsel for the State of Arkansas*

ASHLEY MOODY
Florida Attorney General
*/s/ Natalie P. Christmas*
Natalie P. Christmas*
  *Assistant Attorney General of Legal Policy*
Office of the Attorney General
The Capitol, Pl-01
Tallahassee, Florida 32399-1050
(850) 414-3300
(850) 410-2672 (fax)
natalie.christmas@myfloridalegal.com

*Counsel for the State of Florida*

jim.campbell@nebraska.gov

*Counsel for the State of Nebraska*

WAYNE STENEHJEM
North Dakota Attorney General
*/s/ Matthew Sagsveen___*
Matthew Sagsveen*
  *Solicitor General*
Director of Civil Litigation, Natural Resources, and Indian Affairs Division
North Dakota Office of Attorney General
600 E. Boulevard Avenue
Dept 125
Bismarck, ND 58505
masagsve@nd.gov

*Counsel for the State of North Dakota*

DAVE YOST
Ohio Attorney General
*/s/ Benjamin M. Flowers*
Benjamin M. Flowers*
  *Solicitor General*
30 E. Broad St., 17th Floor
Columbus, OH 43215
bflowers@ohioAGO.gov

*Counsel for the State of Ohio*

JOHN M. O'CONNOR
Oklahoma Attorney General
*/s/ Mithun Mansinghani*
Mithun Mansinghani*
  *Solicitor General*
Oklahoma Office of the Attorney General
313 NE 21st Street
Oklahoma City, OK 73105
Tel: (405) 522-4392
Mithun.Mansinghani@oag.ok.gov

*Counsel for the State of Oklahoma*

CHRISTOPHER M. CARR
Georgia Attorney General
*/s/ Stephen J. Petrany*
Stephen Petrany*
    *Solicitor General*
Ross W. Bergethon
    *Deputy Solicitor General*
Office of the Attorney General
40 Capitol Square, S.W.
Atlanta, Georgia 30334

*Counsel for the State of Georgia*

THEODORE E. ROKITA
Indiana Attorney General
*/s/Thomas M. Fisher*
Thomas M. Fisher*
    *Solicitor General*
Indiana Government Center South
302 W. Washington St., 5th Floor
Indianapolis, IN 46204
Tom.fisher@atg.in.gov

*Counsel for the State of Indiana*

JEFFREY S. THOMPSON
Iowa Solicitor General
*/s/ Samuel P. Langholz*
Samuel P. Langholz*
    *Assistant Solicitor General*
Office of the Attorney General
1305 E. Walnut Street
Des Moines, Iowa 50319
(515) 281-5164
jeffrey.thompson@ag.iowa.gov
sam.langholz@ag.iowa.gov

*Counsel for the State of Iowa*

DEREK SCHMIDT
Kansas Attorney General
*/s/ Shannon Grammel*
Shannon Grammel*
    *Deputy Solicitor General*
Office of the Kansas Attorney General
120 SW 10th Avenue, 2nd Floor

ALAN WILSON
South Carolina Attorney General
*/s/ Thomas T. Hydrick*
Thomas T. Hydrick*
    *Assistant Deputy Solicitor General*
Office of the Attorney General
Post Office Box 11549
Columbia, SC 29211
(803) 734-4127
thomashydrick@scag.gov

*Counsel for the State of South Carolina*

JASON R. RAVNSBORG
South Dakota Attorney General
 */s/David M. McVey*
David M. McVey*
    *Assistant Attorney General*
1302 E. Highway 14, Suite 1
Pierre, SD 57501-8501
Phone: (605) 773-3215
david.mcvey@state.sd.us

*Counsel for the State of South Dakota*

HERBERT H. SLATERY III
Attorney General and Reporter of Tennessee
*/s/Andree S. Blumstein*
Andree S. Blumstein*
    *Solicitor General*
P.O. Box 20207
Nashville, Tennessee 37202
(615) 741-3492
Andree.Blumstein@ag.tn.gov

*Counsel for the State of Tennessee*

SEAN D. REYES
Utah Attorney General
*/s/ Melissa A. Holyoak*
Melissa A. Holyoak*
    *Solicitor General*
Utah Attorney General's Office
350 N. State Street, Suite 230
P.O. Box 142320
Salt Lake City, UT 84114-2320

Topeka, Kansas 66612
Phone: (785) 296-2215
Email: shannon.grammel@ag.ks.gov

*Counsel for the State of Kansas*

DANIEL CAMERON
Attorney General
*/s/ Jeremy J. Sylvester*
Jeremy J. Sylvester*
  *Assistant Attorney General*
Office of the Attorney General
700 Capital Avenue, Suite 118
Frankfort, Kentucky 40601
Phone: (502) 696-5300
Jeremy.Sylvester@ky.gv

*Counsel for the Commonwealth of Kentucky*

LYNN FITCH
Attorney General of Mississippi
*/s/Whitney H. Lipscomb*
Whitney H. Lipscomb*
  *Deputy Attorney General*
John V. Coghlan*
  *Deputy Solicitor General*
State of Mississippi
Office of the Attorney General
550 High Street
Jackson, MS 39201
Tel: (601) 359-3680

*Counsel for the State of Mississippi*

ERIC S. SCHMITT
Attorney General of Missouri
*/s/ D. John Sauer*
D. John Sauer*
  *Solicitor General*
Missouri Attorney General's Office
Post Office Box 899
Jefferson City, MO 65102
Tel: (573) 751-8870
Fax: (573) 751-0774
John.Sauer@ago.mo.gov

*Counsel for the State of Missouri*

385.271.2484
melissaholyoak@agutah.gov

*Counsel for the State of Utah*

BRIDGET HILL
Wyoming Attorney General
*/s/ Ryan Schelhaas*
Ryan Schelhaas*
  *Chief Deputy Attorney General*
Wyoming Attorney General's Office
Attorneys for the State of Wyoming
109 State Capitol
Cheyenne, WY 82002
Telephone: (307) 777-5786
ryan.schelhaas@wyo.gov

*Counsel for the State of Wyoming*

PATRICK MORRISEY
West Virginia Attorney General
*/s/ Lindsay S. See*
Lindsay S. See*
  *Solicitor General*
State Capitol, Bldg 1, Room E-26
Charleston, WV 25305
Lindsay.s.see@wvago.gov

*Counsel for the State of West Virginia*

*\*Pro Hac Vice admission application forth-coming*