**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF LOUISIANA
MONROE DIVISION**

| | |
|---|---|
| THE STATE OF LOUISIANA, By and through its Attorney General, JEFF LANDRY; ET AL,<br><br><div align="right">PLAINTIFFS,</div><br>v.<br><br>XAVIER BECERRA, in his official capacity as Secretary of Health and Human Services; et al.,<br><br><div align="right">DEFENDANTS.</div> | CIVIL ACTION NO. 3:21-cv-4370-TAD-KDM |

**PLAINTIFFS' REPLY IN SUPPORT OF MOTIONS FOR PRELIMINARY INJUNCTION AND TEMPORARY RESTRAINING ORDER**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................... ii

I. PLAINTIFF STATES HAVE STANDING. ...............................................................1

II. NO STATUTORY AUTHORITY EXISTS. ..............................................................2

    A. *Section 9836a(a)(1) Does Not Authorize the Mandate.* .....................................2

    B. *Other Statutes and Regulations Aren't at Issue.* ................................................5

III. NOTICE AND COMMENT WAS REQUIRED. ......................................................7

IV. THE MANDATE IS CONTRARY TO LAW. ..........................................................8

V. THE MANDATE IS ARBITRARY AND CAPRICIOUS. .........................................9

VI. THE MANDATE IS UNCONSTITUTIONAL. ......................................................10

VII. THE MANDATE WILL IRREPARABLY INJURE PLAINTIFFS BY MONDAY. .........11

VIII. CONCLUSION. ............................................................................................14

# TABLE OF AUTHORITIES

Cases

*Ala. Ass'n of Realtors v. DHS*,
   141 S. Ct. 2485 (2021) ...........................................................................................................4

*Alcaraz v. Block*,
   746 F.2d 593 (9th Cir. 1984) .............................................................................................7

*Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez*,
   458 U.S. 592 (1982). ...........................................................................................................1

*BST Holdings, L.L.C. v. OSHA*,
   17 F.4th 604 (5th Cir. 2021) ...........................................................................................4, 8

*Louisiana v. Becerra*,
   20 F.4th 260 (5th Cir. 2021) ...............................................................................................4

*Louisiana v. Becerra*,
   2021 WL 5609846 (W.D. La. Nov. 30, 2021).............................................................passim

*Massachusetts v. EPA*,
   549 U.S. 497 (2007) .............................................................................................................1

*MCI Telecomms. Corp. v. Am. Telephone & Telegr. Co.*,
   512 U.S. 218 (1994) .............................................................................................................2

*Mourning v. Family Publication Servs.*,
   411 U.S. 356 (1973) .............................................................................................................3

*NRDC v. Abraham*,
   355 F.3d 179 (2d Cir. 2004) ...............................................................................................7

*Texas v. Biden*,
   10 4th 538 (5th Cir. 2021) ...................................................................................................1

*Texas v. Biden*,
   2021 WL 5882670 (5th Cir. Dec. 13, 2021)......................................................................12

*Texas v. EEOC*,
   933 F.3d 433 (5th Cir. 2019) .............................................................................................14

*Texas v. EPA*,
   829 F.3d 405 (5th Cir. 2016) .............................................................................................12

*Texas v. United States*,
   787 F.3d 733 (5th Cir. 2015) .............................................................................................14

*Texas v. United States*,
  809 F.3d 134, (5th Cir. 2015) ...........................................................................................1

*Veasey v. Abbott*,
  870 F.3d 387 (5th Cir. 2017) ...........................................................................................14

*Wages & White Lion Invs., L.L.C. v. FDA*,
  16 F.4th 1130 (5th Cir. 2021) ..........................................................................................12

*Whitman v. Am. Trucking Ass'ns*,
  531 U.S. 457 (2001) .........................................................................................................9

Statutes

42 U.S.C. §9832(21)(G)(i) ...................................................................................................5

42 U.S.C. §9836a ...........................................................................................................8, 9, 12

42 U.S.C. 9839(a), 9839(c), and 9840a(b)(9) ....................................................................6

Other Authorities

Cong. Research Serv., *Mandatory Vaccinations: Precedent and Current Laws* 9 (RS21414; May
  21, 2014) ...........................................................................................................................4

Michael Erman, *CDC recommends Moderna, Pfizer COVID-19 vaccines over J&J's*, Reuters
  (Dec. 16, 2021) .................................................................................................................10

Rules

45 C.F.R. §1302.42(b)(1) ....................................................................................................5

45 C.F.R. §1304.3-4 (1975) .................................................................................................5

Regulations

36 Fed. Reg. 2531, 2532 (Feb. 5, 1971) ..............................................................................8

40 Fed. Reg. 27561 (Jun. 30, 1975) .....................................................................................6

73 Fed. Reg. 1285, 1297 (Jan. 8, 2008) ...............................................................................6

86 Fed. Reg at 68077-78 ..................................................................................................3, 8

86 Fed. Reg. at 65052 .........................................................................................................2

86 Fed. Reg. at 68077 .........................................................................................................7

## I.  PLAINTIFF STATES HAVE STANDING.

Defendants briefly contend (Doc. 13 at 11-13) that this Court lacks jurisdiction because Plaintiff States have no standing to challenge the Head Start Mandate. But Plaintiff States satisfy every standing element. They receive "special solicitude" in the standing analysis because they assert procedural rights and allege injuries to their quasi-sovereign interests. *Massachusetts v. EPA*, 549 U.S. 497, 520 (2007); *see also Texas v. United States*, 809 F.3d 134, 151-55 (5th Cir. 2015); *Texas v. Biden*, 10 4th 538 (5th Cir. 2021). The Mandate concretely injures Plaintiff States because it (1) injures their "quasi-sovereign interest in protecting [their] citizens from being required to submit to vaccinations," *Louisiana v. Becerra*, 2021 WL 5609846, at *5 (W.D. La. Nov. 30, 2021)," (2) purports to "specifically preempt[] state law with regard to COVID-19 Vaccine requirements and/or exemptions," *id.*, (3) causes the "loss of jobs … and other damages allegedly resulting from employees being fired for refusing the vaccine and/or [Head Start] providers being terminated," *id.*; PI Exs. B-K, O, R, P, and (4) causes the direct loss of federal funding, increased compliance and enforcement expenses, and reallocation of State resources due to the loss of local programs, *see, e.g.*, PI Exs. B, M, P. [1]

Those injuries are traceable to Defendants' conduct because the Mandate's implementation causes all four harms, an "obvious link." *Louisiana*, 2021 WL 5609846, at *5.

---

[1] Defendants say that *parens patriae* standing does not exist against the federal government. Resp. 13. But *Massachusetts v. EPA* makes certain that States may assert "quasi-sovereign interest[s]" against the federal government. 549 U.S. at 520, n.17. And a State's quasi-sovereign interests encompass "the health and well-being—both physical and economic—of its residents in general." *Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez*, 458 U.S. 592, 607 (1982). Plus, Plaintiff States assert both quasi-sovereign and other independently sufficient injuries.

1

And the injuries are redressable because an injunction or restraining order will, as a matter of common sense, stop them from materializing. *See id.* at *5-*6.

## II.    NO STATUTORY AUTHORITY EXISTS.

### A.  Section 9836a(a)(1) Does Not Authorize the Mandate.

To be clear, Defendants' entire Mandate rests on a single statutory provision. *See* 86 Fed. Reg. at 65052 ("Statutory Authority"). That provision, upon which Defendants place the total weight of their transformative agenda, is about as mundane as they come. It reads:

> The Secretary shall modify, as necessary, program performance standards by regulation applicable to Head Start agencies and programs under this subchapter, including …

> (C) administrative and financial management standards;

> (D) standards relating to the condition and location of facilities (including indoor air quality assessment standards, where appropriate) for such agencies, and programs, including regulations that require that the facilities used by Head Start agencies (including Early Head Start agencies and any delegate agencies) for regularly scheduled center-based and combination program option classroom activities … shall meet or exceed State and local requirements concerning licensing for such facilities; and … shall be accessible by State and local authorities for purposes of monitoring and ensuring compliance, unless State or local laws prohibit such access; and

> (E) such other standards as the Secretary finds to be appropriate.

42 U.S.C. §9836a(a)(1)(C)-(E).

This statutory provision—allowing the Secretary to "modify" as "necessary" three categories of "standards"—does not authorize the Mandate. Start with "modify." In their whole statutory analysis, Defendants do not once mention the Supreme Court's decision in *MCI Telecommunications Corp. v. American Telephone & Telegraph Co.*, 512 U.S. 218 (1994). But that decision alone forecloses Defendants' statutory-authority claim in this case. In *MCI*, the Supreme Court explained that "[t]he dispute between the parties turns on the meaning of the

phrase 'modify any requirement.'" 512 U.S. at 225. And the phrase "modify any requirement" there—just like the phrase "modify … performance standards" in this case—arose in a statute conferring regulatory authority. *See id.*

The Supreme Court held that a statute authorizing the Executive Branch to "modify" requirements conferred only the power to enact incremental, limited, minor changes. *Id.* The petitioners had argued that the phrase "modify any requirement" should be read to "give[] the Commission authority to make even basic and fundamental changes in the scheme created by that section." *Id.* But the Supreme Court "disagree[d]" because "[t]he word 'modify'—like a number of other English words employing the root 'mod-' (deriving from the Latin word for 'measure'), such as 'moderate,' 'modulate,' 'modest,' and 'modicum'—has a connotation of increment or limitation. Virtually every dictionary we are aware of says that 'to modify' means to change moderately or in minor fashion." *Id.*

For their part, Defendants claim that "[b]inding Supreme Court case law confirms" that §9836(a)(1) instead confers "broad authority." Resp. 15. But the case law that Defendants cite addresses statutes authorizing the Executive Branch to "*prescribe* regulations" or "*make … rules and regulations,*" not to *modify* them. *Mourning v. Family Publication Servs.*, 411 U.S. 356, 361, 369 (1973) (emphases added). It is *MCI* that represents the relevant binding Supreme Court case law.

Defendants do eventually acknowledge (at 17) the possibility that the word "modify" has some limiting force. If it does, they say, then their Mandate is a mere incremental modification. *See id.* "Requiring masking of children over age two and staff vaccinations against a deadly and highly contagious disease," Defendants contend, "are two moderate improvements[.]" *Id.* But the Mandate will force at least 11,519 staff immediately to be unemployed and 29,953 more to

3

submit under duress to injections against their wills. 86 Fed. Reg at 68077-78. It is already forcing nearly a million low-income families to choose between masking their toddlers and forgoing federal benefits. *Id.* And according to Head Start directors around the country, it will cause immediate and devastating closures. *See* PI Exs. F-K. By *any* objective measure, it does not effect change in a "minor fashion." *MCI*, 512 U.S. at 225.

The Defendants' statutory authority problems get worse with the rest of §9836a(a)(1), which further limits their power to only the "necessary" modification of three categories of "standards." The Supreme Court just rejected a federal assertion that the term "necessary" confers limitless power. *Ala. Ass'n of Realtors v. DHS*, 141 S. Ct. 2485, 2489 (2021) ("[T]he Government has identified no limit in [the statute] beyond the requirement that the [agency] deem a measure 'necessary'"). So did this Court. *Louisiana*, 2021 WL 5609846, at *11; *see also Necessary*, Black's Law Dictionary (10th ed. 2014) ("must exist or happen and cannot be avoided" or "is needed for some purpose or reason"). As for the three categories of "standards," none encompasses the Mandate. *See* PI Memo. at 7.

And of course, "[e]ven if the text were ambiguous, the sheer scope of the [Government's] claimed authority under [§9836a] would counsel against the Government's interpretation." *Ala. Ass'n of Realtors*, 141 S. Ct. at 2489. While the Defendants briefly contend the major-questions doctrine is novel or that this is not a major question, the doctrine emphatically applies here and extinguishes all doubt that Defendants lack the authority to promulgate the Mandate. *See BST Holdings, L.L.C. v. OSHA*, 17 F.4th 604, 618 (5th Cir. 2021) ("Congress must 'speak clearly if it wishes to assign to an agency decisions of vast economic and political significance'"); *Louisiana v. Becerra*, 20 F.4th 260 (5th Cir. 2021) ("[T]he Secretary will have the most difficulty overcoming the part of the ruling that applied the 'major questions doctrine.'"). As to

4

Defendants' suggestion (at 14) that the Mandate is not controversial because a few *State* governments mandated vaccinations, this Mandate is unprecedented, heavy-handed, costly, and controversial. "There is no question that mandating a vaccine" to hundreds of thousands of staff and even more volunteers, and mandating masks on another million, "is something that should be done by Congress, not a government agency." *Louisiana*, 2021 WL 5609846, at *11.[2]

### B.  Other Statutes and Regulations Aren't at Issue.

For a considerable portion of their statutory-authority analysis, Defendants cite (at 18-21) a flurry of other statutory provisions and regulations not at issue here. Those new provisions are consistently unhelpful. As to the statutory provisions, Defendants do not rely on them as authority for the Mandate, and they would not provide any authority in any event. For instance, one says that a Head Start teacher's "professional development" includes "activities" that assist his or her ability to "provide effective instruction" regarding language, math, science, art, "physical health and development," and other things. 42 U.S.C. §9832(21)(G)(i). To state the obvious, when Congress encourages Head Start teachers to offer the preschool equivalent of health class, those teachers retain autonomy over their private medical decisions. Similarly, another statutory provision says that the Secretary should "address the unique needs of programs located in rural communities, including … removing barriers to obtain health screenings for Head Start participants[.]" *Id.* §9843(a)(3)(B)(xii)(VI). But the Mandate does not remove any "barriers" to "health screenings," and in fact it creates them because it *harms* programs in rural communities most when they are shut down. At best, these statutes are non sequiturs.

_____

[2] Any argument that Congress clearly authorized the Mandate is undermined by the longstanding pre-2021 view that no federal statute authorized vaccine mandates in *any* context. *See, e.g.*, Cong. Research Serv., *Mandatory Vaccinations: Precedent and Current Laws* 9 (RS21414; May 21, 2014), https://bit.ly/3sEnEaf ("No mandatory vaccination programs are specifically authorized, nor do there appear to be any regulations regarding the implementation of a mandatory vaccination program at the federal level during a public health emergency.").

As for the newly invoked regulations, Defendants acknowledge (at 21) that no case law exists on whether they are lawful. In any event, these regulations seem to derive from other statutes and involve subject matter more likely to fall within Defendants' authority. For instance, Plaintiff States agree that Defendants once required *in-home providers* to confirm that *pets* were appropriately managed, immunized, and free from dangerous conditions. *See* 73 Fed. Reg. 1285, 1297 (Jan. 8, 2008). But the pet regulation derived from a different statutory authorization not at issue in this case. *See id.* at 1286 ("The authority for this final rule is found in 42 U.S.C. 9839(a), 9839(c), and 9840a(b)(9)."). Nor does it seem right to compare the interests of Head Start teachers like Amanda Gros, Lisa Sanburn, and Tammie Slayter, PI Exs. L, M, N, who are losing their livelihoods because of this Mandate, to the interests of rabid dogs. As for the 1975 rules that Defendants emphasize, the rules imposed no vaccination requirements on teachers. 40 Fed. Reg. 27561 (Jun. 30, 1975), *available at* https://bit.ly/3qz3BHH. They merely required that Head Start programs make immunizations available to children and support families who want them. *Id.* at 27565.[3] Similarly, modern rules impose no vaccination requirements on teachers and merely require Head Start programs make immunizations available to children and support families who want them. 45 C.F.R. §1302.42(b)(1). Needless to say, an ocean of difference exists between making vaccines *available* to willing recipients and *forcing* them on unwilling subjects.

---

[3] Defendants say that a 1975 rule "requir[ed] Head Start participants to receive a slate of vaccinations." Resp. 2. But that rule did no such thing. Instead it said Head Start programs should "*provide for* treatment and follow-up services," including "treatment of all health problems," "[c]ompletion of all recommended immunizations," and "[e]xtraction of non-restorable teeth." *Id.*; 45 C.F.R. §1304.3-4 (1975) (emphasis added). The "provi[sion]" of *services* for low-income children describes a benefit of the program, not a mandate.

Notwithstanding Defendants' introduction of dozens of new statutory provisions and regulations that draw attention away from the text, the statutory-authority question in this case remains straightforward. Section 9836a(a)(1) does not authorize the Mandate.

### III.   NOTICE AND COMMENT WAS REQUIRED.

In defense of bypassing notice and comment, Defendants offer a long line of arguments that have already been rejected. Defendants say (at 35-38) that (1) delay will cause serious harm, (2) the Delta variant caused new problems, (3) vaccine uptake has been inadequate, (4) flu season and the winter could increase danger, and (5) Head Start will return to fully in-person services shortly. This Court has already rejected the first four reasons. *See Louisiana*, 2021 WL 5609846, at *8–9. The fifth was eminently foreseeable, is in Defendants' control, and is slightly misleading given that most Head Start programs have already been fully or partially in-person for a considerable time. 86 Fed. Reg. at 68077; *cf., e.g.*, *NRDC v. Abraham*, 355 F.3d 179, 205 (2d Cir. 2004) ("We cannot agree ... that an emergency of [an agency's] own making can constitute good cause.").

Defendants cite the Ninth Circuit's decision in *Alcaraz v. Block* for the proposition that an agency has "more latitude in determining when to invoke 'good cause' when notice and comment requirements are self-imposed." 746 F.2d 593, 612 (9th Cir. 1984). But in *Alcaraz*, the department that self-imposed the notice-and-comment requirement stated that the good-cause exception would be used "sparingly, that is, only when there is a *substantial basis* therefor," and the Ninth Circuit followed suit. *Id.* (emphasis added). Here, by contrast, HHS's self-imposed published policy states that the good-cause exception should be "used sparingly, as for example in emergenc[i]es and in instances where public participation would be useless or wasteful because proposed amendments to regulations cover minor technical matters[.]" 36 Fed. Reg.

2531, 2532 (Feb. 5, 1971), *available at* https://bit.ly/3eEgoCZ. But this isn't an emergency—*cf.*
*BST Holdings*, 17 F.4th at 611-12 ("The Mandate's stated impetus—a purported "emergency"
that the entire globe has now endured for nearly two years, and which OSHA itself spent nearly
two months responding to—is unavailing as well[.]")—and the Mandate does not concern minor
technical matters.

When "[i]t took CMS almost two months, from September 9, 2021 to November 5,
2021," to prepare its own vaccine mandate, this Court concluded that its failure to conduct notice
and comment was unlawful because, among other reasons, "[i]t took CMS longer to prepare the
interim final rule without notice than it would have taken to comply with the notice and comment
requirement." *Louisiana*, 2021 WL 5609846, at *10. Here, Defendants took an extra 25 days—
and therefore nearly three months—and now offer the same set of excuses. The APA demands
better.

## IV.   THE MANDATE IS CONTRARY TO LAW.

Defendants suggest (at 25-27) that they complied with 42 U.S.C. §9836a(a)(2)(C)(ii)'s
requirement that they "ensure" that changes "not result in the elimination of or reduction in
quality, scope, or types of … services" and 42 U.S.C. §9836a(b)(3)(B)'s requirement that their
rules "not be used to exclude children from Head Start programs." They explain that they
complied with both statutory requirements because Plaintiff States' "assertions" that children
will leave the program and programs will close are "speculative," and "requiring masking does
not reasonably exclude children." *Id.* Plaintiff States respectfully submit that robust evidence,
including Defendants' own admission that over 10,000 staff will be fired, confirms the Mandate
will reduce Head Start services and that some American parents will remove their children. 86
Fed. Reg at 68077-78; Doc. 1 ¶¶136-39.

Defendants next contend (at 24) that they "plainly" complied with 42 U.S.C. §9836a(a)(2)(B)(x)'s requirement that they "take into consideration" the "unique" challenges faced by (1) "seasonal" programs, (2) "short term" programs," and (3) "rural" programs. Specifically, they point (at 24-25) to their comment that they "considered the circumstances and challenges typically facing children and families serviced by Head Start agencies," including "the disproportionate effect of COVID-19 on low-income communities" and the "potential for devastating consequences for children and families of program closures and service interruptions[.]" But unless "low-income" is synonymous for "seasonal," "short term," *and* "rural"—which it is not—then Defendants did not consider the "unique" challenges faced by each.

Finally, Defendants insist that their consultation with experts in two or three fields satisfied 42 U.S.C. §9836a(2)(A)'s requirement that they consult with experts in six specific fields *and* multiple persons with backgrounds in Head Start. Resp. 25. But an agency "may not construe the statute in a way that completely nullifies textually applicable provisions meant to limit its discretion." *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 485 (2001). Here, as with the first three statutory commands, Defendants ignored Congress and hope to slip their post hoc explanation by the judiciary.

## V.   THE MANDATE IS ARBITRARY AND CAPRICIOUS.

In defense of their rejection of natural immunity, Defendants do not engage with the literature or explain their reasoning. Resp. 30-31. Instead, they repeat (at 30-31) their assertion that they considered alternatives, and they ask this Court to be "most deferential" on this "scientific determination." But this Court has already held that a similar coalition of plaintiffs was likely to win its arbitrary-and-capricious claim on the merits in part because of an agency's

"puzzling" rejection of natural immunity in enacting a vaccine mandate. *Louisiana*, 2021 WL 5609846, at *13. Here, Plaintiff States furnished additional robust evidence for the now-commonplace understanding that in many cases natural immunity is superior to or equivalent to vaccine immunity. Doc. 1 ¶¶94, 202. Whatever deference Defendants might be entitled to, they are not entitled to deny reality to advance a political agenda. The rote rejection of any accommodations for those with natural immunity—without even a single acknowledgement in the entire Mandate—was arbitrary and capricious.

Defendants maintain (at 29) that they adequately took account of deaf toddlers by allowing toddlers with disabilities to use alternative face coverings. But deaf toddlers do not need to see their own mouths; they need to see those of their teachers and peers.

Defendants suggest that the segregation of low-income students that will result from the Mandate is not their fault because all schools could just implement their own vaccine and mask mandates to achieve reintegration. Resp. 34 ("To the extent that there are discrepancies among policies applying to students at the same school, they result from state and local school districts' decisions not to implement mask requirements that align with the federal standards for Head Start."). That is an interesting way to spin it. But before this Mandate, no preschool (to Plaintiff States' knowledge) was segregating students based on income. Thus any such results or "discrepancies" in fact "result from" Defendants' Mandate.

## VI.   THE MANDATE IS UNCONSTITUTIONAL.

Defendants deny (at 40) that their Mandate, if authorized by statute, would constitute an exercise of illegally delegated federal legislative power because it is guided by an "intelligible principle" and does not "regulate broad swaths of the economy." But "if the Government Defendants have the power and authority they claim," to force masks over the faces of nearly a

million low-income children and regulate the vaccine schedules of nearly a million staff and volunteers—a power that Congress has never even claimed for itself—then they would have almost unfettered power over any person involved in the Head Start program, even those indirectly involved. *See Louisiana*, 2021 WL 5609846, at \*15. Indeed, Defendants' reply ignores that "[i]f [HHS] has the authority by a general authorization statute to mandate vaccines, they have authority to do almost anything they believe necessary, holding the hammer of termination of the [Head Start funding] over [families and employees]." *Id.* This is not the role of an executive agency. When "the Executive branch is allowed to usurp the power of the Legislative branch to make laws, two of the three powers conferred by the Constitution" end up "in the same hands." *Id.* at \*17.

**VII.    THE MANDATE WILL IRREPARABLY INJURE PLAINTIFFS BY MONDAY.**

Defendants do not deny that this Monday, January 3 (the first week of school in many places), and the following week, January 10, are the effective final deadlines for many Head Start staff being forced to decide between submission and unemployment. Defendants will begin enforcing the vaccination component of the Mandate on January 31, 2022. 86 Fed. Reg. at 68052. Because a primary vaccination series takes several weeks to complete, the Office of Head Start is advising educators and volunteers to submit to their first Moderna shot by January 3 or their first Pfizer shot by January 10. *Vaccine and Mask Requirements to Mitigate the Spread of COVID-19 in Head Start Programs* at 15, Office of Head Start (Dec. 2, 2021), https://bit.ly/3Gw4Sp8. Although the Johnson & Johnson vaccine allows for later compliance, the CDC recently recommended that people, especially "women between 18 and 49 years old," avoid it due to concerning side effects. *See* Michael Erman, *CDC recommends Moderna, Pfizer COVID-19 vaccines over J&J's*, Reuters (Dec. 16, 2021), https://reut.rs/3mNzFqn; *Johnson &*

11

*Johnson's Janssen COVID-19 Vaccine Overview and Safety*, CDC, https://bit.ly/3eg1we3. Accordingly, the Mandate will work its most devastating harm in just days. Some Head Start programs are already firing teachers who will not get vaccinated based on the Mandate. PI Exs. L at 1; M at 1; N at 1. As a result, many Head Start programs will close or reduce capacity after January 3, creating chaos for families and programs and causing tragic consequences for young childhood education in the Plaintiff States. PI Ex. P.

Notwithstanding their own admissions to the contrary in their rule, Defendants nevertheless argue that Plaintiff States will suffer no irreparable injury. To begin, Defendants claim (at 44) that it is "black-letter law" that "[e]conomic loss such as the loss of funding is not irreparable." "Notably," Defendants say, "Plaintiffs do not identify any cases to the contrary." *Id.* But that is not the law—let alone black-letter law—and Plaintiff States already identified three cases plainly to the contrary. *See* Doc. 2-1 at 23; *Texas v. Biden*, 2021 WL 5882670, at *53 (5th Cir. Dec. 13, 2021) (affirming irreparable injury finding based on monetary "costs" and "pocketbook injury"); *Wages & White Lion Invs., L.L.C. v. FDA*, 16 F.4th 1130, 1142 (5th Cir. 2021) ("substantial financial injury may be sufficient to show irreparable injury") (cleaned up); *Texas v. EPA*, 829 F.3d 405, 433 (5th Cir. 2016) ("a regulation later held invalid almost always produces the irreparable harm of nonrecoverable compliance costs").

Defendants next suggest (at 44) that "Plaintiffs do not receive Head Start Program grants under 42 U.S.C. §9836a because they are states rather than eligible local entities." But that is wrong too. *See, e.g.* PI Ex. B at 2-3 ("Georgia Department of Early Care and Learning ('DECAL') is a State of Georgia Entity," and "DECAL is a direct recipient of one such Head Start grant."). Even putting aside direct funding, the Mandate will cause closures among Head Start programs within Plaintiff States and will increase unemployment, causing the States to lose

money supporting families and teachers exiled by Head Start. Defendants (at 44) call these expenditures "speculative." But in the same brief, Defendants go as far as to encourage families who oppose the Mandate to *transfer* to other public preschools, all but certain to be funded by States like Plaintiffs. *E.g.*, Resp. 7 ("Many alternative pre-kindergarten programs are available to families that object to the Head Start Performance Standards. For example, many school districts provide, in the same schools, both Head Start pre-K services and non-Head Start pre-K services, the latter of which are not subject to the Head Start standards or the Rule… [B]efore the COVID-19 pandemic began, one Maryland school system determined that it could no longer maintain the standards set for Head Start, so it relinquished its grant and provided services through its own non-Head Start pre-K program instead.").[4] It is hard to imagine how downstream costs could be avoided if the Mandate is enforced.

In any event, Plaintiff States will separately be irreparably injured in their quasi-sovereign interests because their citizens "will suffer irreparable injury by having a substantial burden placed on their liberty interests" when they are forced to submit to vaccination and masking. *Louisiana*, 2021 WL 5609846, at *16. Their citizens will also suffer irreparable injury by losing access to education as a result of school closures. *See* Exs. F at 2 ("The only option would be to close the Program."), J at 2 ("We will have to shut down classrooms[.]"), K at 2 ("fewer spots available to needy children"), P at 3 ("Complying with the [Mandate] would cause Pre-K classrooms in Iberville Parish to close[.]"). And while Defendants claim (at 45) that the preemption of State law does not irreparably injure the States because it is (again) "black-letter law" that "the federal government does not invade areas of state sovereignty simply because it

---

[4] The agency's statements not only blink reality but they are contrary to their own acknowledgment in the rule that rural communities may not have the same early childhood education resources as an unidentified urban school system in Maryland.

exercises its authority in a way that preempts conflicting state laws," (cleaned up), in fact an injury to a State's interest "in not being pressured to change its law" is sufficiently "related to its sovereignty" to constitute an irreparable injury. *Texas v. United States*, 787 F.3d 733, 752 n.38 (5th Cir. 2015); *see also Veasey v. Abbott*, 870 F.3d 387, 391 (5th Cir. 2017).

Finally, the States suffer irreparable injuries because "[b]eing deprived of a procedural right to protect its concrete interests (by violation of the APA's notice and comment requirements) is irreparable injury." *Louisiana*, 2021 WL 5609846, at *16; *see also Texas v. EEOC*, 933 F.3d 433, 447 (5th Cir. 2019).

## VIII.   CONCLUSION.

This week, the President finally admitted that, when it comes to Covid-19, "there is no federal solution."[5] Plaintiff States agree with this important, albeit belated, acknowledgement. The Head Start Mandate was part of—in some ways the worst part of—a misguided attempt to transform society through unilateral federal executive action. It is unlawful many times over and cannot be salvaged. Because its most crucial deadlines loom just days away—by design right when school is to resume for hundreds of thousands of affected teachers and children—Plaintiff States respectfully ask this Court to temporarily restrain or preliminarily enjoin Defendants from enforcing the Mandate.

---

[5] *Remarks by President Biden at COVID-19 Response Team's Regular Call With the National Governors Association* (Dec. 27, 2021); https://bit.ly/34c27M9.

14

By:*/s/ Elizabeth B. Murrill*
ELIZABETH B. MURRILL (La #20685)
  Solicitor General
J. SCOTT ST. JOHN (La #36682)
  Deputy Solicitor General
MORGAN BRUNGARD*
JOSIAH KOLLMEYER (La #39026)
  Assistant Solicitors General
LOUISIANA DEPARTMENT OF JUSTICE
1885 N. Third Street
Baton Rouge, Louisiana 70804
Tel: (225) 326-6766
murrille@ag.louisiana.gov
stjohnj@ag.louisiana.gov
brungardm@ag.louisiana.gov
kollmeyerj@ag.louisiana.gov
*Counsel for the State of Louisiana*

STEVE MARSHALL
Alabama Attorney General
*/s/ Edmund G. LaCour Jr.*
Edmund G. LaCour Jr.*
  *Solicitor General*
Office of the Attorney General
State of Alabama
501 Washington Avenue
P.O. Box 300152
Montgomery, Alabama 36130-0152
Telephone: (334) 242-7300
Fax: (334) 353-8400
Edmund.LaCour@AlabamaAG.gov
*Counsel for the State of Alabama*

TREG R. TAYLOR
Attorney General of Alaska
*/s/ Charles E. Brasington*
Charles E. Brasington*
  *Assistant Attorney General*
State of Alaska
1031 West Fourth Avenue, Suite 200
Anchorage, AK 99501
Phone: (907) 269-6612
charles.brasington@alaska.gov
*Counsel for the State of Alaska*

AUSTIN KNUDSEN
Montana Attorney General
*/s/Kristin Hansen*
Kristin Hansen*
  *Lieutenant General*
David M.S. Dewhirst*
  *Solicitor General*
215 North Sanders
P.O. Box 201401
Helena, MT 59620-1401
Phone: 406-444-2026
Fax: 406-444-3549
david.dewhirst@mt.gov
*Counsel for the State of Montana*

DOUGLAS J. PETERSON
Nebraska Attorney General
*/s/ James A. Campbell*
James A. Campbell*
  *Solicitor General*
2115 State Capitol
Lincoln, NE 68509
Tel: (402) 471-2682
jim.campbell@nebraska.gov
*Counsel for the State of Nebraska*

15

MARK BRNOVICH
Arizona Attorney General
*/s/ Robert J. Makar*
Robert J. Makar*
  *Assistant Attorney General*
2005 N. Central Ave.
Phoenix, AZ 85004
Tel: (602) 542-4389
Robert.Makar@azag.gov
ACL@azag.gov
*Counsel for the State of Arizona*

LESLIE RUTLEDGE
Arkansas Attorney General
*/s/ Dylan L. Jacobs*
Dylan L. Jacobs*
  *Assistant Solicitor General*
Office of the Arkansas Attorney General
323 Center St., Suite 200
Little Rock, AR 72201
(501) 682-2007
Dylan.Jacobs@arkansasag.gov
*Counsel for the State of Arkansas*

ASHLEY MOODY
Florida Attorney General
*/s/ Natalie P. Christmas*
Natalie P. Christmas*
  *Assistant Attorney General of Legal Policy*
Office of the Attorney General
The Capitol, Pl-01
Tallahassee, Florida 32399-1050
(850) 414-3300
(850) 410-2672 (fax)
natalie.christmas@myfloridalegal.com
*Counsel for the State of Florida*

CHRISTOPHER M. CARR
Georgia Attorney General
*/s/ Stephen J. Petrany*
Stephen Petrany*
  *Solicitor General*
Ross W. Bergethon
  *Deputy Solicitor General*
Office of the Attorney General

WAYNE STENEHJEM
North Dakota Attorney General
*/s/ Matthew Sagsveen*
Matthew Sagsveen*
  *Solicitor General*
Director of Civil Litigation, Natural
Resources, and Indian Affairs Division
North Dakota Office of Attorney General
500 N. 9th Street
Bismarck, ND 58501-4509
masagsve@nd.gov
*Counsel for the State of North Dakota*

DAVE YOST
Ohio Attorney General
*/s/ Benjamin M. Flowers*
Benjamin M. Flowers*
  *Solicitor General*
30 E. Broad St., 17th Floor
Columbus, OH 43215
bflowers@ohioAGO.gov

*Counsel for the State of Ohio*

JOHN M. O'CONNOR
Oklahoma Attorney General
*/s/ Mithun Mansinghani*
Mithun Mansinghani*
  *Solicitor General*
Oklahoma Office of the Attorney General
313 NE 21st Street
Oklahoma City, OK 73105
Tel: (405) 522-4392
Mithun.Mansinghani@oag.ok.gov

*Counsel for the State of Oklahoma*

ALAN WILSON
South Carolina Attorney General
*/s/ Thomas T. Hydrick*
Thomas T. Hydrick*
  *Assistant Deputy Solicitor General*
Office of the Attorney General
Post Office Box 11549
Columbia, SC 29211

40 Capitol Square, S.W.
Atlanta, Georgia 30334
*Counsel for the State of Georgia*

THEODORE E. ROKITA
Indiana Attorney General
*/s/Thomas M. Fisher*
Thomas M. Fisher*
  *Solicitor General*
Indiana Government Center South
302 W. Washington St., 5th Floor
Indianapolis, IN 46204
Tom.fisher@atg.in.gov
*Counsel for the State of Indiana*

JEFFREY S. THOMPSON
Iowa Solicitor General
*/s/ Samuel P. Langholz*
Samuel P. Langholz*
  *Assistant Solicitor General*
Office of the Attorney General
1305 E. Walnut Street
Des Moines, Iowa 50319
(515) 281-5164
jeffrey.thompson@ag.iowa.gov
sam.langholz@ag.iowa.gov
*Counsel for the State of Iowa*

DEREK SCHMIDT
Kansas Attorney General
*/s/ Shannon Grammel*
Shannon Grammel*
  *Deputy Solicitor General*
Office of the Kansas Attorney General
120 SW 10th Avenue, 2nd Floor
Topeka, Kansas 66612
Phone: (785) 296-2215
Email: shannon.grammel@ag.ks.gov
*Counsel for the State of Kansas*

DANIEL CAMERON
Attorney General
*/s/ Jeremy J. Sylvester*
Jeremy J. Sylvester*
  *Assistant Attorney General*

(803) 734-4127
thomashydrick@scag.gov

*Counsel for the State of South Carolina*

JASON R. RAVNSBORG
South Dakota Attorney General
 */s/David M. McVey*
David M. McVey*
  *Assistant Attorney General*
1302 E. Highway 14, Suite 1
Pierre, SD 57501-8501
Phone: (605) 773-3215
david.mcvey@state.sd.us

*Counsel for the State of South Dakota*

HERBERT H. SLATERY III
Attorney General and Reporter of Tennessee
*/s/Andree S. Blumstein*
Andree S. Blumstein*
  *Solicitor General*
P.O. Box 20207
Nashville, Tennessee 37202
(615) 741-3492
Andree.Blumstein@ag.tn.gov

*Counsel for the State of Tennessee*

SEAN D. REYES
Utah Attorney General
*/s/ Melissa A. Holyoak*
Melissa A. Holyoak*
  *Solicitor General*
Utah Attorney General's Office
350 N. State Street, Suite 230
P.O. Box 142320
Salt Lake City, UT 84114-2320
385.271.2484
melissaholyoak@agutah.gov

*Counsel for the State of Utah*

17

Office of the Attorney General
700 Capital Avenue, Suite 118
Frankfort, Kentucky 40601
Phone: (502) 696-5300
Jeremy.Sylvester@ky.gv
*Counsel for the Commonwealth of Kentucky*

LYNN FITCH
Attorney General of Mississippi
*/s/Whitney H. Lipscomb*
Whitney H. Lipscomb*
  *Deputy Attorney General*
John V. Coghlan*
  *Deputy Solicitor General*
State of Mississippi
Office of the Attorney General
550 High Street
Jackson, MS 39201
Tel: (601) 359-3680
*Counsel for the State of Mississippi*

ERIC S. SCHMITT
Attorney General of Missour
*/s/ D. John Sauer*
D. John Sauer*
  *Solicitor General*
Missouri Attorney General's Office
Post Office Box 899
Jefferson City, MO 65102
Tel: (573) 751-8870
Fax: (573) 751-0774
John.Sauer@ago.mo.gov
*Counsel for the State of Missouri*

BRIDGET HILL
Wyoming Attorney General
*/s/ Ryan Schelhaas*
Ryan Schelhaas*
  *Chief Deputy Attorney General*
Wyoming Attorney General's Office
Attorneys for the State of Wyoming
109 State Capitol
Cheyenne, WY 82002
Telephone: (307) 777-5786
ryan.schelhaas@wyo.gov
*Counsel for the State of Wyoming*

PATRICK MORRISEY
West Virginia Attorney General
*/s/ Lindsay S. See*
Lindsay S. See*
  *Solicitor General*
State Capitol, Bldg 1, Room E-26
Charleston, WV 25305
Lindsay.s.see@wvago.gov
*Counsel for the State of West Virginia*

18