**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF LOUISIANA**
**MONROE DIVISION**

**STATE OF LOUISIANA ET AL**        **CASE NO.  3:21-CV-04370**

**VERSUS**                          **JUDGE TERRY A. DOUGHTY**

**XAVIER BECERRA ET AL**            **MAG. JUDGE KAYLA D. MCCLUSKY**

**MEMORANDUM ORDER**

This case involves the Head Start Vaccine and Mask Mandate[1]("Head Start Mandate").

The Head Start Mandate requires all Head Start staff, volunteers working in classrooms or

directly with children, and contractors whose activities involve contact with or providing direct

services to children and families, to be fully vaccinated for COVID-19 by January 31, 2022.  The

Head Start Mandate also requires immediate masking by all individuals two years of age or older

when indoors, when outdoors during activities that involve close contact with other people, and

when there are two or more people in a vehicle owned, leased, or arranged by the Head Start

Program.

In the immortal words of President Ronald Reagan, the nine most terrifying words in the

English language are, "I'm from the government and I'm here to help." Presidential News

Conference, August 12, 1986. In order to help rid the United States of the COVID-19 virus, the

government has imposed four vaccine mandates.  The mandates pose an issue for millions of

Americans: be fully vaccinated or lose their jobs.

 The Head Start Mandate was not passed by an act of Congress, but by an interim final

rule of the following Executive branch federal agencies and divisions: Office of Head Start

("OHS"); Administration of Children and Families ("ACF"); and the Department of Health and

---

[1] 86 Fed. Rep. 68052

Human Services ("DHHS").   The Plaintiff States[2] brought suit against the Agency Defendants[3] seeking an injunction prohibiting enforcement of the Head Start Mandate.

Pending before the Court is Plaintiff States' Motion for Preliminary Injunction ("PI") [Doc. No. 2], Motion for Temporary Restraining Order ("TRO") [Doc. No. 6] and Amended Motion for Temporary Restraining Order [Doc. No. 7].   The parties briefed both the PI and the TRO.

Although this case is about the Head Start Mandate, the real issue is separation of powers under the United States Constitution.   Specifically, whether the Agency Defendants, government agencies under the Executive branch, have the authority to impose the Head Start Mandate.

When this country's founders declared independence on July 4, 1776, they sought a government much different from one involving the dictatorship of a king.   Fifty-five (55) delegates attended the Constitutional Convention in Philadelphia from May 25 to September 17, 1787.   The delegates came up with an ingenious system which involved three separate but equal branches of government: (1) the Executive branch (President of the United States); (2) the Legislative branch (Senate and House of Representatives); and (3) the Judicial branch (Supreme Court and lower courts).   To avoid tyranny, the Constitution gave each branch unique powers which operated as a check on the others.   The Legislative branch was given the power to make laws.[4]   The Executive branch had the President of the United States as Head and Commander in

---

[2] Plaintiff States are the States of Louisiana, Alabama, Alaska, Arizona, Arkansas, Florida, Georgia, Indiana, Iowa, Kansas, Kentucky, Mississippi, Missouri, Montana, Nebraska, North Dakota, Ohio, Oklahoma, South Carolina, South Dakota, Tennessee, Utah, West Virginia, and Wyoming.

[3] The Government Defendants consist of Xavier Becerra, in his official capacity as Secretary of Health and Human Services, The U.S. Department of Health and Human Services, Administration for Children and Families, Jooyeun Chang, Principal Deputy Assistant for Children and Families, and Bernadine Futrell, Director of the Office of Head Start.

[4] U.S. Const. art. I, Section 8, U. S. Constitution.

Chief of the United States Armed Forces.  The President signs Acts of Congress into laws but was not given the authority to make laws.[5]

The U.S. Constitution was ratified on June 21, 1788.  Since then, the government has created numerous federal agencies.  There currently exists approximately 220 Executive branch agencies, which includes the U.S. Department of Health and Human Resources ("HHR").  The HHR includes, as a division, the ACF.   The ACF includes the OHS.  Therefore, all of the Agency Defendants are within the Executive branch of the U.S. Government.

These government agencies and divisions were created by Acts of Congress, which gave these agencies certain powers. Here, Congress enacted Title 42 U.S.C. § 9836a(a)(1)(C)-(E) and gave the Secretary of Head Start agencies and programs the power to modify, as necessary, program performance standards by regulation, which includes:

(C)     administrative and financial management standards;

(D)     standards relating to the condition and location of facilities for such agencies and programs used by Head Start agencies; and

(E)     such other standards as the Secretary finds to be appropriate.

The powers that Congress afforded the Agency Defendants within the statute above do not include, or imply, the power to impose vaccine and/or mask mandates. Agency Defendants "claim to possess 'superpowers'" to impose a vaccine mandate on staff, volunteers, and contractors, and a mask mandate on children as young as two years of age.  For the reasons further set forth herein, this Court finds the Plaintiff States are likely to succeed on the merits on their claims that Agency Defendants DO NOT have the power to impose the Head Start Mandate.  Plaintiff States' Motion for Preliminary Injunction [Doc. No. 2] is GRANTED.

---

[5] U.S. Const. art. II

Plaintiff States' Motion for Temporary Restraining Order [Doc. No. 6] and Amended Motion for Temporary Restraining Order [Doc. No. 7] are DISMISSED AS MOOT.

## I.      BACKGROUND

Title 42 U.S.C. § 9831 defines the purpose of the Head Start program as "to promote the school readiness of low-income children by enhancing their cognitive, social and economic development."  The Head Start program provides federal funding for educational and related services to low-income families of preschool-age children.

When the Head Start program was created in 1965, President Lyndon B. Johnson stated, "We call our program Project Head Start.  These children will receive preschool training to prepare them for regular school in September.  They will get medical and dental attention that they badly need, and parents will receive counseling on improving the home environment." Lyndon B. Johnson Remarks on Project Head Start May 18, 1965. www.presidency.ucsb.edu.

On the Fiftieth anniversary of Project Head Start, President Barack Obama stated, "For millions of families, Head Start has been a lifeline.  And for millions of kids, it's been the start of a better life."  www.obamawhitehouse.archives.gov, May 18, 2015.

After initially rejecting vaccine mandates,[6] President Joe Biden's "patience" began "wearing thin" with those "who haven't gotten vaccinated."[7]  On September 9, 2021, the Biden Administration announced a series of federal vaccine mandates, which included the Head Start Mandate.[8]

On November 30, 2021, eighty-two (82) days after President Biden's announcement, HHS published an interim final rule, which required (1) COVID-19 vaccinations by Head Start

---

[6] Press Briefing by Press Secretary Jen Psaki, April 6, 2021, https://bit.ly/3rBJVoL.
[7] White House, Remarks by President Biden on Fighting the COVID-19 Pandemic (September 9, 2021) https://bit.ly/3Ey4Zj6.
[8] Biden September 9, 2021 Remarks, Id.

staff, volunteers, and contractors, and (2) masking of all Head Start individuals two years of age or older.  Vaccine and Mask Requirements to Mitigate the Spread of COVID-19 in Head Start Programs, 86 FR 68052-01 ("86 Fed. Reg.").  Mask requirements were to take effect immediately, and staff, workers, and contractors were required to be fully vaccinated by January 31, 2022.[9]

Despite having eighty-two (82) days to complete the interim final rule, Agency Defendants did not complete the Administrative Procedure Act's ("APA") notice-and-comment requirements.[10] *Id* at 68058.  Instead, Agency Defendants invoked the "good cause" exception. The reasons given by the Agency Defendants for waiving the notice-and-comment requirement were failure to achieve sufficiently high levels of vaccinations, potential harm to children from unvaccinated staff, continuing strain on the health care system, known efficacy and safety of available vaccines, and danger to the health and safety of staff, children, and families. Agency Defendants also cited "impracticality" and "contrary to the public interest" in waiving notice of the notice-and comment procedures.  For the same reasons, Agency Defendants also waived the delay required under the Congressional Review Act "CRA".[11]

The Head Start Mandate based its statutory authority solely on Title 42 U.S.C. § 9836a(a)(1)(C)-(E).  The specifics of the mask requirement included universal masking for all individuals two years of age or older when indoors in a setting where Head Start services are provided, when there are two or more individuals in a vehicle owned, leased, or arranged by the Head Start program, and for those not fully vaccinated, when outdoors in crowded settings or during activities that involve close contact with other people.  86 Fed. Reg. 68053.

---

[9] Which means Moderna and Pfizer's firsts shots are required by January 3 and 10, and the second by January 31, 2022.
[10] 5 U.S.C. § 706.
[11] 5 U.S.C. § 808(2).

The vaccination requirement would require all staff who work with enrolled Head Start children, volunteers in classrooms, or volunteers working directly with children, and contractors whose activities involve contact with or providing direct services to children and families to be vaccinated by January 31, 2022.  86 Fed. Reg. 68052, 68060-61.

There are only two clear exemptions in the vaccine requirement. Those exemptions are for those whom medical necessity requires a delay in vaccination and those who are legally entitled to an accommodation with regard to the COVID-19 vaccine under federal law. Individuals granted accommodations are required to undergo weekly COVID-19 testing.  86 Fed. Reg. 68060-62.

The Head Start Mandate requires documentation, recordkeeping, and tracking of all staff members.  86 Fed. Reg. 68061.  The implementation date for the COVID-19 vaccination is January 31, 2022.  This requires staff, volunteers, and contractors to have received the final dose of a vaccine series by January 31, 2022.  86 Fed. Reg. 68062.

The Head Start Mandate preempts state laws.  86 Fed. Reg. 68063.  The Head Start Mandate does not allow individuals who are required to get a vaccine any alternatives other than vaccination or exemption.  The Head Start Mandate does not allow alternatives of natural immunity, social distancing, or additional testing.  86 Fed. Reg. 68066.

The Head Start Mandate does not provide additional funding for recordkeeping and tracking, or for additional cost of testing for those granted exceptions.  86 Fed. Reg. 68061, 68066.  If a Head Start agency fails to meet the applicable standards, the Secretary must initiate proceedings to terminate its funding.  42 U.S.C. § 9836a(e)(1)(C).  Therefore, the penalty for not adhering to the Head Start Mandate is termination of funding by the federal government.

On December 21, 2021, the Plaintiff States filed a Complaint [Doc. No. 1] and a Motion for Preliminary Injunction [Doc. No. 2].  On December 23, 2021, the Plaintiff States additionally filed a Motion for Temporary Restraining Order [Doc. No. 6] and an Amended Motion for Temporary Restraining Order [Doc. No. 7].  A Response [Doc. No. 13] was filed by Agency Defendants on December 29, 2021 and a Reply [Doc. No. 14] was filed by Plaintiff States on December 31, 2021.

In its motions, Plaintiff States allege the Agency Defendants: (1) had no authority to issue the Head Start Mandate; (2) that the Mandate is contrary to law; (3) the Mandate violates the APA's notice-and-comment requirement; (4) the Mandate violates the CRA; (5) the Mandate is arbitrary and capricious; (6) the Mandate violates the Treasury and General Government Appropriations Act of 1999; and (7)  the Mandate violates the Non-Delegation Doctrine, the Spending Clause, the Tenth Amendment, and the Anti-Commanding Doctrine.

For purposes of the Motion for Preliminary Injunction [Doc. No. 2], this Court only finds it necessary to address the claims (1) that the Agency Defendants did not have authority to issue the Head Start Mandate; (2) that the Head Start Mandate violates the APA's notice and comment requirement; and (3) that the Head Start Mandate violates the Tenth Amendment to the U.S. Constitution.

## II.    STANDING

This Court must determine whether it has judicial power to hear this case.  The United States Constitution limits exercise of judicial power to certain "cases" and "controversies."  U.S. Const. art. III Section 2.

Under the doctrine of "standing," a federal court can exercise judicial power only where a plaintiff has demonstrated that it (1) suffered an injury in fact, (2) fairly traceable to the

challenged conduct of the defendant, and (3) likely to be redressed by a favorable decision. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61, 112 S. Ct. 2130, 119 L. Ed. 2d 351 (1992). The party invoking federal jurisdiction bears the burden of establishing these elements.  *Id*. at 561.

The Plaintiffs in this case are twenty-four (24) states.  States are not normal litigants for purposes of invoking federal jurisdiction. *Massachusetts v. E.P.A.,* 549 U.S. 497, 518, 127 S. Ct. 1438, 167 L. Ed. 2d 248 (2007).  Rather, a state is afforded "special solicitude" in satisfying its burden to demonstrate the traceability and redressability elements of the traditional standing inquiry whenever its claims and injury meet certain criteria. *Id*. at 520; *Texas v. United States*, 809 F.3d 134, 151–55 (5th Cir. 2015), *as revised* (Nov. 25, 2015).  Specifically, a state seeking special solicitude standing must allege that a defendant violated a congressionally accorded procedural right that affected the state's "quasi-sovereign" interests in, for instance, its physical territory or lawmaking function. *Massachusetts*, 549 U.S. at 520–21; *Texas*, 809 F.3d at 151–55.

Plaintiff States have standing under the normal inquiry because they are entitled to special solicitude.  Plaintiff States have standing to challenge the Head Start Mandate because the Agency Defendants' actions harm Plaintiff States' sovereign, proprietary, and *parens patriae* interests.

In *State v. Becerra*, No. 8:21-CV-839-SDM-AAS, 2021 WL 2514138 (M.D. Fla. June 18, 2021) the State of Florida attacked a Centers for Disease Control and Prevention ("CDC") "conditional order," which required a series of steps before cruise ships were allowed to sail. The Court found Florida had standing to protect its proprietary interests and its sovereign interests.

The State of Texas was found to have standing in a suit against the U.S. Dept. of Homeland Security's 100 day pause of the removal of illegal aliens in *Texas v. U.S.*, 524 F. Supp. 3d 598 (S.D. Tex., February 23, 2021). In *State v. Biden*, 10 F. 4th 538 (5th Cir. 2021), the State of Texas was also found to have standing based on "special solicitude."  (Injunction request against the U.S. Dept. of Homeland Security to suspend its Migrant Protection Protocols.)

Texas was again found to have standing under "special solicitude" in *Texas*, 809 F.3d 134.  Texas sued to prevent implementation of a DAPA Program by the Department of Homeland Security.  The Fifth Circuit further noted that, pursuant to their sovereign interest, states may have standing based on federal assertions of authority to regulate matters they believe they control, federal preemption of state law, and interference with the enforcement of state law. *Id.* at 153.

In *Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez*, 458 U.S. 592, 102 S. Ct. 3260, 73 L. Ed. 2d 995 (1982), the U.S. Supreme Court held Puerto Rico, like a state, had "*parens patriae*" standing to bring an action against East Coast apple growers for allegedly violating federal law in preferring domestic laborers over foreign temporary workers.   Puerto Rico was found to have a "quasi-sovereign" interest on behalf of its residents.

In *Texas v. Equal Emp. Opportunity Comm'n*, 933 F.3d 433 (5th Cir. 2019), the Fifth Circuit found standing for Texas after there was an increased regulatory burden, pressure to change state law, and deprivation of a procedural right to protect its concrete interests.

A.      **Injury in Fact**

A plaintiff seeking to establish injury in fact must show that it suffered "an invasion of a legally protected interest" that is "concrete," "particularized," and "actual or imminent, not conjectural or hypothetical." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1548, 194 L. Ed. 2d 635

(2016), *as revised* (May 24, 2016).  For an injury to be "particularized," it "must affect the plaintiff in a personal and individual way."  *Id*. at 1548.  A "concrete" injury must be "de facto," that is, it must "actually exist."  "Concrete" is not, however necessarily synonymous with "tangible."  Intangible injuries can nevertheless be "concrete."  *Id.,* at 1548-49.

Agency Defendants maintain the Plaintiff States do not have standing because they fail to meet the injury in fact requirement.  Agency Defendants argue the States themselves do not have injury in fact because they do not receive the Head Start grants to operate the classrooms.  Agency Defendants further argue that without actual injury in fact, the States do not have the right to bring a *parens patriae* action on behalf of their citizens.

However, although this is a correct statement of part of the law, Agency Defendants leave out an important part:  To have *parens patriae* interest, the State must assert an injury that has been characterized as a "*quasi-sovereign*" interest.  *Alfred E. Snapp & Son, Inc. v. Puerto Rico*, 458 U.S. 592, 601 (1982).  The Court listed the types of these *quasi-sovereign* interest as (1) the exercise of sovereign power over individuals and entities within the relevant jurisdiction – this involves the power to create and enforce a legal code, both civil and criminal; (2) the demand for recognition from other sovereigns; (3) public nuisances; (4) the health and well-being both physical and economic of its residents in general; and (5) in having its citizens not discriminated against.  *Id* at 601-608.

Plaintiff States have alleged both individual and *quasi-sovereign parens patriae* interests.

This Court finds the Plaintiff States' alleged injuries are both particularized and concrete.  Plaintiff States have a "*parens patriae*" standing and/or a quasi-sovereign interest in protecting its citizens from being required to submit to vaccinations and/or mask mandates.  Additionally, the Plaintiff States have standing to regulate matters they believe they control, to attack

10

preemption of state law by a federal agency, and to protect the enforcement of state law. The Head Start Mandate specifically preempts state laws with regard to COVID-19 Vaccine requirements and/or exemptions. For example, Louisiana R.S. 17:170 allows Louisiana students in schools and colleges to opt out of the required vaccines by a written dissent. This statute conflicts with the Head Start Mandate and Louisiana has standing to enforce its laws. So do the other states whose laws are preempted by the Head Start Mandate. The presence of one party with standing is sufficient to satisfy Article III's case-or-controversy requirement. *Brackeen v. Haaland*, 994 F.3d 249, 291 (5th Cir. 2021).

The Plaintiff States also have standing, and injury based upon the alleged loss of jobs, loss of businesses, loss of tax revenue, unemployment benefits, reliance interest by Plaintiff States in the Head Start program, and other damages allegedly resulting from employees being fired for refusing the vaccine, and/or providers being terminated.

**B.      Traceability**

Plaintiff States must show a "fairly traceable" link between their alleged injuries and the Head Start Mandate. As a general matter, the causation required for standing purposes can be established with "no more than de facto causality." *Dep't of Com. v. New York,* 139 S. Ct. 2551, 2556, 204 L. Ed. 2d 978 (2019). The plaintiff need not demonstrate that the defendant's actions are "the very last step in the chain of causation." *Bennett v. Spear*, 520 U.S. 154, 169–70, 117 S. Ct. 1154, 137 L. Ed. 2d 281 (1997).

Here, there is an obvious link between the Head Start Mandate and the Plaintiff States' alleged injuries. All of the above alleged injuries are "fairly traceable" to the Head Start Mandate.

### C.      Redressability

The redressability element of standing to sue requires a plaintiff to demonstrate "a substantial likelihood that the requested relief will remedy the alleged injury in fact." *El Paso Cty., Texas v. Trump*, 982 F.3d 332, 341 (5th Cir. 2020), *cert. denied sub nom. El Paso Cty., Texas v. Biden,* 141 S. Ct. 2885, 210 L. Ed. 2d 991 (2021), *reh'g denied*, 142 S. Ct. 51, 210 L. Ed. 2d 1019 (2021).

The Plaintiff States have demonstrated a substantial likelihood that the requested relief would remedy the alleged injury in fact.  If Plaintiff States are successful in having the Head Start Mandate declared invalid, this would redress their alleged injuries.

### D.      Special Solicitude

Although this Court has found that Plaintiff States have proven standing through the normal inquiry, they also can establish standing as a result of special solicitude.  Plaintiff States assert a congressionally bestowed procedural right, the APA, and the government action at issue affects the Plaintiff States' quasi-sovereign interests (damage to citizens, loss of jobs, businesses, reliance interests, loss of tax funding and/or protection of State laws). *Massachusetts,* 549 U.S. at 519–20.

Therefore, any infirmity in Plaintiff States' demonstration of traceability or redressability are remedied by the Plaintiff States' special solicitude.

In conclusion, the Court finds that the Plaintiff States have standing and that this Court has the judicial power to hear this case**.**

## III.    LAW AND ANALYSIS

For a PI to issue, Plaintiff States must show: (1) a substantial likelihood of success on the merits; (2) a substantial threat that the failure to grant the injunction will result in irreparable

injury to the moving party; (3) that the threatened injury outweighs any damages the injunction may cause defendant; and (4) that the injunction is in the public interest. *Jackson Women's Health Org. v. Currier*, 760 F.3d 448, 452 (5th Cir. 2014).

A very important piece of evidence in this case is a letter from Yasmina Vinci ("Vinci"), Executive Director of the National Head Start Association ("NHSA"), to U.S. HHS, Secretary Xavier Becerra [Plaintiff States' Motion for Preliminary Injunction Doc. No. 2-2, Exhibit A]. The letter is dated December 15, 2021, which is after the publication of the Head Start Mandate and before the vaccine mandate deadline. The letter gives the results of a field survey and extensive engagement with Head Start programs nationwide. Vinci wrote, "The results indicate the potential devastating effects the new rule on vaccines and masking will have on the children and families we serve."

Vinci also noted a webinar conducted on December 10, 2021, which involved over 520 grantees and program administrators. Secretary Becerra was asked to allow important local flexibility because differences between state and federal mandates would result in losing valuable collaboration agreements with local school districts. Vinci pointed out that the Head Start Mandate would result in a vital element of the Head Start Model – qualified and dedicated staff and involved parents- not being available. Further, Vinci pointed out that many Head Start programs depend on local school districts for busing. Because the Head Start Mandate requires transportation personnel to be vaccinated, she was concerned about losing local school transportation.

The survey results were shocking. Twenty percent (20%) of the local Head Start agencies were less than fifty percent (50%) vaccinated. The survey indicated anticipated workforce attrition due to the Head Start Mandate was that twenty-six percent (26%) of the local

Head Start programs estimated losses of over thirty percent (30%) of its staff, while sixteen percent (16%) estimated losses of twenty to thirty percent (20 - 30%) of its staff.  Even more shocking were the survey results of anticipated Head Start classroom closures.  Fifty percent (50%) estimated their classrooms would be closed, thirty-two percent (32%) were unsure, and only eighteen percent (18%) said their Head Start classrooms would not be closed.

Vinci noted that if fifty percent of the classroom have to close, that would result in 1,324 classrooms closing.  Vinci noted that closings could be significantly higher due to thirty-two (32%) percent of the Head Start programs being unsure if their classrooms would be required to close.

Plaintiff States additionally provided numerous declarations from commissioners, teachers, superintendents, directors, staff, and doctors that detailed the devasting effects the Head Start Mandate would have on their local Head Start programs.[12]

### A.      Likelihood of Success on the Merits

The Plaintiff States make numerous constitutional, statutory, and procedural arguments that the Head Start Mandate is invalid.  As previously noted, for purposes of this Motion for PI, this Court finds it only necessary to examine the Plaintiff States' claim that (1) Agency Defendants did not have authority to issue the Head Start Mandate; (2) the Head Start Mandate violates the APA's notice-and comment requirements; (3) the Head Start Mandate violates the Tenth Amendment to the U.S. Constitution.[13]

In *BST Holdings, L.L.C. v. Occupational Safety & Health Admin., United States Dep't of Lab.*, 17 F.4th 604 (5th Cir. 2021), the Fifth Circuit issued a stay to the OSHA vaccine mandate, which was put into place by an emergency temporary standard ("EST") on November 5, 2021.

---

[12] [Doc. No. 2 - 3 to 21].
[13] All other issues will be addressed when the merits are addressed.

The Fifth Circuit found the OSHA mandate was over-exclusive and under-exclusive, was not an emergency response under 29 U.S.C. 655, and that the OSHA mandate grossly exceeded OSHA's statutory authority.  This case was transferred to the Sixth Circuit pursuant to a lottery drawing, and the stay was dissolved in a 2-1 decision.  *In re MCP NO. 165*, No. 21-4027, 2021 WL 5989357 (6th Cir. Dec. 17, 2021).

In *Louisiana v. Becerra*, 20 F.4th 260 (5th Cir. 2021), the Fifth Circuit upheld a preliminary injunction issued by this Court as to the original fourteen states that brought the action with regard to a vaccine mandate which applied to the staff/employees of Medicare and Medicaid certified providers.[14]

The vaccine mandates in both of these cases are set to be argued before the Supreme Court of the United States on January 7, 2022.[15]

### 1.    Authority of Agency Defendants

Plaintiff States maintain that the Head Start Mandate must be enjoined because it exceeds the Agency Defendants' authority. The HHS, ACF, and OHS are part of the Executive branch of government. Only Congress, as the Legislative branch, has the authority to make laws.[16] The Executive branch must take care that the laws be faithfully executed.[17]  Because the Executive branch cannot make laws, it is given its power through Acts of Congress.

The Agency Defendants claim power solely on the basis of Title 42 U.S.C. § 9836 a(a)(1)(C)-(E) which states:

(a)    Standards

(1)    Content of standards

---

[14] A Stay of the injunction was granted as to other states beyond the fourteen states that brought the suit.
[15] *Becerra v. Louisiana*, No. 21A241, 2021 WL 6061695 (U.S. Dec. 22, 2021) (U.S., Dec. 22, 2021)
[16] U.S. Const. art. I, Section 8, United States Constitution.
[17] U.S. Const. art. II, § 3.

> The Secretary shall modify, as necessary, program performance standards by regulation   applicable to Head Start agencies and programs under this subchapter, including…
>
> (C)    administrative and financial management standards;
>
> (D)    standards relating to the condition and location of facilities (including indoor air quality assessment standards, where appropriate) for such agencies, and programs, including regulations that require that the facilities used by Head Start agencies (including Early Head Start agencies and any delegate agencies) for regularly scheduled center-based and combination program option classroom activities-
>
> (i) shall meet or exceed State and local requirements concerning licensing for such facilities; and
>
> (ii) shall be accessible by State and local authorities for purposes of monitoring and ensuring compliance, unless State or local laws prohibit such access; and
>
> (E)    such other standards as the Secretary finds to be appropriate.

§ 9836a. Standards; monitoring of Head Start agencies and programs.

Agency Defendants maintain the statutory text of Title 42 U.S.C. § 9836a(a)(1)(C)-(E) authorizes the Head Start Mandate.  This Court does not agree.

Title 42 U.S.C. § 9836a(a)(1)(C) details the "administration and financial management standards." Title 42 U.S.C. § 9836a(a)(1)(D) details the standards relating to the condition and location of facilities, including regulations that require that the facilities used by Head Start agencies for regularly scheduled center-based and combination program option classroom activities.  This includes that the facilities: (i) shall meet or exceed State and local requirements concerning licensing for such facilities; and (ii) shall be accessible by State and local authorities for purposes of monitoring and ensuring compliance, unless State or local laws prohibit such access.  It even gives an example of indoor air quality assessment standards.

Agency Defendants argue that subsections (C) and (D) authorize the Head Start Mandate because it was an "administrative standard" necessary for the safe management of the Head Start

16

programs and the Head Start Mandate is "related to the condition of the facilities" to ensure they do not become places of viral contagion.  [Doc. No. 13, p.16].  This interpretation is overly broad.  In examining the language and content of the statutory text, 42 U.S.C. § 9836 a(a)(1)(C) and (D) in no way authorizes the Head Start Mandate.  If what the Agency Defendants argue is correct, (C) and (D) could be used to apply to almost any regulation the Agency Defendants wanted to make.  They would have "superpowers" to implement almost any Head Start standard. The statutory text does not, nor Congress, does not give the Agency Defendants any superpowers to implement rules such as these.

The statute allows the Secretary to modify performance standards for the Head Start agencies and programs.  Section (C) deals with administrative and financial standards.  Section (D) deals with the condition and location of facilities. Section (E) allows the Secretary to modify such other performance standards as the Secretary finds to be appropriate.

The only portion of the statutory text that could possibly apply is § 9836a(a)(1)(E) which allows the secretary to modify any other standards "as the secretary finds to be appropriate."  If the Secretary can actually modify any standard "the Secretary finds to be appropriate," that would be very concerning.  The Agency Defendants would have unlimited power.  There are hundreds of federal agencies and likely thousands of different divisions within those federal agencies.  Most of them have statutes similar to Section (E), which give the Secretary or Director general authority to make appropriate modifications.  If a general authority statute such as 42 U.S.C. § 9836a(a)(1)(E) allows the Secretary to impose a vaccine mandate on individuals, what else might they be able to do?  How far would they be able to go?  Could the Secretary mandate all children in the Head Start Program be vaccinated?  Could the Secretary mandate the parents and siblings of children in Head Start to take the COVID-19 vaccines?  These examples may

seem far-fetched, but so did the idea that vaccines could be mandated to millions of United States citizens.

Fortunately, the Supreme Court of the United States has addressed this problem and requires that Congress must "speak clearly if it wishes to assign to an agency, decisions of vast economic and political significance." *Util. Air Regul. Grp. v. E.P.A.*, 573 U.S. 302, 324, 134 S. Ct. 2427, 189 L. Ed. 2d 372 (2014).  In *Utility Air*, the U.S. Supreme Court found the Environmental Protection Agency ("EPA") exceeded its authority when the EPA adjusted levels set forth in the Clean Air Act regarding greenhouse-gas emissions.

Like the present case, EPA used general authority to expand its power.  Justice Scalia wrote:

> EPA's interpretation is also unreasonable because it would bring about an enormous and transformative expansion in EPA's regulatory authority without clear congressional authorization.  When an agency claims to discover in a long-extant statute an unheralded power to regulate "a significant portion of the American economy," *Brown & Williamson*, 529 U.S. at 159, 120 S. Ct. 1291, we typically greet its announcement with a measure of skepticism.  We expect Congress to speak clearly if it wishes to assign an agency decision of vast "economic and political significance."

573 U.S. at 324.[18]

See also *Food and Drug Admin.*, 529 U.S. at 159; *Alabama Ass'n of Realtors v. Dep't of Health & Hum. Servs.*, 141 S. Ct. 2485, 2489, 210 L. Ed. 2d 856 (2021); *Tiger Lily, LLC v. United States Dep't of Hous. & Urb. Dev.*, 5 F.4th 666 (6th Cir. 2021); *Paul v. United States*, 140 S. Ct. 342, 205 L. Ed. 2d 368 (2019); *Becerra*, 2021 WL 2514138, at *20; and *King v. Burwell*, 576 U.S. 473, 486, 135 S. Ct. 2480, 192 L. Ed. 2d 483 (2015).

---

[18] Referred to by some members of the Supreme Court of the United States as the "major questions doctrine."  Dept. of Homeland Security Regents.  *Dep't of Homeland Sec. v. Regents of the Univ. of California*, 140 S. Ct. 1891, 1925, 207 L. Ed. 2d 353 (2020); *Gundy v. United States*, 139 S. Ct. 2116, 2141–42, 204 L. Ed. 2d 522, *reh'g denied*, 140 S. Ct. 579, 205 L. Ed. 2d 378 (2019).

Additionally, in *Whitman v. Am. Trucking Associations*, 531 U.S. 457, 468, 121 S. Ct. 903, 149 L. Ed. 2d 1 (2001), Justice Scalia famously wrote:

> Congress, we have held, does not alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions—it does not, one might say, hide elephants in mouseholes.

531 U.S. at 468

The "elephants in mouseholes" analogy is appropriate here.  If Congress intended to allow OHS to be able to mandate vaccines for Head Start staff, volunteers, and contractors, Congress certainly hid it well.  Agency Defendants argue that the above doctrine does not apply to the Head Start Mandate because it is not a "decision of vast economic and political significance."  This mandate applies to 273,600 Head Start staff, 864,000 children, and approximately 1,000,000 volunteers.  86 Fed. Reg. 68068.  In this Court's opinion, the Head Start Mandate is a "decision of vast economic and political significance."

Agency Defendants further argue past history of modifications of Head Start standards show the ability to impose the Head Start Mandate.  These include:

(1)     providing "health services";

(2)     teaching and instruction involving physical health and development;

(3)     health screenings in rural communities;

(4)     recognizing health problems in children for appropriate referral;

(5)     allowing families of homeless children to apply, to enroll in, and attend Head Start programs which requires immunization and medical records;

(6)     allowing revisions in standards as to the quality, scope, or types of health care services to be provided by Head Start;

(7)     health screenings for all Head Start children;

19

    (8)     verification of immunization records;

    (9)     appropriate treatment for children with HIV;

    (10)   health examinations for Head Start staff;

    (11)   health and wellness standards;

    (12)   staff training on prevention and control of infectious diseases;

    (13)   spacing cribs 3 feet apart;

    (14)   temporarily excluding children with acute or short-term contagious illnesses;

    (15)   determining whether children are up to date on state required vaccinations, and, with parental consent, assist the child and parents in getting up to date vaccinations;

    (16)   using Head Start program funds for professional health care services when no other funding is available; and

    (17)   requiring vaccinations for pets with children enrolled in in-home Head Start programs.

It is obvious that (except for required vaccinations of pets) all of the above standards are for identifying and referring for treatment medical issues of Head Start children.  None of these standards mandate treatment.  Even more importantly, these standards do not mandate a specific "type" of treatment.  Rather than leave it to the discretion of the patient and physician, the Head Start Mandate mandates a specific type of treatment – COVID-19 vaccines.  That is a huge difference.  These past modifications even more clearly show Agency Defendants have no authority to impose the Head Start Mandate.

The latest case from the United States Supreme Court regarding the power of government agencies is *Alabama Ass'n of Realtors v. Dep't. of Health and Human Services,* 141 S.Ct. 2485

(2021). In this case, the Supreme Court dealt with the issue of whether the Center for Disease Control (CDC) had the authority to impose a nationwide eviction moratorium. Congress had initially imposed a 120-day eviction moratorium as part of the Coronavirus Aid, Relief and Economic Security Act ("CARES ACT") for properties that participated in federal assistance programs or were subject to federally-backed loans. The Congressional eviction moratorium expired in July 2021 and was not renewed by Congress.

Thereafter, the CDC imposed its own eviction moratorium which covered all residential properties nationwide and imposed criminal penalties on violators. The CDC extended their eviction moratorium four times.

The CDC based its authority for the eviction moratorium on Section 361(a) of the Public Health Service Act which stated:

> The Surgeon General, with the approval of the Secretary of Health and Human Services, is authorized to make and enforce such regulations as in his judgment are necessary to prevent the introduction, transmission, or spread of communicable diseases from foreign countries into the states or possessions, or from one state or possession into any other state or possession. For purposes of carrying out and enforcing such regulations, the Surgeon General may provide for such inspection, fumigation, disinfection, sanitation, pest extermination, destruction of animals or articles found to be so infected or contaminated as to be sources of dangerous infection to human beings, and other measures, as in his judgment may be necessary.

The CDC contended that the first sentence of the statute relied upon gave CDC broad authority to take whatever measures it deemed necessary to control the spread of the COVID-19 virus, including the eviction moratorium. But the Supreme Court noted that the second sentence of the Section 361(a) illustrates the kind of measures that could be necessary.

The Court further held that even if the text of Section 361(a) were ambiguous, the sheer scope of CDC's claimed authority "would counsel against the Government's interpretation."

The Court further stated, "we expect Congress to speak clearly when authorizing an agency to exercise powers of vast economic and political significance."  Finding the CDC's action was the exercise of power of vast economic and political significance, the Court found the CDC did not have the authority to impose the eviction moratorium.

See also *Telecommunications Corp. v. American Telephone and Telegraph Co.*, 512 U.S. 218 (1994), where the Supreme Court held that a statute authorizing the Executive branch to "modify" (the term used by Agency Defendants here) requirements conferred only the power to enact incremental, limited, minor changes.  512 U.S. at 225

Like the CDC, the statute upon which Agency Defendants base their authority has never been used to impose a mandatory specific medical treatment upon individuals.

This Court has no hesitation in finding that the Head Start Mandate is a decision of vast economic significance and that Congress has not clearly spoken to give Agency Defendants the authority to impose it.  The Plaintiff States are likely to succeed on the merits that the Agency Defendants exceeded their authority in enacting the Head Start Mandate.

### 2.      Notice and Comment Requirement

Title 5 U.S.C. § 553 of the APA requires federal agency rules to undergo notice and comment unless they are exempt.  The federal agency is required to give general notice of proposed rulemaking to be published in the Federal Register not more than thirty days before the proposed rules' effective date and to give interested persons an opportunity to participate in the rulemaking process through submission of written data, views, or arguments.  Failure to give required notice and comment requires the rule to be vacated.

This "notice and comment" procedure does not apply to interpretive rules, general statements of policy, rules of agency organization, procedure, practice, or when the agency finds

22

"good cause" for not requiring notice and comment.  The Agency Defendants did not go through the notice and comment process with regard to the Head Start Mandate.  The Head Start Mandate became effective on November 30, 2021, which is the same day it was published in the Federal Register.

Agency Defendants maintain they are not obligated to perform notice and comment due to the exception found in 5 U.S.C. § 553(a)(2), which states:

553. Rulemaking.

(a)     This section applies, according to the provisions thereof, except to the extent that there is involved –

(2)     a matter relating to agency management or personnel or to public property, loans, grants, benefits, or contracts.

Agency Defendants argue that because they are a federal grant program they are not required to engage in notice and comment under 5 U.S.C. § 553.  However, the interim final rule in question did not relate to grants, but to a vaccine and mask mandate.  Additionally, Agency Defendants did not exempt itself from notice and comment on the basis of 5 U.S.C. § 553(a)(2), but on a finding of "good cause" pursuant to 5 U.S.C. § 553(b)(3)(B).  In fact, Agency Defendants in the interim final rule admitted they ordinarily publish a notice of proposed rulemaking in the Federal Register and invite public comment on the proposed rule before the rule takes effect.  86 Fed. Reg. 68058.  Therefore, the exception in 5 U.S.C. § 553(a)(2) does not apply.  By using the good cause exception in the interim final rule, Agency Defendants cannot now claim the benefit of an exemption they did not claim in the interim final rule.  *Alcaraz v. Block*, 746 F.2d 593, 611-12 (9th Cir. 1984).  Agency Defendants claimed the good cause exception and are required to meet the same standard as any other agency, whether self-imposed or not.

23

The Head Start Mandate is not alleged to be an interpretive rule, a general statement or policy, or a rule of agency organization, procedure, or practice.  The failure to perform the required notice and comment is entirely based upon the "good cause" exception. 86 Fed. Reg. 68058-59.

Title 5 U.S.C. § 553(b)(3)(B) states**:**  (B) this section does not apply -- when the agency for good cause finds (and incorporates the finding and a brief statement of reasons thereafter in the rules issued) that notice and public procedure therein are impracticable, unnecessary, or contrary to the public interest.

In failing to perform the notice and comment procedure, Head Start found good cause. 86 Fed. Reg. 68058-59.  The reasons given by Agency Defendants for failing to perform the notice and comment procedure were:

1.    Failure to achieve sufficiently high levels of vaccination based on voluntary efforts;

2.    Potential harm to children from unvaccinated staff;

3.    Continuing strain on the health care system;

4.    Efficacy and safety of available vaccines;

5.    Danger to the health and safety of staff, children, and families;

6.    Contrary to the public interest to delay imposing the mandate;

7.    Impracticable and contrary to the public interest to undertake normal notice and comment procedures.

The "good cause" exception in 5 U.S.C. § 553 is read narrowly in order to avoid providing agencies with an escape clause from the ADA notice and comment requirements. *United States v. Johnson*, 632 F.3d 912 (5th Cir. 2011).  Circumstances justifying reliance on this exception are "indeed rare."  *Council of S. Mountains, Inc. v. Donovan*, 653 F.2d 573 (D.C. Cir. 1981).  The good cause exception was described in *Sorenson Commc'ns Inc. v. F.C.C.*, 755 F.3d

24

702 (D.C. Cir. 2014) as "meticulous and demanding," "narrowly construed," "reluctantly countenanced," and evoked only in "emergency situations."

Due to this stringent standard, the good cause exception to notice and comment is rarely upheld. See *Johnson*, 632 F.3d at 928 (need for immediate guidance under the Sex Offender Registration and Notification Act and in prior attempts to protect the public were not good cause); *Mack Trucks, Inc. v. E.P.A.* 682 F.3d 87, 94-95 (D.C. Cir. 2012) (EPA interim final rule requiring penalties for sellers of non-compliant diesel engines not good cause when one manufacturer would be unable to sell the engines without the interim rule); *Sorenson Communications Inc.*, 755 F.3d at 706–07 (FCC did not have good cause to issue interim and final rules for reimbursement for telecommunication services due to potential depletion of the fund used to pay for reimbursement); *Becerra*, 2021 WL 2514138, at *35–36 (CDC did not have good cause for a rule issuing a conditional sailing order for cruise ships due to COVID-19); *Regeneron Pharms., Inc. v. United States Dep't of Health & Hum. Servs.*, 510 F. Supp. 3d 29, 48 (S.D.N.Y. 2020) (CMS's rule regulating drug prices based on the Most Favored Nation Rule was not good cause where reasons were general risks of high drug prices and the COVID-19 pandemic); *Regeneron Pharmaceuticals, Inc.*, 510 F. Supp. 3d at 48 (not good cause where reasons by DHS for an interim final rule regarding prevailing wages with regard to the VISA program were based on the COVID-19 pandemic and economic consequences of it); *Chamber of Com. of United State v. United States Dep't of Homeland Sec.*, 504 F. Supp. 3d 1077, 1094 (N.D. Cal. 2020); *Ass'n of Cmty. Cancer Centers v. Azar*, 509 F. Supp. 3d 482, 496 (D. Md. 2020) (not good cause where CMS claimed reduced costs would help alleviate financial instability caused by the COVID-19 pandemic).

There are few cases where the good cause exception was upheld.  In *Council of Southern Mountains, Inc.*, 653 F.2d 573, calling it an "extremely close case," the Court upheld the Secretary of Labor postponing the implementation of Mine Safety and Health Adm. Regulations dealing with self-contained self-rescuers which provided oxygen to miners after a cave-in.   The deadline was extended for six months due to only a small number of the devices being available, the agency acted with diligence, it was deferred for a very short period of time, and circumstances were beyond the agency's control.

It should be noted that this issue was discussed in *BST Holdings* at 8, but OSHA had authority for a six-month "emergency temporary standard" ("ETS") pursuant to 29 U.S.C. § 655(a)(1).  Although the notice and comment requirements of 5 U.S.C. § 553 did not apply, the Court did not believe COVID-19 posed the kind of grave danger required for an ETS.  The Court stated:

> The Mandate's stated impetus – a purported "emergency" that the entire globe has now endured for nearly two years, and which OSHA itself spent nearly two months responding to-is unavailing as well.

No. 21-60845 at 7.

After reviewing the reasons listed by Agency Defendants for bypassing the notice and comment requirement, the Court finds Plaintiff States are likely to succeed on the merits on this claim.  It took Agency Defendants almost three months (eighty-two days) from September 9, 2021, to November 30, 2021, to prepare the Head Start Mandate.  The situation was not so urgent that notice and comment were not required.  Agency Defendants could have completed notice and comment TWICE during that time.  It took Agency Defendants over twice as long to prepare the Head Start Mandate without notice and comment as it would have to have complied with the notice and comment requirement.  Notice and comment would have allowed others to

comment upon the need for such drastic action before implementing it.  It certainly would have allowed Agency Defendants to review and evaluate the survey information from NHSA Executive Director Yasmina Vinci [Doc. No. 2-2] prior to implementing the Head Start Mandate.

### 3.    Tenth Amendment

In the federal system, the federal government has limited powers.  The States and the people retain the remainder.[19]  The States have broad authority to enact legislation for the public good ("police power"), but the federal government has no such authority and can only exercise the powers granted to it, including the power to make all laws which may be necessary and proper for carrying into execution the enumerated powers.  If the federal government were to radically readjust the balance of state and national authority, those charged with the duty of legislating must be reasonably explicit about it.  The Supreme Court is unlikely to assume Congress has meant to effect a significant change into the sensitive state and federal relations.  Congress does not normally intrude upon the police power of States.  *Bond v. United States*, 572 U.S. 844, 857–58, 134 S. Ct. 2077, 189 L. Ed. 2d 1 (2014).

Absent a clear statement of intention from Congress, there is a presumption against statutory construction that would significantly affect the federal-state balance.  *Boelens v. Redman Homes, Inc.* 748 F.2d 1058, 1067 (5th Cir. 1984).

The Head Start Mandate specifically preempts state and local law.  86 Fed. Reg. at 68063.  As noted by the Fifth Circuit in *BST Holdings*:

> First, the Mandate likely exceeds the federal government's authority under the Commerce Clause because it regulates noneconomic inactivity that falls squarely within the States' police power.  A person's choice to remain unvaccinated and forego regular testing is noneconomic inactivity.  *Cf. NFIB v. Sebelius*, 567 U.S. 519, 522 (2012) (Roberts, C.J. concurring); see also *Id.* at 652-53 (Scalia, J., dissenting).  And to mandate that a person receive a vaccine or undergo testing falls squarely

---

[19] Tenth Amendment to the United States Constitution.

within the States' police power.  *Zucht v. King*, 260 U.S. 174, 176 (1922) (noting that precedent had long "settled that it is within the police power of a state to provide for compulsory vaccination"); *Jacobson v. Massachusetts*, 197 U.S. 11, 25-26 (1905) (Similar). No. 21-60845 at 16-17.

The Plaintiff States make a strong case that the Head Start Mandate violates the States' police power and are likely to succeed on the merits of this claim.

### 4.      Remaining Claims

Plaintiff States argue several other claims that the Head Start Mandate is invalid. Because this Court has found Plaintiff States likely to succeed on the merits in three of their claims, addressing the remaining claims is unnecessary at this time.  There are other interesting issues which will warrant more discussion later.  For example, why was natural immunity ignored?  The Head Start Mandate was based upon the Delta variant being the primary variant, so what effect is there on the Head Start Mandate since Omicron is now the primary variant? How many staff, volunteers, and contractors will quit, and how many Head Start programs will close?  If many Head Start programs will close, is the Head Start Mandate defeating the purpose of the Head Start Program?  How do you keep two to four-year-old children in masks all day? These questions will be addressed on the merits.

### B.      Irreparable Injury

The second requirement for a PI is irreparable injury.  The Plaintiff States must demonstrate "a substantial threat of irreparable injury" if the injunction is not issued.  *Texas*, 809 F.3d at 150.  For injury to be "irreparable," plaintiffs need only show it cannot be undone through monetary remedies.  *Burgess v. Fed. Deposit Inc., Corp.*, 871 F.3d 297, 304 (5th Cir. 2017).

Being deprived of a procedural right to protect its concrete interests (by violation of the ADA's notice and comment requirements) is irreparable injury.  *Texas*, 933 F.3d at 447.

The Plaintiff States will suffer irreparable injury by not being able to enforce their laws which have been preempted by the Head Start Mandate, by incurring the increased cost of training and of enforcing the Head Start Mandate, and by the encroachment of their police power. The Plaintiff States' citizens will suffer irreparable injury by having a substantial burden placed on their liberty interests because they will have to choose between losing their jobs or taking the vaccine.  The Head Start local agencies and suppliers will be burdened with the task of tracking and enforcing the mandate or else face the loss of Head Start funding.  The Head Start staff and volunteers will also have to enforce a mask mandate on two, three, and four-year-old children which requires the children to wear a mask that must fit snugly, and cover the mouth, nose, and chin.

The Plaintiff States have shown irreparable injury.

### C.      The Balance of Equities and The Public's Interest

The Plaintiff States have satisfied the first two elements to obtain a PI.  The final two elements they must satisfy are that the threatened harm outweighs any harm that may result to the Agency Defendants and that the injunction will not undermine the public interest.  *Valley v. Rapides Par. Sch. Bd.,* 118 F.3d 1047, 1051 (5th Cir. 1997).  These two factors overlap considerably.  *Texas,* 809 F.3d at 187.  In weighing equities, a court must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief.  *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24, 129 S. Ct. 365, 172 L. Ed. 2d 249 (2008).  The public interest factor requires the court to consider what public interests

may be served by granting or denying a preliminary injunction.  *Sierra Club v. U.S. Army Corps of Engineers*, 645 F.3d 978, 997–98 (8th Cir. 2011).

This Court believes the balance of equities and the public interest favors the issuance of a PI.  The public interest is served by maintaining the constitutional structure and maintaining the liberty of individuals who do not want to take the COVID-19 vaccine.  This interest outweighs Agency Defendants' interests.  Once the vaccine has been taken, it is too late.  It is important that the public's interest be taken into account by the Court before allowing the Agency Defendants to mandate the vaccines.

## IV.   CONCLUSION

The issue in this case is not whether individuals should take the COVID-19 vaccine, but whether federal agencies can mandate individuals to take a vaccine or be fired.  In this Court's opinion, the Executive branch has declared it has the authority to make laws through Federal agencies.  A crossroad has clearly been reached in this country.  If the Executive branch is allowed to usurp the power of the Legislative branch to make laws, then this country is no longer a democracy—it is a monarchy.

This two-year pandemic has fatigued the entire country.  However, this is not an excuse to forego the separation of powers. If the walls of separation fall, the system of checks and balances created by the founders of this country will be destroyed.  In the words of Thomas Paine, "Government, even in its best state, is but a necessary evil; in its worst state, an intolerable one." Common Sense (1776).

This issue will certainly be decided by a higher court than this one.  This issue is important.  The separation of powers has never been so thin.

Because the Plaintiff States have satisfied all four elements required for a PI to issue, a PI should issue against the Agency Defendants enjoining and restraining the Agency Defendants from implementing the Head Start Mandate.

The geographic scope of the PI will be limited to the twenty-four Plaintiff States, Louisiana, Alabama, Alaska, Arizona, Arkansas, Florida, Georgia, Indiana, Iowa, Kansas, Kentucky, Mississippi, Missouri, Montana, Nebraska, North Dakota, Ohio, Oklahoma, South Carolina, South Dakota, Tennessee, Utah, West Virginia, and Wyoming.

This Court will additionally address security under Fed. R. Civ. P. 65.  The requirement of security is discretionary.  *Kaepa, Inc. v. Achilles Corp.*, 76 F.3d 624, 628 (5th Cir. 1996). Plaintiffs are twenty-four (24) sovereign states.  This Court will not require Plaintiff States to post security.

For the reasons set forth in this Court's ruling, Plaintiff States' Motion for Preliminary Injunction [Doc. No. 2] is **GRANTED**.  Plaintiff States' Motion for Temporary Restraining Order [Doc. No. 6] and Plaintiff States' Amended Motion for Temporary Restraining Order [Doc. No. 7] are **DENIED AS MOOT**.  The U.S. Department of Health and Human Resources, the Administration for Children and Families, and the Office of Head Start, along with their Secretary, directors, administrators, and employees are hereby **ENJOINED and RESTRAINED** from implementing the Head Start Mandate set forth in 86 Fed. Reg. 68052 (November 30, 2021), as to all Head Start staff, volunteers, contractors, students, and all others covered by said Head Start Mandate.

This preliminary injunction order shall remain in effect pending the final resolution of this case, or until further orders from this Court, the United States Court of Appeals for the Fifth Circuit, or the Supreme Court of the United States.

The Court further finds an absence of any issue of disputed fact as to the issues addressed.  Therefore, no hearing is required.  *Kaepa, Inc.*, 76 F.3d at 628.

No security bond shall be required under Federal Rule of Civil Procedure 65.

MONROE, LOUISIANA, this 1st day of January 2022.

TERRY A. DOUGHTY
UNITED STATES DISTRICT JUDGE