**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF LOUISIANA
LAKE CHARLES DIVISION**

| | |
|---|---|
| THE STATE OF LOUISIANA, By and through its Attorney General, JEFF LANDRY, et al., PLAINTIFFS, <br><br> v. <br><br> XAVIER BECERRA, in his official capacity as Secretary of Health and Human Services; et al., DEFENDANTS. | No. 3:21-cv-04370-TAD-KDM <br><br> **Plaintiff Sandy Brick's Proposed Memorandum Opposing Defendants' Motion to Dismiss, or in the Alternative, Motion for Summary Judgment.** |

# TABLE OF CONTENTS

Introduction ................................................................................................................ 1

Argument .................................................................................................................... 1

I.    The Court can hear this case now because Brick has standing ........................... 1

II.   The Defendants lack the statutory authority to promulgate the Rule ............... 3

A.    The authority to modify administrative standards is not the authority to
regulate public health ............................................................................................. 4

B.    The authority to modify the standards related to the
"condition of facilities" is not the power to regulate public health ...................... 5

C.    "Such other standards as the Secretary finds to be appropriate"
is not the power to regulate public health ............................................................. 7

D.    Several canons of construction support Etherton's
reading of the statute ........................................................................................... 11

*1.    The Rule is unprecedented* .................................................................................. 12

*2.    The Agency Defendants' interpretation presents nondelegation problems* .......... 12

*3.    The Major Questions Doctrine shows the Rule is not authorized* ....................... 12

*4.    The federalism canon shows the Rule is not authorized* ...................................... 13

*5.    Chevron does not support Defendants' position* .................................................... 14

III.   The Rule is arbitrary and capricious ................................................................... 17

IV.   The Defendants violated the APA by skipping notice and comment ................. 23

V.    The Rule is not in accordance with law because Defendants did not
follow the prescribed steps for issuing it ............................................................. 24

VI.   If the Rule does allow Defendants to regulate the public health,
then the lack of intelligible principle in the Head Start statute violates the
Constitution's nondelegation doctrine ................................................................. 25

VII.  The Rule exceeds the powers of Congress under the Commerce Clause .......... 26

VIII. The Rule violates the Tenth Amendment ...........................................................27

Conclusion...................................................................................................................27

**TABLE OF AUTHORITIES**

*Ala. Ass'n of Realtors v. HHS*,
   141 S. Ct. 2485 (2021) ........................................................................................ 9, 26

*Am. Bus Ass'n v. Slater*,
   231 F.3d 1 (D.C. Cir. 2000) .................................................................................15

*Arkansas v. Oklahoma*,
   503 U.S 91, 105 (1992) ..........................................................................................9

*Bennett v. Spear*,
   520 U.S. 154 (1997) ...............................................................................................3

*BST Holdings, L.L.C. v. OSHA*,
   17 F.4th 604 (5th Cir. 2021) ..................................................................... 22, 23, 26

*Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*,
   467 U.S. 837 (1984) ................................................................................... 14, 15, 17

*Dep't of Commerce v. New York*,
   139 S. Ct. 2551 (2019) ...........................................................................................2

*FCC v. Beach Commc'ns*,
   508 U.S. 307 (1993) .............................................................................................18

*GEO Group, Inc. v. Newsom*,
   15 F.4th 919 (9th Cir. 2021) ............................................................................. 9, 10

*GEO Group, Inc. v. Newsom*,
   31 F.4th 1109 (9th Cir. 2022) ........................................................................... 9, 10

*Gonzales v. Oregon*,
   546 U.S. 243 (2006) .............................................................................................17

*Gustafson v. Alloyd Co.*,
   513 U.S. 561 (1995) ...............................................................................................8

*Kentucky v. Biden*,
   23 F.4th 585 (6th Cir. 2022) ................................................................................25

*Livingston Educ. Serv. Agency v. Becerra*,
   2022 U.S. Dist. LEXIS 39283 (E.D. Mich. Mar. 4, 2022) ................................ 4, 5, 6

*Livingston Educ. Serv. Agency v. Becerra*,
   2022 U.S. App. LEXIS 13673 (6th Cir. May 20, 2022) ............................. 4-5, 10, 11

*Louisiana v. Becerra*,
 3:21-CV-04370, 2022 U.S. Dist. LEXIS 1333 (W.D. La. Jan. 1, 2022) ......... *Passim*

*Missouri v. Biden*,
 42 S. Ct. 647 (2022) ................................................................. 10, 11, 16, 24

*Mourning v. Family Publications Service, Inc.*,
 411 U.S. 356 (1973).......................................................................................9

*Nat'l Ass'n of Mfrs. v. Dep't of Def.*,
 138 S. Ct. 617 (2018) ....................................................................................3

*NFIB v. OSHA*,
 142 S. Ct. 661 (2022) ................................................6, 7, 13, 16, 23, 25, 26

*NFIB v. Sebelius*,
 567 U.S. 519, 580 (2012) ...........................................................................27

*Texas v. Becerra*,
 No. 5:21-CV-300-H, 2021 U.S. Dist. LEXIS 248309
 (N.D. Tex. Dec. 31, 2021)................................................................ *Passim*

*Tiger Lily, LLC v. U.S. HUD*,
 5 F.4th 666 (6th Cir. 2021) .........................................................................25

*United States v. Lopez*,
 514 U.S. 549 (1995) .....................................................................................27

*West Virginia v. EPA*,
 No. 20-1530, 2022 U.S. LEXIS 3268 (Feb. 28, 2022)........................... 12, 13, 14, 15

*Yates v. United States*,
 574 U.S. 528 (2015) .......................................................................................8

**Statutes**

42 U.S.C. § 9836a............................................................................................16

42 U.S.C. § 9836a(a)(1)(D)

42 U.S.C. § 9836a(a)(1)(C)................................................................................4

42 U.S.C. § § 9836a(a)(1)(E) ........................................................................7, 9

42 U.S.C. § 9836a(a)(2)(A) .................................................................................24

42 U.S.C. § 9836a(a)(2)(C)(ii) ...........................................................................21

**Rules**

Federal Rule of Civil Procedure 41(a)(1)(A) ........................................... 1 n.1

**Other**

*Introduction to Indoor Air Quality*, EPA,
    https://www.epa.gov/indoor-air-quality-iaq/introduction-indoor-air-
    quality#:~:text=Indoor%20Air%20Quality%20(IAQ)%20refers,risk%20of%20indo
    or%20health%20concerns ...............................................................................6

Nathan Richardson, *Deference Is Dead (Long Live Chevron)*,
    73 Rutgers U. L. Rev. 441 (2021)..............................................................14

Thomas M. Merrill, *The Chevron Doctrine* 7 (2022) ....................................14

Interim Final Rule with Comment Period, *Vaccine and Mask Requirements
to Mitigate the Spread of COVID-19 in Head Start Programs*,
    86 Fed. Reg. 68052 (Nov. 30, 2021) ................................................. 21, 25

## INTRODUCTION

As this Court stated when enjoining the Rule: "The powers that Congress afforded the Agency Defendants within the statute above do not include, or imply, the power to impose vaccine and/or mask mandates." *Louisiana v. Becerra*, 3:21-CV-04370, 2022 U.S. Dist. LEXIS 1333, at *5 (Jan. 1, 2022). Nothing has occurred since then that alters the soundness of that conclusion. Congress has not passed legislation authorizing the Agency Defendants to promulgate the Rule. Not only that, the Rule violates the APA because it is arbitrary and capricious. The Defendants lacked good cause to skip notice and comment. They also skipped the prescribed steps for promulgating the Rule by not consulting with all required experts. Even if the Rule did not violate the APA, the Head Start statute violates the Constitution's non-delegation doctrine, the Commerce Clause, and the Tenth Amendment.

Therefore, Brick's cross-motion for summary judgment should be granted and the Defendants' motion to dismiss or for summary judgment should be denied.[1]

## ARGUMENT

### I. The Court can hear this case now because Brick has standing.

Defendants' cursory argument that Brick lacks standing fails. Defs.' Br. 10-11. Brick works as a teacher for a preschool that serves Head Start students. Pl.'s Statement of Undisputed Facts ("Pl.'s SUF") ¶ 10 (Decl. of Sandy Brick ("Brick

---

[1] Plaintiff Jessica Trenn plans to file a notice of voluntary dismissal of her claims pursuant to Fed. R. Civ. P. 41(a)(1)(A) given that she is no longer employed by the Head Start provider.

Decl.") ¶ 3). Around December 16, 2021, her employer informed her that she would have to be vaccinated by January 31, 2022, or apply for a medical or religious exemption. Pl.'s SUF ¶ 11 (Brick Decl. ¶ 4). It also told her that employees who refuse to get vaccinated (or tested weekly if granted an exemption) are subject to termination as of January 31, 2022. Pl.'s SUF ¶ 11 (Brick Decl. ¶ 4). But after Brick filed this lawsuit to save her job, and after this Court preliminarily enjoined the Rule, her employer informed her that it was no longer enforcing the vaccination policy. Pl.'s SUF ¶ 13 (Brick Decl. ¶ 6-7); *Louisiana*, 2022 U.S. Dist. LEXIS 1333, at *42-43. Thus, if it were not for this Court's preliminary injunction, Brick's injury would be "'certainly impending.'" *Dep't of Commerce v. New York* ("*DOC*"), 139 S. Ct. 2551, 2565 (2019) (quotation omitted).

The Defendants attempt to resist this by claiming that Brick's injury is not imminent because there is a lengthy administrative process in place before they would pull funding from her employer, but that is wild speculation. A plaintiff has standing when her "theory of standing thus does not rest on mere speculation about the decisions of third parties" and "relies instead on the predictable effect of Government action on the decisions of third parties." *Id.* at 2566.

*DOC's* reasoning shows that it is predictable that Brick's employer will terminate her because of the Rule. It is much easier for Brick's employer to terminate her than having the Defendants investigate it for noncompliance and subjecting it to paperwork and hassle. Additionally, the end result of noncompliance is the employer losing its funding. There is no reason for Brick's employer to take

2

that risk. Indeed, the Supreme Court has held that a third party will predictably follow a government's advisory opinion on the law rather than face penalties for disregarding it and being wrong on the law. *Bennett v. Spear*, 520 U.S. 154, 170 (1997). And here, the Rule is not an advisory opinion, it is an order. The Defendants also do not claim that such a process would result in Brick not having to get vaccinated. So there is no reason for the employer to waste time dealing with that process even if out of the goodness of its heart it was willing to absorb the costs of being investigated by the government and risk its funding.

Thus, this Court's injunction against the Rule is the only thing stopping her employer from terminating her pursuant to the Rule in the near future. She therefore has standing.

## II. The Defendants lack the statutory authority to promulgate the Rule.

As Defendants acknowledge, an agency's statutory authority to promulgate a rule is a matter of statutory interpretation that "'begins with the statutory text.'" Defs.' Br. Supp. MSJ 9 (quoting *Nat'l Ass'n of Mfrs. v. Dep't of Def.*, 138 S. Ct. 617, 631 (2018)). There is no statutory text saying that Defendants can require Head Start staff and volunteers to take the COVID vaccine or wear a mask. As this Court explained in is preliminary injunction order, the Agency Defendants claim that three provisions authorize the Rule, but none of them have anything to do with vaccines. *Louisiana*, 3:21-CV-04370, 2022 U.S. Dist. LEXIS 1333, at *22. Specifically, they rely on their authority to "modify" "administrative and financial standards," "standards relating to the condition . . . of facilities (including indoor air

3

quality assessment standards),” and “such other standards as the Secretary finds to be appropriate,” but as this Court already concluded, these three arguments fail. *Id.* at *22-23.

### A. The authority to modify administrative standards is not the authority to regulate public health.

This Court rejected Defendants’ contention that the authority to “modify” “administrative standards” authorizes the Rule. *Id.* at *23. The Court said that “interpretation is overly broad.” *Id.* It reasoned that if the Agency Defendants were correct, then “administrative standards” would mean could be used to apply to “almost any regulation the Agency Defendants wanted to make.” *Id.* at *24.

*Texas v. Becerra* also reasoned that “administrative standards” is not the power to mandate masks or vaccines. No. 5:21-CV-300-H, 2021 U.S. Dist. LEXIS 248309 (N.D. Tex. Dec. 31, 2021). It said the “‘scope of ‘administrative standards’ is informed by the term to which it is joined: ‘financial management standards.’” *Id.* at *19 (quoting § 9836a(a)(1)(C)). “Read together, the term ‘financial management standards’ ‘suggests limitation’ on the scope of the term ‘administrative standards.’” *Id.* at *20. Thus, it authorizes “management standards” and “not mandatory masking and vaccine requirements.” *Id.*

The Agency Defendants do not engage with this Court’s reasoning or the reasoning in *Texas* on the interpretation of “administrative standards.” Defs.’ Br. 12-13. While they cite *Livingston Educ. Serv. Agency v. Becerra*, that case’s reasoning is cursory and flawed. *Livingston* reasoned that “administrative . . . standards” includes “trying to ‘keep the doors open’” and “the Rule seeks to

accomplish that goal after nearly two years of program closures and staff shortages due to COVID-19." 2022 U.S. Dist. LEXIS 39283, at *11 (E.D. Mich. Mar. 4, 2022); 2022 U.S. App. LEXIS 13673, at *5-6 (6th Cir. May 20, 2022). But this ignores that "administrative" is conjoined to, and therefore limited by, "financial standards" as *Texas* explains. It also shows that there is no limiting principle to "administrative standards" as this Court warned because *Livingston* essentially says it means HHS can do whatever it wants. Yet by using the term "administrative standards" Congress limited both the ends and means of what HHS could do. In short, "administrative standards" does not include mask or vaccine mandates.

## B. The authority to modify the standards related to the "condition of facilities" is not the power to regulate public health.

This Court also rejected the Agency Defendants' argument that the authority to modify standards "'related to the condition of the facilities' to ensure they do not become places of viral contagion." 2022 U.S. Dist. LEXIS 1333, at *23 (quotation omitted). It concluded that this too was an "overly broad" interpretation. *Id.*

*Texas* is in accord. It reasoned that the ability to "modify" standards relating to "the condition . . . of facilities (including indoor air quality assessment standards)" is inadequate statutory authority. *Texas*, 2021 U.S. Dist. LEXIS 248309, at *20-21 (quoting 42 U.S.C. § 9836a(a)(1)(D)). It reasoned that "[f]acility" is defined as "a structure, such as a building or modular unit." *Id.* at *20. And that "[t]he 'condition' of facilities—as the references to 'indoor air quality assessment standards,' licensing, and accessibility make clear—relate to physical conditions of buildings and equipment—not conditions on children's participation and adults' employment

or volunteer eligibility." *Id.* at *21. The court concluded that the "new Rule governs the conditions of people—not buildings" and thus is not authorized by the "condition of facilities" provision.

Again, the Agency Defendants have no response other than to cite *Livingston.* Defs.' Br. 12-13. But *Livingston's* reasoning that the ability to modify standards for facilities and indoor air quality amounts to a public health mandate is flawed. 2022 U.S. Dist. LEXIS 39283, at *12. Conjoining "facilities" with "indoor air quality" shows that this provision deals with physical buildings and not people just as *Texas* reasoned. As HHS's sister agency, the EPA, explains on its website "[i]ndoor air quality" refers to things like "asbestos," "nitrogen dioxide," and "carbon monoxide" that emanate from sources such as "fuel-burning combustion appliances." *Introduction to Indoor Air Quality*, EPA.[2] It is telling that the EPA's explanation does not mention infectious diseases emanating from human beings. It's also telling that this rule came from HHS, but we've seen no nationwide rule from the Biden Administration EPA regulating COVID via its air-quality powers.

This is in accord with *NFIB v. OSHA* where the Supreme Court struck down the OSHA vaccine mandate. 142 S. Ct. 661, 665 (2022). The Court reasoned that the OSHA statute "empowers the Secretary to set workplace safety standards, not broad public health measures." Thus, "[a]lthough COVID-19 is a risk that occurs in many workplaces, it is not an *occupational* hazard in most" given that it "can and

---

[2] https://www.epa.gov/indoor-air-quality-iaq/introduction-indoor-air-quality#:~:text=Indoor%20Air%20Quality%20(IAQ)%20refers,risk%20of%20indoor%20health%20concerns.

does spread at home, in schools, during sporting events, and everywhere else that people gather." *Id.* at 665. The Supreme Court thus rejected Justice Sotomayor's musing at oral argument that if OSHA can mandate masks around machines "where sparks are flying," then it can mandate vaccines because a "human being" is "like a machine" "if it's spewing a virus, blood-borne viruses?" Tr. of Oral Argument at 29:11-25, *NFIB*, 142 S. Ct. 661.

*NFIB's* reasoning that "workplace safety" does not equal public health supports this Court and *Texas'* reasoning that the "condition of facilities" does not equal public health or the power to regulate people who use those facilities. Indeed, the air that human beings exhale throughout the day is not the same thing as the "condition of facilities" or even "indoor air quality." Just as human beings are not machines that emit sparks, they are not facilities. Therefore, Defendants lack authority under the "condition of facilities" provision to regulate the public health of teachers and volunteers.

### C. "Such other standards as the Secretary finds to be appropriate" is not the power to regulate public health.

As this Court explained in *Louisiana* "[t]he only portion of the statutory text that could possibly apply is § 9836a(a)(1)(E) which allows the secretary to modify any other standards "as the secretary finds to be appropriate." 2022 U.S. Dist. LEXIS 1333, at *24. But this Court explained that it does not authorize mask and vaccine mandates because such an interpretation lacks a limiting principle. *Id. Texas* also reasoned that this interpretation "has no genuine limiting principle." 2021 U.S. Dist. LEXIS 248309, at *23. This Court explained that this is "very

concerning" because "hundreds of federal agencies" "have statutes similar to Section (E), which give the Secretary or Director general authority to make appropriate modifications." 2022 U.S. Dist. LEXIS 1333, at *25. Thus, most of the federal government would be able to do whatever it wanted. As this Court noted: "the nine most terrifying words in the English language are, 'I'm from the government and I'm here to help.'" *Id.* at *2 (quotation omitted).

Rather than attempting to dispel these concerns, the Agency Defendants double down by pointing to "similar enabling language in other statutes" and arguing that "the Supreme Court has concluded that this language grants the agency 'broad authority.'" Defs.' Br. 12. This only proves this Court's point that a lack of a limiting principle here will spill over to the hundreds of other federal agencies with similarly worded statutes.

Not only that, *Texas* answers the Agency Defendants' claim that "such other" standards is "broad authority." It reasoned that it must be defined in relation to the other performance standards specifically mentioned in the text, such as the "administrative standards" discussed above. 2021 U.S. Dist. LEXIS 248309, at *22. This comports with the "principle of noscitur a sociis—a word is known by the company it keeps—to 'avoid ascribing to one word a meaning so broad that it is inconsistent with its accompanying words, thus giving unintended breadth to the Acts of Congress.'" *Yates v. United States*, 574 U.S. 528, 543 (2015) (quoting *Gustafson v. Alloyd Co.*, 513 U.S. 561, 575 (1995)).

And it echoes the reasoning of *Alabama Association of Realtors v. HHS*. There, HHS claimed that a statute gave its sub-agency, the CDC, the authority to issue a moratorium on evictions throughout the country. 141 S. Ct. 2485, 2486 (2021). It pointed to the statute authorizing HHS to "make and enforce such regulations as in [its] judgment are necessary to prevent the introduction, transmission, or spread of communicable diseases." *Id.* at 2487. This was despite the subsequent sentence authorizing things like "fumigation, disinfection, and sanitation." *Id.* The Supreme Court held that this provision did not authorize the moratorium because "the second sentence informs the grant of authority by illustrating the kinds of measures that could be necessary" "such as "fumigation, disinfection, sanitation." *Id.*

This belies the Agency Defendants' argument that the Head Start statute grants HHS "broad authority." Defs.' Br. 12. To be sure, they cite *Mourning v. Family Publications Service, Inc.*, for that proposition, but the statutory language there authorized the Federal Reserve to "prescribe regulations to carry out the purposes of [the Act]" and was untethered to words that limited the grant of that authority. 411 U.S. 356, 365-66 (1973). Likewise, *Arkansas v. Oklahoma*, empowered the EPA to "prescribe conditions . . . to assure compliance with the requirements of [§ 402(a)(1)] and *such other requirements as he deems appropriate*." 503 U.S 91, 105 (1992). And that language was not informed, nor limited by surrounding words or provisions. *Id.* The same can be said of *GEO Group, Inc. v. Newsom* where the court did not consider whether surrounding words limited or informed the word

"appropriate." 15 F.4th 919, 930 (9th Cir. 2021), *vacated by* 31 F.4th 1109 (9th Cir. 2022).

The Agency Defendants seek to bolster their view that they have unlimited power to promulgate rules for Head Start programs by saying the HHS Secretary can "identify" and correct "'deficiencies'" in Head Start Programs, but that fails for three reasons. Defs.' Br. Supp. MSJ 14.

*First*, in the Rule itself, the Agency Defendants never cited the sections dealing with "deficiencies" as their statutory authority for the Rule.

*Second*, even if they had, they conflate two statutory sections. Section 9836a(e)(1) reads: "If the Secretary determines that a Head Start agency fails to meet the standards described in subsection (a)(1), the Secretary shall inform the agency of the deficiencies that shall be corrected." (cleaned up). In this specific context, "deficiencies" are failures to comply with performance standards. But as the court in *Texas* reasoned: "the 'deficiencies' for which the Secretary can impose sanctions contemplate threats to 'health and safety' does not widen the scope of what 'performance standards' comprises." 2021 U.S. Dist. LEXIS 248309, at *28. This is especially so when the subsections immediately surrounding the broad grant of authority in Section 9836a(a)(1)(E) deal with human resources type standards.

To be sure, the Sixth Circuit in *Livingston* read the language about deficiencies that threaten "health" as being akin to the provision in *Missouri v. Biden* that the Supreme Court used to uphold the CMS mandate, but that analogy is flawed. 2022 U.S. App. LEXIS 13673, at *5 (discussing *Missouri*, 142 S. Ct. 647 (2022)). The

provision at issue in *Missouri* said: "the Secretary [may] impose conditions on the receipt of Medicaid and Medicare funds that 'the Secretary finds necessary in the interest of the health and safety of individuals who are furnished services.'" *Id.* (quoting 142 S. Ct. at 652). Thus, this says that the actual "conditions" or regulations surrounding the CMS program could pertain to health and safety. This is different than the Head Start statute saying that when a Head Start program is deficient in meeting performance standards in a way that threatens health, that the Secretary can correct it. This does not mean that the performance standards themselves can relate to health and safety. Instead, it means that the deficiency needs to be egregious enough that it impacts health and safety to justify the federal government stepping in. In other words, Congress did not want Head Start providers getting buried in government paperwork over minor failures in meeting performance standards.

*Third*, the section about deficiencies only empowers the Agency Defendants to address them on a case-by-case basis given that they use the words "on the basis of a review pursuant to subsection (c), that a Head Start agency designated pursuant to this subchapter fails to meet the [program performance] standards described in subsection (a)(1)." Thus, these sections contemplate individualized review and remedies and are not empowering the Agency Defendants to issue a class-wide rule or remedy.

> ### D. Several canons of construction support Brick's reading of the statute.

In addition to the Head Start statute's plain text not authorizing the Rule, several canons of construction also show that it is unauthorized.

### 1. *The Rule is unprecedented.*

As the court in *Texas* reasoned, the unprecedented nature of the Rule counsels against interpreting the Head Start statute as authorizing it. *Texas*, 2021 U.S. Dist. LEXIS 248309, at *11, 25.

### 2. *The Agency Defendants' interpretation presents nondelegation problems.*

Interpreting the Head Start statute as authorizing the vaccine mandate would create nondelegation problems for the reasons explained below.

### 3. *The Major Questions Doctrine shows the Rule is not authorized.*

The major questions doctrine forecloses the Defendants' interpretation of the statute as this Court reasoned in *Louisiana*. 2022 U.S. Dist. LEXIS 1333, at *25. Since this Court's decision in *Louisiana*, the Supreme Court issued *West Virginia v. EPA* and Justice Gorsuch's concurrence shows that this case satisfies all three guideposts for "when an agency action involves a major question for which clear congressional authority is required." No. 20-1530, 2022 U.S. LEXIS 3268, at *64 (Feb. 28, 2022) (Gorsuch, J., concurring). Those guideposts include "when an agency claims the power to resolve a matter of great 'political significance,'" "when it seeks to regulate 'a significant portion of the American economy,'" or "when an agency seeks to 'intrud[e] into an area that is the particular domain of state law.'" *Id.* at 64-65 (citations omitted).

*First*, vaccination is matter of "great political significance." *West Virginia*, 2022 U.S. LEXIS 3268, at *64 (citation omitted). *NFIB* held as much. 142 S. Ct. at 665; *see also id.* at 668 (Gorsuch, J., concurring).

*Second*, this Court concluded that it "has no hesitation in finding that the Head Start Mandate is a decision of vast economic significance and that Congress has not clearly spoken to give Agency Defendants the authority to impose it." 2021 U.S. Dist. LEXIS 248309, at *31.

*Third*, the Defendants are "'intrud[ing] into an area that is the particular domain of state law.'" *West Virginia*, 2022 U.S. LEXIS 3268, at *64 (Gorsuch, J., concurring) (citation omitted). States have traditionally been the primary agents in our constitutional system for regulating health and safety. *Texas*, 2021 U.S. Dist. LEXIS 239608, at *15; *Louisiana*, 2022 U.S. Dist. LEXIS 1333, at *38. Before COVID, there were few instances of federal vaccine mandates and they were authorized expressly. *NFIB*, 142 S. Ct. at 668 (Gorsuch, J., concurring) ("And in the rare instances when Congress has sought to mandate vaccinations, it has done so expressly.").

Therefore, the major questions doctrine applies and this Court must look for a clear authorization for the mandate from Congress in the Head Start statute. As this Court previously reasoned, there is none. 2022 U.S. Dist. LEXIS 1333, at *31.

### 4. *The federalism canon shows the Rule is not authorized.*

The federalism canon cautions against interpreting the Head Start statute as authorizing the Rule. As Justice Gorsuch recognized in *West Virginia*, "the major

questions doctrine and the federalism canon often travel together." 2022 U.S. LEXIS 3268, at *64 (Gorsuch, J., concurring) (citation omitted).

### 5. *Chevron* does not support Defendants' position.

Lastly, Defendants claim that their interpretation of the Head Start statute is entitled to deference under *Chevron*, but that is not so for three reasons. Defs.' Br. Supp. MSJ 14 (citing *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 843 (1984)).

*First*, and most fundamentally, *Chevron* deference is outdated. "[T]he Supreme Court after 2016 effectively stopped applying the *Chevron* doctrine as a reason to uphold an agency interpretation." Thomas M. Merrill, *The Chevron Doctrine* 7 (2022); *see also* Nathan Richardson, *Deference Is Dead (Long Live Chevron)*, 73 Rutgers U. L. Rev. 441, 523 (2021).

*Second*, even if the doctrine applies, if the statute is unambiguous, the Court does not proceed to *Chevron* step two and simply interprets and applies the statute. As Brick argues above, the Head Start statute is clear that the Agency Defendants lack authority to promulgate the Rule. *Chevron* is inapplicable as a result.

While the Agency Defendants may say that the statute is silent on vaccine and mask mandates, and therefore *Chevron* step two applies because the statute is "silent" "with respect to the specific issue," that misunderstands *Chevron*. *Id.* An agency is only entitled to deference in interpreting a silent statute when the statute delegated it discretion on the issue in the first place. As *Chevron* reasoned, "courts recognize an implicit delegation of rulemaking authority only when Congress has

14

not spoken directly to the extent of such authority, or has intentionally left competing policy interests to be resolved by the agency charged with administration of the statute." *Id.* at 503. Indeed, "[I]f Congress wishes to deny an agency a given power, it need not expressly restrict the agency; it is enough for Congress simply to decline to delegate power . . . . In order for there to be an ambiguous grant of power, there must be a grant of power in the first instance." *Am. Bus Ass'n v. Slater*, 231 F.3d 1, 9 (D.C. Cir. 2000). Not only that, the major question doctrine shows that a statute's silence on an issue means that Congress did not intend to delegate authority to the agency on that issue. *West Virginia*, 2022 U.S. LEXIS 3268, at *35. But as explained above, there is nothing in the Head Start statute plausibly giving the Agency Defendants discretion on the issue of teacher and volunteers' health. Thus, there is no need for this Court to proceed to *Chevon* step two.

*Third,* even if the Court reviewed the Agency Defendants' interpretation of the Head Start statute under *Chevron* step two, their interpretation is not reasonable. They claim that "HHS has issued regulations under the Head Start Act that concern the health and safety of Head Start students and personnel," but the vaccine and mask mandates are "unprecedented" as the court in *Texas* recognized. 2021 U.S. Dist. LEXIS 248309, at *11; Defs.' Br. 14-15. Additionally, this Court in *Louisiana* already considered these regulations and concluded that "[t]hese past modifications even more clearly show Agency Defendants have no authority to impose the Head Start Mandate." 2022 U.S. Dist. LEXIS 1333, at *28. This Court reasoned that "these standards do not mandate a specific 'type' of treatment," which foreshadowed

the Supreme Court's reasoning in *NFIB v. OSHA* that "a vaccination after all, 'cannot be undone at the end of the workday.'" 142 S. Ct. at 665 (citation omitted). It is also in accord with the reasoning in *Texas* where the court explained that "screenings and immunization assistance" "are not required." 2021 U.S. Dist. LEXIS 248309, at *26-27. And "[m]andatory vaccines and universal masking, in contrast, present barriers to entry unlike any other "performance standard." *Id.*

Still, Defendants point to their previous regulations requiring staff to receive "health examinations as recommended by their health care provider in accordance with state, tribal, or local requirements," but again, screening is fundamentally different from vaccine mandates. Defs.' Br. 16. Additionally, the court in *Texas* reasoned that the reference to state requirements "confirms" that "health and safety regulation belongs, in the first instance, to the States," and thus it does not authorize the Rule. 2021 U.S. Dist. LEXIS 248309, at *30.

While Defendants claim that this "history" is like the history of CMS regulations in *Missouri*, that case is distinguishable because of the specific provision in the statute allowing CMS to issue regulations "'necessary to promote and protect patient health and safety.'" 142 S. Ct. at 652. Similar language does not exist in the part of the Head Start statute that discusses the types of performance standards the Defendants can issue. *See* 42 U.S.C. § 9836a.

Given that broad language about "health and safety" does not exist in the Head Start statute (unlike the statute in *Missouri*), Defendants are wrong that Plaintiff needed to point to a specific provision precluding a vaccine and mask mandate.

16

Defs. Br. 19. That gets things backwards. As *Gonzales v. Oregon* said, *Chevron* deference is "warranted only when it appears that Congress delegated authority to the agency generally." 546 U.S. 243, 255 (2006). But that general grant of authority is absent here. Thus, Defendants had an obligation to show that "administrative standards," "condition of facilities," and "such other standards as the Secretary finds to be appropriate" are somehow broad enough to allow for mask and vaccine mandates. For the reasons explained above, they have failed to do so. Thus, their interpretation of the Head Start Act under *Chevron* step two is not reasonable and should be rejected. Accordingly, Defendants lack statutory authority to issue the Rule and it therefore violates the APA.

## III. The Rule is arbitrary and capricious.

The Rule violates the APA because it is arbitrary and capricious on six independent grounds.

*First,* As *Texas* concluded, the Rule is arbitrary and capricious because it imposes a one-size-fits-all nationwide mandate. 2021 U.S. Dist. LEXIS 248309, at *45-46. *Texas* rejected the Defendants' argument that tailoring a rule to different portions of the country would be "burdensome" because it was "conclusory" and lacked evidentiary support. *Id.* at *49-50. So too here.

The Defendants' only attempt to explain this "burden" is that it is "easy" for a grant recipient serving areas that "cross state lines" to have one rule to follow. Defs.' Br. 27. But that is no answer to *Texas* pointing to the CDC guidance that celebrated the success of Head Start programs adjusting to COVID based on their locality.

17

2021 U.S. Dist. LEXIS 248309, at *50 ("Moreover, the Rule ignores CDC guidance "that localities should monitor community transmission in making decisions" and the CDC's report that Head Start had successfully navigated the pandemic through "maximum program flexibility.") (quotations omitted).

Nor does claiming that a tailored rule would be a "burden" from an administrative standpoint account for the corresponding burden that the nationwide Rule places on Head Start programs' liberty or the liberty of the individuals in the Program. "While [r]egulation is sometimes necessary," "it is always burdensome." *FCC v. Beach Commc'ns*, 508 U.S. 307, 320 (1993) (Stevens, J., concurring in the judgment). The Defendants also make a passing reference to the fact that "children benefit from routine and predictability," but that makes no sense given that students attend the same Head start provider every day, so the fact that another provider operates differently does not impact them. Defs.' Br. 27.

*Second*, the Rule is arbitrary and capricious because Defendants departed from their prior policy of not requiring vaccination and masks despite there being less burdensome alternatives. *Texas* found that the Defendants had a tradition of granting broad local control and flexibility. *Texas*, 2021 U.S. Dist. LEXIS 248309, at *71-72.  That guidance and tradition reflects Defendants' conscious "decision not to *regulate*," which can be "adequately justified by a presumption in favor of freedom." *FCC*, 508 U.S. at 320 (Stevens, J., concurring in the judgment) (emphasis in original). They thus had to justify their decision to abandon their decision not to regulate.

This they failed to do. Defendants simply make conclusory statements that the voluntary vaccination rate of Head Start staff was "robust" to protect participants, but that is not a reasoned explanation. Defs.' Br. 25. They do not explain how the marginal benefits of increasing the vaccination rates of an already heavily vaccinated staff outweighed the reliance interests of staff and volunteers in the prior policy of voluntary vaccination. They also cite the "potential for new variants" as a reason to abandon voluntary vaccination but that is not a reasonable explanation given that new variants may not emerge or new variants might be more innocuous. Defs.' Br. 25. They also cite the "return to fully in-person services," but the *Texas* Court explained that under the previous policy 73% of Head Start providers were operating in-person in September 2021, during COVID, and did so "successfully." 2021 U.S. Dist. LEXIS 248309, at *48. For similar reasons "the advent of the Delta variant" by itself is not a sufficient reason to depart from the policy of local flexibility given that it was percolating in the United States several months before Defendants issued the Rule in November 2021. Defs.' Br. 25.

*Third*, the Defendants failed to consider less disruptive alternatives, such as mandatory testing in lieu of vaccination. They attempt to distinguish the OSHA vaccine mandate based on it covering "over 80 million employees nationwide" and "a far broader array of workplace contexts," but this fails. Defs.' Br. 27. As explained above, the Head Start Rule applies nationwide and each Head Start provider's workplace context is different. Given the similarities between the Rule and the OSHA mandate, Defendants needed to provide a more detailed explanation of why

19

they cannot use the testing option that OSHA adopted. And they must explain why they chose to regulate programs with less than 100 employees whereas OSHA chose not to regulate employees with less than 100 employees. Additionally, Brick adopts the Plaintiff States' argument that the Defendants did not properly consider natural immunity as an alternative to mandatory vaccination and masking. Dkt. No. 101-1, at 21.

*Fourth*, the Rule's open-endedness makes it arbitrary and capricious. As *Texas* reasoned, the Defendants did not cite the fact that "children benefit from routine and predictability" to justify the lack of an end date. 2021 U.S. Dist. LEXIS 248309, at \*51. But *Texas* also concluded that even if that were the justification, it undermines the Defendants justification because having an end date would create routine and predictability. *Id.* at \*52.

*Fourth*, the Defendants did not consider science that undermines the Rule's rationale. Vaccinated people can spread COVID, so forcing preschool teachers to get vaccinated to slow the spread is nonsensical. *See* AR 00067 ("Early evidence suggests infections in fully vaccinated persons caused by the Delta variant of SARS-CoV-2 may be transmissible to others.").

*Fifth*, HHS promulgated the Rule despite its heavy costs to the quality and quantity of Head Start services. The statute requires the agency to "ensure that [revisions to existing performance standards] . . . will not result in the elimination of or any reduction in quality, scope, or types of health, educational, parental involvement, nutritional, social, or other services required to be provided." 42 U.S.C.

§ 9836a(a)(2)(C)(ii). What is more, CDC guidance said that when making decisions about implementing COVID-19 prevention strategies, Early Care and Education/Child Care Programs ("ECE") "should consider education loss and social and emotional well-being of children, and the needs of the families served when they cannot attend ECE programs in person." AR 00448.

Yet the Rule mandates vaccinations regardless of whether this will cause Head Start staff to quit or get fired, which will cause some classrooms to close entirely and cause other classrooms to change teachers mid-year. For those young children without access to Head Start services at all, this will damage their early development, as the Administrative Record ("AR") shows the importance of Head Start services for numerous populations. *See, e.g.*, AR 00223, AR00297, AR00305, AR00325, and AR 00371. And the Rule itself provides a list of horribles resulting from the closure of classrooms, from child malnutrition to child abuse and neglect. 86 Fed. Reg. 68,057. Even in those instances where a teacher departs and another teacher is hired mid-year to keep a classroom open, the bonds of attachment between teacher and child will be destroyed and cause unnecessary disruption, which negatively impacts student learning. In fact, the AR includes three academic articles on the importance of stable teacher-student bonds for child development. AR 00999, AR 01030, AR 01033.

The Defendants' failure to properly account for these costs renders the Rule arbitrary and capricious. It is illogical to accept the nearly certain prospect of staff quitting or being fired in response to the mandate to avoid the far more speculative

21

scenario of unvaccinated staff spreading COVID and causing classrooms to close. *Texas*, 2021 U.S. Dist. LEXIS 248309, at *58 (noting that "the Rule's enforcement 'could result in the closing of over 1,300 Head Start classrooms' and the loss of nearly '60,000 staff'"). This is so given that a large majority of staff were already vaccinated. Therefore increasing vaccination would only have marginal benefits and diminishing returns. Thus, the Defendants' failure to explain why they accepted downsides that were certain for speculative upsides is arbitrary and capricious decision-making.

*Sixth*, the Rule relies on pretextual justifications for wielding a general police power that it lacks. The Defendants' response does not deny that the "Rule is part of a broader focus by the administration to protect the health and safety of Americans." Defs.' Br. 28. Instead, they generally see no problem with this being the Rule's justification. But this glosses over the constitutional concerns of the federal government issuing vaccine mandates given that it lacks a general police power. As the Fifth Circuit reasoned in *BST Holdings, LLC v. OSHA*, the OSHA vaccine mandate "likely exceeds the federal government's authority under the Commerce Clause because it regulates noneconomic inactivity that falls squarely within the States' police power." 17 F.4th 604, 617 (5th Cir. 2021).

Indeed, Chief Justice Robert's comment at the OSHA vaccine mandate oral argument answers Defendants' argument that "it is not at all surprising that other federal agencies" imposed vaccine mandates. Defs.' Br. 28. Specifically, he stated: "it seems to me that it's that the government is trying to work across the waterfront

and it's just going agency by agency." Tr. of Oral Argument, *NFIB v. OSHA*, U.S. No. 21A244, at 79. Or as the Fifth Circuit observed: "After the President voiced his displeasure with the country's vaccination rate in September, the Administration pored over the U.S. Code in search of authority, or a 'work-around,' for imposing a national vaccine mandate." *BST Holdings*, 17 F.4th at 612.

Given that the real reason for the Rule is imposing a nationwide vaccine mandate and it is not about setting performance standards for Head Start programs, it is arbitrary and capricious.

## IV. The Defendants violated the APA by skipping notice and comment.

This Court in *Louisiana* concluded that the Defendants did not have "good cause" to skip notice and comment. 2022 U.S. Dist. LEXIS 1333, at *36-37. It reasoned that the Defendants could have conducted notice and comment "TWICE" during the "almost three months (eighty-two days) from September 9, 2021, to November 30, 2021, to prepare the Head Start Mandate."

*Texas* held the same. 2022 U.S. Dist. LEXIS 39283, at *38. It reasoned that the Rule fails to explain why a notice-and-comment process could not be used for the Rule's mask mandate. *Id.* at *39. It also reasoned that the Rule gives 62 days for staff and volunteers to get vaccinated after the Rule took effect, so HHS could have used that time for notice-and-comment and still have the same deadline for compliance. *Id.* at *39-40. It also noted that HHS promulgated the Rule 25 days after the OSHA and Center for Medicare Services vaccine mandates despite being "substantially shorter and less complex." *Id.* at *41. It further noted that skipping

notice and comment harmed the public interest by "silenc[ing] Head Start teachers, volunteers, and parents—the people who likely understand well the educational, linguistic, and social-development costs and benefits of masking toddlers and teachers in classrooms." *Id.* at *42-43.

Although Defendants rely on *Missouri* to excuse its decision to silence these stakeholders by skipping notice and comment, that argument fails. *Missouri* involved CMS, which has expertise in regulating public health. 142 S. Ct. at 654. Conversely, Defendants here have no expertise in regulating public health and attempt to regulate individuals' health for the first time with the Rule. Thus, the unique circumstances in *Missouri* do not apply and Defendants should have engaged in notice and comment given their lack of expertise. Defendants also invoke *Livingston*, but its reasoning is unpersuasive because it just says *Missouri* applies because the Rule is like the rule there. Therefore, there is no reason for this Court to depart from its prior conclusion that the Rule is illegal because the Defendants skipped notice and comment.

## V.   The Rule is not in accordance with law because Defendants did not follow the prescribed steps for issuing it.

The Head Start Act requires the Defendants to "consult with experts in the fields of child development, early childhood education, child health care, family services (including linguistically and culturally appropriate services to non-English speaking children and their families), administration, and financial management, and with persons with experience in the operation of Head Start programs." 42 U.S.C. § 9836a(a)(2)(A). But they admitted their failure to do this because the Rule

does not list all these required experts when it discusses who the Secretary consulted with as the Court in *Texas* explained. 2021 U.S. Dist. LEXIS 24830986, at *34 (discussing 86 Fed. Reg. at 68,053–54). *Texas* then concluded that because of this the "plaintiffs have shown a substantial likelihood that the Secretary did not follow the procedures required to modify performance standards." *Id.* Here at the merits stage, this Court should adopt *Texas*.

While Defendants claim that *Missouri* excuses their noncompliance, that case is distinguishable because it held that the Defendants had "good cause" to defer notice and comment and could thus also hold off on the consultations the statute required there. 142 S. Ct. at 654. But here, Defendants lacked good cause to skip notice and comment as explained above. Defendants also claim that they satisfied the consultation requirement through "internal consultation," but do not point to any evidence in the record that it did so. Defs.' Br. 22-23. Nor any evidence that it did so before issuing the Rule.

## VI. If the Rule does allow Defendants to regulate the public health, then the lack of intelligible principle in the Head Start statute violates the Constitution's nondelegation doctrine.

The lack of a limiting principle to the government's interpretation of a statute is a telltale sign that the interpretation lacks an intelligible principle to guide the agency's implementation of Congress's policy and violates the nondelegation doctrine. *Tiger Lily, LLC v. United States HUD*, 5 F.4th 666, 672 (6th Cir. 2021); *Kentucky v. Biden*, 23 F.4th 585, 607 n.14 (6th Cir. 2022); *NFIB*, 142 S. Ct. at 668 (Gorsuch, J., concurring). While the Supreme Court has only struck down two statutes on nondelegation grounds that is partly due to it interpreting statutes

narrowly to avoid deciding that constitutional issue. *Ala. Ass'n of Realtors*, 141 S. Ct. at 2489. Indeed, many "major question" cases could also have been nondelegation cases given that the two are "closely related." *NFIB*, 142 S. Ct. at 668 (Gorsuch, J., concurring).

When challenged by Brick to identify an intelligible principle in the Head Start statute to guide the Defendants in setting a vaccine mandate, the Defendants failed. Defendants' point to their ability to set "appropriate" standards, but "appropriate" lacks any sort of limiting principle. Defs.' Br. 22. Under their theory, "appropriate" could mean anything they want it to as this Court reasoned in *Louisiana*. 2022 U.S. Dist. LEXIS 1333, at *24-25. Likewise, when deciding that the Rule was arbitrary and capricious, the court in *Texas* reasoned that "if 'such other performance standards' could include mask and vaccine mandates, there would be no genuine limiting principle to the Secretary's authority to regulate in the name of 'health and safety standards.'" *Texas*, No. 2021 U.S. Dist. LEXIS 248309, at *23. That lack of a limiting principle shows that there is a nondelegation issue.

## VII. The Rule exceeds the powers of Congress under the Commerce Clause.

As this Court noted in *Louisiana*, the Rule relates to the OSHA vaccine mandate. 2022 U.S. Dist. LEXIS 1333, at *38. The Fifth Circuit held that the OSHA mandate "likely exceeds the federal government's authority under the Commerce Clause because it regulates noneconomic inactivity that falls squarely within the States' police power." *Id.* (quoting *BST Holdings*, 17 F.4th at 617).

While Defendants claim that this is a spending powers case, the mismatch between mask and vaccine mandates and the Head Start Program's goals shows this is a veiled attempt to regulate public health and safety. And not as condition "directly related to" the Head Start Program's "main purposes." *NFIB v. Sebelius*, 567 U.S. 519, 580 (2012). As the Fifth Circuit emphasized "the Administration pored over the U.S. Code in search of authority, or a 'work-around,' for imposing a national vaccine mandate." *Id.* at 612. Just as the OSHA mandate "commandeer[ed]" the nation's private employers, the Rule commandeers preschools to regulate public health. But the federal government has no such power. Therefore, the Rule is unconstitutional if the Head Start Act authorizes it.

## VIII.  The Rule violates the Tenth Amendment.

As this Court held in *Louisiana*, "[t]he Plaintiff States make a strong case that the Head Start Mandate violates the States' police power and are likely to succeed on the merits of this claim." 2022 U.S. Dist. LEXIS 1333, at *38. Given that this is a conclusion on a question of law, it should be extended to the full merits. Brick also adopts the Plaintiff States' argument on this point. While Defendants point to *Missouri* rejecting a Tenth Amendment challenge to the mandate for workers providing Medicare services, that is distinguishable given the special role that states have traditionally played in education. *United States v. Lopez*, 514 U.S. 549, 566 (1995).

## CONCLUSION

27

This case boils down to the fact that Congress simply did not authorize the Defendants to regulate the public health of Head Start staff and volunteers. Therefore, Brick's cross-motion for summary judgment should be granted and the Defendants' motion to dismiss or for summary judgment should be denied.

Dated: August 5, 2022

/s/ Sarah Harbison
Sarah Harbison
Pelican Institute for Public Policy
400 Poydras St., Suite 900
New Orleans, LA 70130
Telephone: 504-952-8016
sarah@pelicaninstitute.org

Daniel R. Suhr*
Liberty Justice Center
440 N. Wells St. Suite 200
Chicago, Illinois 60654
Telephone: 312-637-2280
dsuhr@libertyjusticecenter.org
*Pro Hac Vice