# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF LOUISIANA
### MONROE DIVISION

STATE OF LOUISIANA ET AL   CASE NO.  3:21-CV-04370

VERSUS       JUDGE TERRY A. DOUGHTY

XAVIER BECERRA ET AL   MAG. JUDGE KAYLA D. MCCLUSKY

## MEMORANDUM RULING

"The accumulation of all powers, legislative, executive, and judiciary, in the same hands, whether of one, a few, or many, and whether hereditary, self-appointed, or elected may justly be pronounced the very definition of tyranny."  James Madison, Federalist No. 51, 1788.  This case involves the separation of powers addressed by Madison in Federalist 51. Courts are protectors of the United States Constitution and its delegated powers.  The separation of powers keeps the three branches equal.  If one branch attempts to exceed its constitutional powers, it is the Judicial Branch's duty to stop it.

Before the Court are various motions regarding the Head Start Vaccine and Mask Mandate ("Head Start Mandate").  The first is a Motion to Dismiss, or in the Alternative, Motion for Summary Judgment [Doc. No. 65] filed by Agency Defendants.[1] The second is a Motion to Dismiss, or in the Alternative, Motion for Summary Judgment filed by Agency Defendants [Doc. No. 35 in Member Case No. 2:21-cv-4386].[2]  The third is a Cross Motion for Summary

---

[1] The Agency Defendants consist of Xavier Becerra, in his official capacity as Secretary of Health and Human Services, The U.S. Department of Health and Human Services, Administration for Children and Families, Jooyeun Chang, Principal Deputy Assistant for Children and Families, and Bernadine Futrell, Director of the Office of Head Start.

[2] On May 23, 2022, Brick v. Biden, Case No. 21-4386, and La. v. Becerra, Case No. 21-4370 were consolidated - [Doc. No. 78 in 21-4370] and [Doc No. 41 in 21-4386].  In Brick v. Biden, 21-4386, the initial Plaintiffs were Sandy Brick and Jessica Trenn.  On August 23, 2022, Jessica Trenn was terminated [Doc. No. 116 in Case No. 21-4370].

Judgment [Doc. No. 100] filed by Plaintiff States.[3]  The fourth is a Cross-Motion for Summary

Judgment [Doc. No. 105] filed by Plaintiff Sandy Brick ("Brick").  Plaintiff States and Plaintiff

Sandy Brick will collectively  be referred to as "Plaintiffs."

Both Oppositions [Doc. No. 106, 112, and 122] and Replies [Doc. No. 121 and 123] have

been filed by the various parties in this proceeding.

For the reasons set forth herein, Agency Defendants' Motions to Dismiss, or in the

Alternative, Motions for Summary Judgment [Doc. No. 65] and [Doc. No. 35 in 2:21-cv-4386]

are DENIED, and Plaintiffs' Cross Motions for Summary Judgment [Doc. Nos. 100, 105] are

GRANTED.

## I.     BACKGROUND

The Head Start Mandate required that all Head Start staff, volunteers working in

classrooms or directly with children, and contractors whose activities involve contact with or

providing direct services to children and families to be fully vaccinated for COVID-19 by

January 31, 2022.  The Head Start Mandate also required immediate masking by all individuals

two years of age or older when indoors, when outdoors during activities that involve close

contact with other people, and when there are two or more people in a vehicle owned, leased, or

arranged by the Head Start Program. 86 FR 68052

The Office of Head Start ("OHS"), Administration of Children and Families ("ACF"),

and the Department of Health and Human Services ("HHS") enacted the Head Start Mandate by

an interim final rule. Id. The aforementioned organizations are Executive branch federal

agencies. Congress did not pass the Head Start Mandate.

---

[3] Plaintiff States are the States of Louisiana, Alabama, Alaska, Arizona, Arkansas, Florida, Georgia, Indiana, Iowa, Kansas, Kentucky, Mississippi, Missouri, Montana, Nebraska, North Dakota, Ohio, Oklahoma, South Carolina, South Dakota, Tennessee, Utah, West Virginia, and Wyoming.

This case, although factually centered around the Head Start Mandate, is ultimately about the separation of powers under the United States Constitution.  Specifically, whether the Agency Defendants, government agencies under the Executive branch, have the authority to impose the Head Start Mandate.

These government agencies and divisions were created by Acts of Congress, which gave these agencies certain powers. Agency Defendants rely solely on Title 42 U.S.C. § 9836a(a)(1)(C)-(E) for the authority to enact the Head Start Mandate. Title 42 U.S.C. § 9836a(a)(1)(C)-(E) authorizes the Secretary of Head Start agencies and programs the power to modify, as necessary, program performance standards by regulation, which includes:

> (C)     administrative and financial management standards;

> (D)     standards relating to the condition and location of facilities for such agencies and programs used by Head Start agencies; and

> (E)     such other standards as the Secretary finds to be appropriate.

The stated purpose of the Head Start program is "to promote the school readiness of low-income children by enhancing their cognitive, social, and emotional development." 42 U.S.C. § 9831. The Head Start program provides federal funding for educational and related services to low-income families of preschool-age children.

After initially rejecting vaccine mandates,[4] President Joe Biden's "patience" began "wearing thin" with those "who haven't gotten vaccinated."[5]  On September 9, 2021, the Biden Administration announced a series of federal vaccine mandates, which included the Head Start Mandate.[6]

---

[4] Press Briefing by Press Secretary Jen Psaki, April 6, 2021, https://bit.ly/3rBJVoL.
[5] White House, Remarks by President Biden on Fighting the COVID-19 Pandemic (September 9, 2021) https://bit.ly/3Ey4Zj6.
[6] Biden September 9, 2021 Remarks, Id.

On November 30, 2021, eighty-two (82) days after President Biden's announcement, HHS published an interim final rule, which required (1) COVID-19 vaccinations by Head Start staff, volunteers, and contractors, and (2) masking of all Head Start individuals two years of age or older.  Vaccine and Mask Requirements to Mitigate the Spread of COVID-19 in Head Start Programs, 86 FR 68052-01 ("86 Fed. Reg.").  Mask requirements were to take effect immediately, and staff, workers, and contractors were required to be fully vaccinated by January 31, 2022.[7]

The specifics of the mask requirement included universal masking for all individuals two years of age or older when indoors in a setting where Head Start services are provided, when there are two or more individuals in a vehicle owned, leased, or arranged by the Head Start program, and for those not fully vaccinated, when outdoors in crowded settings or during activities that involve close contact with other people.  86 Fed. Reg. 68053.

The vaccination requirement required all staff who work with enrolled Head Start children, volunteers in classrooms, or volunteers working directly with children, and contractors whose activities involve contact with or providing direct services to children and families to be vaccinated by January 31, 2022.  86 Fed. Reg. 68052, 68060-61.

Brick is a preschool teacher in Kinder, Louisiana, who serves Head Start students. She falls directly under the "required staff" working with "enrolled Head Start children" who are required to receive the COVID-19 vaccination [Doc. No. 1, Complaint; Member Case 2:21-cv-4386].

---

[7] Which means Moderna and Pfizer's firsts shots were required by January 3, and 10, and the second by January 31, 2022.

4

There are only two exemptions in the vaccine requirement. Those exemptions are for those with a medical necessity which requires a delay in vaccination and those who are legally entitled to an accommodation with regard to the COVID-19 vaccine under federal law. Individuals granted accommodations are required to undergo weekly COVID-19 testing.  86 Fed. Reg. 68060-62.

The Head Start Mandate required documenting, recordkeeping, and tracking of all staff members.  86 Fed. Reg. 68061.  The implementation date for the COVID-19 vaccination mandate was January 31, 2022.  The COVID-19 vaccination mandate required staff, volunteers, and contractors to have received the final dose of a vaccine series by January 31, 2022.  86 Fed. Reg. 68062.

The Head Start Mandate preempts state laws.  86 Fed. Reg. 68063.  The Head Start Mandate does not allow individuals who are required to get a vaccine any alternatives other than vaccination or exemption.  The Head Start Mandate does not allow alternatives of natural immunity, social distancing, or additional testing.  86 Fed. Reg. 68066.

The Head Start Mandate does not provide additional funding for recordkeeping and tracking or for additional cost of testing for those granted exceptions.  86 Fed. Reg. 68061, 68066.  If a Head Start agency fails to meet the applicable standards, the Secretary must initiate proceedings to terminate its funding.  42 U.S.C. § 9836a(e)(1)(C).

On December 21, 2021, the Plaintiff States filed a Complaint [Doc. No. 1] and a Motion for Preliminary Injunction [Doc. No. 2].  This Court granted the Plaintiff States' Motion for Preliminary Injunction on January 1, 2022 [Doc. No. 15].

The Administrative Record ("AR") was filed by Agency Defendants [Doc. No. 97] on July 15, 2022.  Plaintiffs allege the Agency Defendants: (1) did not have authority to issue the

Head Start Mandate; (2) the Head Start Mandate is contrary to law; (3) the Head Start Mandate violates the APA's notice-and-comment requirement; (4) the Head Start Mandate is arbitrary and capricious; (5) the Head Start Mandate violates the Treasury and General Government Appropriations Act of 1999; (6) the Head Start Mandate violates the Nondelegation Doctrine, Spending Clause, Tenth Amendment to the United States Constitution, and the Anti-Commandeering Doctrine; and (7) the Plaintiffs have standing to bring these claims.

The Agency Defendants argue: (1) the Plaintiffs lack standing to pursue their claims; (2) the Head Start Mandate is authorized by Statute; (3) the Head Start Mandate is not contrary to law; (4) the Head Start Mandate is not arbitrary and capricious; (5) the Agency Defendants had good cause to issue the Head Start Mandate without notice and comment; (6) the Head Start Mandate does not violate the Treasury and General Government Appropriations Act of 1999; and (7) the Head Start Mandate does not violate the Nondelegation Doctrine, the Spending Clause, the Tenth Amendment or the Anti-Commandeering Doctrine.

## II.   STANDING

The Court must first determine whether it has judicial power to hear this case.  The United States Constitution limits exercise of judicial power to certain "cases" and "controversies."  U.S. Const. Art. III Section 2.

Under the doctrine of "standing," a federal court can exercise judicial power only where a plaintiff has demonstrated that it (1) suffered an injury in fact, (2) fairly traceable to the challenged conduct of the defendant, and (3) likely to be redressed by a favorable decision. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61, 112 U.S. 2130, 119 L. Ed. 2d 351 (1992).  The party invoking federal jurisdiction bears the burden of establishing these elements.  *Id*. at 561.

Agency Defendants maintain Plaintiffs cannot prove injury in fact because they are not recipients of Head Start Program grants under the Head Start Act.

Brick has standing individually.  Brick alleged she is a teacher for a preschool that serves Head Start students.  Brick does not want to take the COVID-19 vaccine and filed this lawsuit to prevent being terminated from her job.[8]

The Plaintiff States in this case are twenty-four (24) states. States are not normal litigants for purposes of invoking federal jurisdiction.  *Massachusetts v. EPA,* 549 U.S. 497, 518, 127 U.S. 1438, 167 L. Ed. 2d 248 (2007).  Rather, a state is afforded "special solicitude" in satisfying its burden to demonstrate the traceability and redressability elements of the traditional standing inquiry whenever its claims and injury meet certain criteria.  *Id*. at 520; *Texas v. United States*, 809 F.3d 134, 151–55 (5th Cir. 2015), *as revised* (Nov. 25, 2015).  Specifically, a state seeking special solicitude standing must allege that a defendant violated a congressionally afforded procedural right that affected the state's "*quasi-sovereign*" interests in, for instance, its physical territory or lawmaking function.  *Massachusetts*, 549 U.S. at 520–21; *Texas*, 809 F.3d at 151–55.

Plaintiff States allege they have standing to challenge the Head Start Mandate because they have special solicitude, and the Agency Defendants' actions harm their sovereign, proprietary, and *parens patriae* interests.

In *State v. Becerra*, No. 8:21-CV-839-SDM-AAS, 2021 WL 2514138 (M.D. Fla. June 18, 2021), the State of Florida attacked a Centers for Disease Control and Prevention ("CDC") "conditional order," which required a series of steps before cruise ships were allowed to sail.

---

[8] [Doc. No. 105-2] Declaration of Sandy Brick.

The court found Florida had standing to protect its proprietary interests and its sovereign interests.

The State of Texas was found to have standing in a suit against the United States Dept. of Homeland Security's 100-day pause of the removal of illegal aliens in *Texas v. U.S.*, 524 F. Supp. 3d 598 (S.D. Tex., February 23, 2021). In *State v. Biden*, 10 F. 4th 538 (5th Cir. 2021), the State of Texas was also found to have standing based on "special solicitude." (Injunction request against the U.S. Dept. of Homeland Security to suspend its Migrant Protection Protocols).

Texas was again found to have standing under "special solicitude" in *Texas v. United States*, 809 F.3d 134. Texas sued to prevent implementation of a DAPA Program by the United States Department of Homeland Security. The Fifth Circuit further noted that, pursuant to their sovereign interest, states may have standing based on federal assertions of authority to regulate matters they believe they control, federal preemption of state law, and interference with the enforcement of state law. *Id.* at 153.

In *Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez*, 458 U.S. 592, 102 U.S. 3260, 73 L. Ed. 2d 995 (1982), the United States Supreme Court held Puerto Rico, like a state, had *parens patriae* standing to bring an action against East Coast apple growers for allegedly violating federal law in preferring domestic laborers over foreign temporary workers. Puerto Rico was found to have a *quasi-sovereign* interest on behalf of its residents.

In *Texas v. Equal Emp. Opportunity Comm'n*, 933 F.3d 433 (5th Cir. 2019), the Fifth Circuit found standing for *Texas* after there was an increased regulatory burden, pressure to change state law, and deprivation of a procedural right to protect its concrete interests.

The Court will now analyze whether these Plaintiffs have satisfied the standing requirements.

A.      Injury in Fact

A plaintiff seeking to establish injury in fact must show that it suffered "an invasion of a legally protected interest" that is "concrete," "particularized," and "actual or imminent, not conjectural or hypothetical." *Spokeo, Inc. v. Robins*, 136 U.S. 1540, 1548, 194 L. Ed. 2d 635 (2016), *as revised* (May 24, 2016).  For an injury to be "particularized," it "must affect the plaintiff in a personal and individual way." *Id*. at 1548.  A "concrete" injury must be "de facto," that is, it must "actually exist."  "Concrete" is not, however necessarily synonymous with "tangible."  Intangible injuries can nevertheless be "concrete." *Id.,* at 1548-49.

Agency Defendants maintain the Plaintiff States do not have standing because they fail to meet the injury in fact requirement.  Agency Defendants argue the States themselves do not have injury in fact because they do not receive the Head Start grants to operate the classrooms. Agency Defendants further argue that without actual injury in fact, the States do not have the right to bring a *parens patriae* action on behalf of their citizens.  The Court rejects these arguments.

Agency Defendants' statement of the law, while correct in part, does not consider an important aspect of the law: to have *parens patriae* interest, the State must assert an injury that has been characterized as a *quasi-sovereign* interest.  *Alfred E. Snapp & Son, Inc. v. Puerto Rico*, 458 U.S. 592, 601 (1982).  The types of these *quasi-sovereign* interest as (1) the exercise of sovereign power over individuals and entities within the relevant jurisdiction – this involves the power to create and enforce a legal code, both civil and criminal; (2) the demand for recognition from other sovereigns; (3) public nuisances; (4) the health and well-being both physical and economic of its residents in general; and (5) in having its citizens not discriminated against. *Id* at 601-608.

9

In *Massachusetts v. EPA*, 27 U.S. 497 519-520 n. 17 (2007) in determining whether a state has a *parens patriae* interest, the Court stated:

> One helpful indication in determining whether an alleged injury to the health and welfare of its citizens suffices to give the state standing to sue *parens patriae* is whether the injury is one that the State, if it could, would likely attempt to address through its sovereign lawmaking powers.

549 U.S. at 519. Additionally, states have *parens patriae* standing where the state is bringing an action on behalf of citizens to enforce rights guaranteed by a federal statute. *Texas v. United States*, 86 F. Supp. 3d 591, 626 (S.D. Texas 2015). Plaintiff States allege the Agency Defendants violated the APA and preempted state law. Accordingly, Plaintiff States have both *parens patriae* standing and individual standing.

The Court finds the Plaintiff States' alleged injuries are both particularized and concrete. Plaintiff States have *parens patriae* standing and/or a *quasi-sovereign* interest in protecting their citizens from being required to submit to vaccinations and/or mask mandates in violation of the APA.  Additionally, the Plaintiff States have standing to regulate matters they control, to attack preemption of state law by a federal agency, and to protect the enforcement of state law.  The Head Start Mandate specifically preempts state laws with regard to COVID-19 Vaccine requirements and/or exemptions**.**  For example, Louisiana R.S. § 17:170 allows Louisiana students in schools and colleges to opt out of the required vaccines by a written dissent.  This statute conflicts with the Head Start Mandate, and Louisiana has standing to enforce its laws. The Head Start Mandate also preempts the laws of other states with similar statutes.  The presence of one party with standing is sufficient to satisfy Article III's case-or-controversy requirement.  *Brackeen v. Haaland*, 994 F.3d 249, 291 (5th Cir. 2021).

The Plaintiff States also have individual standing and injury based upon the alleged loss of jobs, businesses, tax revenue, unemployment benefits, reliance interest by Plaintiff States in the Head Start program, and other damages allegedly resulting from employees being fired for refusing the vaccine, and/or providers being terminated.

**B.**    **Traceability**

Plaintiff States must show a "fairly traceable" link between their alleged injuries and the Head Start Mandate.  As a general matter, the causation required for standing purposes can be established with "no more than de facto causality." *Dep't of Com. v. New York,* 139 U.S. 2551, 2556, 204 L. Ed. 2d 978 (2019).  The plaintiff need not demonstrate that the defendant's actions are "the very last step in the chain of causation." *Bennett v. Spear*, 520 U.S. 154, 169–70, 117 U.S. 1154, 137 L. Ed. 2d 281 (1997).

Here, there is an obvious link between the Head Start Mandate and the Plaintiff States' alleged injuries. A violation of the APA would require citizens of the Plaintiff States to make the choice of taking the vaccine or losing their jobs.  Because the Plaintiff States' laws are preempted, the alleged injuries are "fairly traceable" to the Head Start Mandate.

**C.**    **Redressability**

The redressability element of standing to sue requires a plaintiff to demonstrate "a substantial likelihood that the requested relief will remedy the alleged injury in fact." *El Paso Cty., Texas v. Trump*, 982 F.3d 332, 341 (5th Cir. 2020), *cert. denied sub nom. El Paso Cty., Texas v. Biden*, 141 U.S. 2885, 210 L. Ed. 2d 991 (2021), *reh'g denied*, 142 U.S. 51, 210 L. Ed. 2d 1019 (2021).

The Plaintiff States have demonstrated a substantial likelihood that the requested relief would remedy the alleged injury in fact.  If Plaintiff States are successful in having the Head Start Mandate declared invalid, this would redress their alleged injuries.

### D.      Special Solicitude

Although the Court has found that Plaintiff States have proven standing through the normal inquiry, they also can establish standing as a result of special solicitude.  Plaintiff States assert a congressionally bestowed procedural right, the APA, and the government action at issue affects the Plaintiff States' *quasi-sovereign* interests.

### E.      Standing Conclusion

Accordingly, the Court finds that Brick has standing in her individual capacity. She does not want to be forced to take the COVID-19 vaccination and filed this lawsuit to prevent termination from her job.

The Court further finds that based upon the Head Start Mandate's pre-emption of state law and Plaintiff States' assertion of a congressionally bestowed procedural right, (the APA), that affected the States' *quasi-sovereign* interests, the Plaintiff States have special solicitude standing. The Court additionally finds that Plaintiff states have standing under the traditional inquiry, and, even if there were any infirmity in Plaintiff States' demonstration of traceability or redressability are remedied by the Plaintiff States' special solicitude. The Court finds that the Plaintiff States have standing and that this Court has the judicial power to hear this case.

## III.    STANDARD OF REVIEW

### A.      Motion to Dismiss

To survive a motion to dismiss under FED. R. CIV. P. 12(b)(1), a plaintiff bears the burden to establish a court's jurisdiction. *Lujan*, 504 U.S. at 561.  Additionally, a complaint must

contain enough facts to state a claim for relief that is plausible on its face. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

### B.    Motion for Summary Judgment

Summary judgment is appropriate when the evidence before a court shows, "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).  A fact is "material" if proof of its existence or nonexistence would affect the outcome of the lawsuit under applicable law in the case. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).  A dispute about a material fact is "genuine" if the evidence is such that a reasonable fact finder could render a verdict for the nonmoving party. *Id.*

"[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting *Anderson*, 477 U.S. at 247).  "The moving party may meet its burden to demonstrate the absence of a genuine issue of material fact by pointing out that the record contains no support for the non-moving party's claim." *Stahl v. Novartis Pharm. Corp.,* 283 F.3d 254, 263 (5th Cir. 2002).  Thereafter, if the non-movant is unable to identify anything in the record to support its claim, summary judgment is appropriate. *Id.*  "The court need consider only the cited materials, but it may consider other materials in the record." FED. R. CIV. P. 56(c)(3).

In evaluating a motion for summary judgment, courts "may not make credibility determinations or weigh the evidence" and "must resolve all ambiguities and draw all permissible inferences in favor of the non-moving party." *Total E & P USA Inc. v. Kerr–McGee*

*Oil and Gas Corp.*, 719 F.3d 424, 434 (5th Cir. 2013) (citations omitted).  While courts will "resolve factual controversies in favor of the nonmoving party," an actual controversy exists only "when both parties have submitted evidence of contradictory facts."  *Little v. Liquid Air. Corp.,* 37 F.3d 1069, 1075 (5th Cir. 1994).  To rebut a properly supported motion for summary judgment, the opposing party must show, with "significant probative evidence," that a genuine issue of material fact exists.  *Hamilton v. Segue Software, Inc*., 232 F.3d 473, 477 (5th Cir. 2000) (emphasis added).  "'If the evidence is merely colorable, or is not significantly probative,' summary judgment is appropriate.'"  *Cutting Underwater Tech. USA, Inc. v. Eni U.S. Operating Co*., 671 F.3d 512, 517 (5th Cir. 2012) (quoting *Anderson,* 477 U.S. at 248).

Relatedly, there can be no genuine dispute as to a material fact when a party fails "to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex Corp.,* 477 U.S. at 322-23.  This is true "since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."  *Id*. at 323.

Challenges to agency decisions are normally resolved on motions for summary judgment. *Berry v. Esper*, 322 F. Supp. 3d 88, 90 (D.D.C. 2018).

## IV.    AUTHORITY OF AGENCY DEFENDANTS

### A.    Statutory Text

Agency Defendants solely base their authority to impose the Head Start Mandate on Title 42 U.S.C. § 9836a(a)(1) (C-(E), which states:

(a)    Standards

(1)    Content of standards

The Secretary shall modify, as necessary, program performance standards

by regulation applicable to Head Start agencies and programs under this subchapter, including...

(C)     administrative and financial management standards;

(D)     standards relating to the condition and location of facilities  (including indoor air quality assessment standards, where appropriate) for such agencies, and programs, including regulations that require that the facilities used by Head Start agencies (including Early Head Start agencies and any delegate agencies) for regularly scheduled center-based and combination program option classroom activities-

(i) shall meet or exceed State and local requirements concerning licensing for such facilities; and

(ii) shall be accessible by State and local authorities for purposes of monitoring and ensuring compliance, unless State or local laws prohibit such access; and

(E)     such other standards as the Secretary finds to be appropriate.

### 1.    Modify

Plaintiffs argue the word "modify"[9] in the text only allows Agency Defendants to make moderate or minor changes.  In *MCI Telecommunications Corp. v. American Telephone & Telegraph Co.,* 512 U.S. 218 (1994), the Supreme Court held a statute authorizing the Federal Communications Commission to "modify any requirement" for tariff filing did not authorize the challenged regulation because it affected a fundamental change, rather than a modification. The Court noted the word "modify" connotes moderate change. 512 U.S. at 225-226 (1994).

This Court has no doubt that Congress knows what the word "modify" means, and the Court also knows that Congress uses words intentionally. If they intended to, Congress would have used a broader term than simply "modify." In Title 29 U.S.C. § 655, Congress specifically establishes the procedure for promulgation, modification, or revocation of standards. The power

---

[9] The word "modify" means (1) "To make somewhat different; - to make small changes to (something) by way of improvement, suitability, or effectiveness," (2) "To make more moderate or less sweeping; to reduce in degree or extent; to limit quality, or moderate," or (3) "To describe the or limit the meaning of:" Modify, Black's Law Dictionary (10th Ed. 2014).

to modify is obviously narrower than the power to "promulgate, modify or revoke." By limiting Agency Defendants' power to only "modify" the program performance standards, Congress only gave Agency Defendants the power to make moderate or minor changes in the program performance standards. The Head Start Mandate is not a moderate or minor change in the program performance standards. The Court finds the Agency Defendants have exceeded their authority by implementing the Head Start Mandate because Congress only gave Agency Defendants the power to "modify" Head Start performance standards. The Head Start Mandate is not a modification.

### 2.    Program Performance Standards

None of the three (3) types of program performance standards that could be modified allow the Agency Defendants to impose the Head Start Mandate. The first program performance standard concerns "administrative and financial management standards." [10] The Agency Defendants argue that the Head Start Mandate is an "administrative standard." The Court rejects this argument. Administrative and financial management standards obviously deal with administering the Head Start program and financial issues. This language cannot be used to require COVID-19 vaccinations and masking. Under the Agency Defendants' interpretation, nearly anything could be an administrative standard. The unambiguous language of 42 U.S.C. 9836a(a)(1)(C) does not give Agency Defendants the power to impose the Head Start Mandate.

The second type of performance standard deals with standards relating to the condition and location of facilities for such agencies and programs. These regulations require that facilities used by Head Start agencies for regularly scheduled center-based and combination program option classroom activities meet or exceed State and local requirements concerning licensing for

---

[10] 42 U.S.C. § 9836a(a)(1)(C)

such facilities, and they shall be accessible by State and local authorities for purposes of monitoring and ensuring compliance unless State or local laws prohibit such access. 42 U.S.C. § 9836a(a)(1)(D).

Again, Agency Defendants' argument that the Head Start Mandate is "related to the condition of the facilities" is overbroad.  The example given in 9836a(a)(1)(D) is indoor air quality assessment standards. The Head Start Mandate deals with the condition of Head Start students, volunteers, and workers (vaccinated and/or masked), not with the condition of the facilities.  The last two portions of the program performance standard concern requirements for licensing and accessibility of facilities, and it also does not authorize the Head Start Mandate. The language of 9836a(a)(1)(D) does not give Agency Defendants the power to impose the Head Start Mandate.

The only portion of the statutory text that could possibly apply is the third,[11] which allows the Secretary to modify "such other standards as the Secretary finds to be appropriate." Although the language of this text is arguably broad enough to encompass the Head Start Mandate (or anything else) there are other reasons why this language does not give Agency Defendants the authority to institute the Head Start Mandate.

Congress must "speak clearly if it wishes to assign to an agency decisions of vast economic and political significance." *Util. Air Regul. Grp. v. EPA* 573 U.S. 302, 324, (2014).  In *Utility Air*, the United States Supreme Court found the Environmental Protection Agency ("EPA") exceeded its authority when the EPA adjusted levels set forth in the Clean Air Act regarding greenhouse-gas emissions.

---

[11] 42 U.S.C. § 9836a(a)(1)(E)

Like the present case, EPA used general authority to expand its power.  Justice Scalia wrote:

> EPA's interpretation is also unreasonable because it would bring about an enormous and transformative expansion in EPA's regulatory authority without clear congressional authorization. When an agency claims to discover in a long-extant statute an unheralded power to regulate "a significant portion of the American economy," *Brown & Williamson*, 529 U.S. at 159, 120 S. Ct. 1291, we typically greet its announcement with a measure of skepticism. We expect Congress to speak clearly if it wishes to assign an agency decision of vast "economic and political significance."

573 U.S. at 324.[12]  *See also Food and Drug Admin*., 529 U.S. at 159; *Alabama Ass'n of Realtors v. Dep't of Health & Hum. Servs*., 141 U.S. 2485, 2489, 210 L. Ed. 2d 856 (2021); *Tiger Lily, LLC v. United States Dep't of Housing & Urb. Dev.*, 5F. 4th 666 (6th Cir. 2021); *Paul v. United States*, 140 U.S. 342, 205 L. Ed. 2d 368 (2019); *Becerra*, 2021 WL 2514138, at *20; and *King v. Burwell*, 576 U.S. 473, 486, 135 U.S. 2480, 192 L. Ed. 2d 483 (2015).

Additionally, in *Whitman v. Am. Trucking Associations*, 531 U.S. 457, 468, 121 U.S. 903, 149 L. Ed. 2d 1 (2001), Justice Scalia famously wrote "Congress, we have held, does not alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions—it does not, one might say, hide elephants in mouseholes. 531 U.S. at 468. Here, the elephant is the Head Start Mandate and its vaccine and mask requirements. The mousehole is Agency Defendant's attempt to disguise the Head Start Mandate as a mere modification of Head Start performance standards.

In *Alabama Ass'n of Realtors v. Dep't of Health and Human Services,* 141 U.S. 2485 (2021), the Supreme Court addressed the issue of whether the Center for Disease Control had the

---

[12] Referred to by some members of the Supreme Court of the United States as the "major questions doctrine."  Dept. of Homeland Security Regents.  *Dep't of Homeland Sec. v. Regents of the Univ. of California*, 140 U.S. 1891, 1925, 207 L. Ed. 2d 353 (2020); *Gundy v. United States*, 139 U.S. 2116, 2141–42, 204 L. Ed. 2d 522, *reh'g denied*, 140 U.S. 579, 205 L. Ed. 2d 378 (2019).

authority to impose a nationwide eviction moratorium.  The CDC based its authority on a broad portion of the Public Health Service Act, which authorized the Secretary "to make and enforce such regulations as in his judgment are necessary to prevent the introduction, transmission, or spread of communicable disease." *Id.* at 2487, quoting 42 C.F.R. § 70.2 (2020). The Court found the CDC's moratorium was an exercise of vast economic and political significance, which required Congress to speak clearly, and held that the CDC did not have the authority to impose the eviction moratorium.

The United States Supreme Court recently recognized the doctrine as the "major questions doctrine." *West Virginia v. Environmental Protection Agency*, 142 U.S. 2587 (2022). At issue was whether the EPA had the authority to enact rules addressing carbon dioxide pollution for existing power plants by requiring power plants to reduce their own production of electricity, or subsidize increased generation by natural gas, wind, or solar sources.

In finding the EPA did not have the authority to make such changes, the Court stated, "Agencies have only those powers given to them by Congress and 'enabling legislation' is generally not an 'open book to which the agency [may] add pages and change the plot line.'" 142 U.S. at 2609. In a concurring opinion in *West Virginia v. EPA*, Justice Gorsuch identified four clues to determine what qualifies as a clear congressional statement that authorizes an agency's action: (1) where the legislative provisions on which the agency seeks to rely are with regard to their place in the overall statutory scheme; (2) the age and focus of the statute the agency invokes in relations to the problem the agency seeks to address; (3) the agency's past interpretations of the relevant statute; and (4) when there is a mismatch between an agency's challenged action and its assigned mission and expertise. *Id.* (GORSUCH, J., concurring).

19

Applying these factors, the statutory language Agency Defendants rely on is not adequate to confer authority on them to impose the Head Start Mandate.  The applicable statute deals with Head Start administrative and financial management standards, the condition and location of facilities, and licensing of facilities and accessibility to the facilities. Section (E) of 9836a(a)(1) is a broad enabling legislation that allows the Secretary to modify "such other standards as the Secretary finds to be appropriate."

There is nothing in 42 U.S.C. § 9836a which would allow Agency Defendants to make medical decisions for employees and volunteers, and/or to require two (2), three (3), and four (4), year-old students to wear masks the majority of the day. There is a disconnect between the Agency's challenged actions and its assigned mission and expertise.  Agency Defendants' expertise is not making medical decisions for its students, volunteers, or employees.

Agency Defendants argue that the history of modifications allows them to impose the Head Start Mandate.  These include:

(1)     funding to be used to support health services;

(2)     teaching and instruction involving physical health and development;

(3)     health screenings in rural communities;

(4)     recognizing health problems in children in rural communities for appropriate medical referrals;

(5)     allowing families of homeless children to apply, to enroll in, and attend Head Start programs which requires immunization and medical records for enrollment;

(6)     allowing consideration of the effects of revisions in standards as to the quality, scope, or types of health care services to be provided by Head Start;

(7)     health screenings for all Head Start staff;

(8)     meeting the childcare standards of the states in which they operate;

(9)     verification of immunization records;

(10)     appropriate treatment for children with HIV;

(11)     health examinations for Head Start staff;

(12)     health and wellness standards;

(13)     staff training on prevention and control of infectious diseases;

(14)     spacing cribs 3 feet apart;

(15)     temporarily excluding children with acute or short-term contagious illnesses;

(16)     determining whether children are up to date on state required vaccinations, and, with parental consent, assist the child and parents in getting up to date vaccinations;

(17)     using Head Start program funds for professional health care services when no other funding is available; and

(18)     requiring vaccinations for pets with children enrolled in in-home Head Start programs.

Although Agency Defendants rely on this list to reinforce their arguments, these past modifications do not allow Agency Defendants to impose the Head Start Mandate because, unlike what Agency Defendants attempted to do here, these past modifications do not impose specific medical treatments on anyone.  Instead, these modifications impose training to identify medical issues that can be referred for medical treatment.  Mandating specific medical treatment is outside the purpose and scope of Head Start's statutory structure and purpose.

The Court finds that the Head Start Mandate, which imposes its requirements upon 273,600 Head Start staff, 864,000 children and approximately 1,000,000 volunteers,[13] involves an agency decision of vast economic and political significance.  Congress has not clearly spoken to grant Agency Defendants the authority to impose the Head Start Mandate.  Therefore, the Head Start Mandate violates the major questions doctrine.

---

[13] 86 Fed. Reg. 68068

Finally, Agency Defendants maintain that this factual situation is similar to those in *Biden v. Missouri*, 142 U.S. 647 (2022) and in *Livingston Educational Service Agency v. Becerra*, 2022 WL 660793 (E.D. Mich., March 3, 2022). This Court does not agree. In *Missouri v. Biden,* in a 5-4 opinion the Supreme Court found the Center for Medicare and Medicaid Services (CMS) had the authority to impose an interim final rule, which imposed a COVID-19 vaccine mandate on the staff of healthcare facilities participating in Medicare and Medicaid.

The CMS Vaccine Mandate was enforced on the basis of a statute that authorized the Secretary to impose conditions on the recipient of Medicare and Medicaid funds that the Secretary found necessary in the interest of the health and safety of individuals who were furnished services. Because the Secretary nationally imposed conditions of participation that relate to the qualifications of healthcare workers themselves, the Court found "the rule thus fits neatly within the language of the statute." 142 U.S. at 652.  The Court also found the CMS had a longstanding litany of health-related participation conditions imposed upon the staff of the participating healthcare facilities.

Other than requiring the vaccination of pets, the Agency Defendants have never mandated specific medical treatment.  The CMS is an agency that deals with healthcare facilities that receive Medicare and Medicaid funding.  The Agency Defendants in this case are charged with promoting school readiness of Louisiana children by enhancing their cognitive, social, and economic development.[14]  Agency Defendants refer Head Start children for health screenings and treatment but do not recommend specific treatment.  By mandating COVID-19 vaccines and/or masks for 2- to 4-year-old children, Agency Defendants veered outside of the authority for which Head Start was created.

---

[14] 42 U.S.C. § 9831

In *Livingston Educational Service Agency v. Becerra*, 2022 WL 660793 (S.D. Mich., March 4, 2022), four Michigan school districts filed suit for a preliminary injunction enjoining the Head Start Mandate. The court declined to issue a preliminary injunction, finding the agency secretary had authority to issue The Head Start Mandate under 9836(a)(1)(D) (condition and location of facilities) and (E) (any regulation he finds to be appropriate.)  Plaintiffs appealed the district court's decision.  In *Livingston Educational Service Agency v. Becerra*, 35 F. 4th 489 (6th Cir. 2022), the United States Court of Appeals for the Sixth Circuit denied plaintiff's request for a preliminary injunction finding the plaintiffs unlikely to succeed on the merits as to whether the defendants had the authority to issue the Head Start Mandate.  This decision only addressed the need for a preliminary injunction and did not address the merits.  This Court respectfully declines to adopt the same reasoning used by the Sixth Circuit.

Additionally, they were both decided before the Supreme Court's decision in *West Virginia v. EPA*.[15]  There are only three branches of government created by the United States Constitution. Government agencies are not one of those branches.  They only have the authority the Legislative branch bestows upon them.  If government agencies such as the Defendants in this case are allowed to usurp the authority they have, the balance of powers in the United States Constitution would be irrelevant. As stated by Justice Gorsuch:

> One of the Judiciary's most solemn duties is to ensure that acts of Congress are applied in accordance with the Constitution in the cases that come before us.

142 S. at 2676.

---

[15] Another court granted a preliminary injunction enjoining the Head Start Mandate in  *Texas v. Becerra*, 2021 WL 6198109 (N.D. Tex., December 31, 2021).

For the reasons set forth herein, the Court finds the Agency Defendants do not have the authority to impose the Head Start Mandate.  Because the Head Start Mandate was not authorized, it is not necessary to address the other alleged constitutional and statutory violations.

## V.     PERMANENT INJUNCTION

A permanent injunction is an extraordinary remedy never awarded of right.  *Benisek v. Lamone,* 138 U.S. 1942, 1943, 201 L. Ed. 2d 398 (2018).  In each case, the courts must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief.  *Winter v. Nat. Res. Def. Council, Inc.* 555 U. S. 7, 24, 129 U.S. 365, 172 L. Ed. 2d 249 (2008).

The standard for a permanent injunction requires a movant to show (1) the substantial likelihood of success on the merits, (2) that he is likely to suffer irreparable harm in the absence of an injunction, (3) that the balance of equities tips in his favor, and (4) that an injunction is in the public interest.  *Benisek*, 138 U.S. at 1944.  The party seeking relief must satisfy a cumulative burden of proving each of the four elements enumerated before an injunction can be granted.  *Clark v. Prichard*, 812 F.2d 991, 993 (5th Cir. 1987).  None of the four prerequisites has a quantitative value.  *State of Tex. V. Seatrain Int'l, S.A.,* 518 F.2d 175, 180 (5th Cir. 1975).

### A.     Success on the Merits

For the reasons set forth herein, Plaintiffs have been successful on their claim that the Agency Defendants exceeded their authority in imposing the Head Start Mandate.  Therefore, Plaintiffs have met the first factor required for a Permanent Injunction.

### B.     Irreparable Injury

The second requirement for a Permanent Injunction is irreparable injury.  The Plaintiff States must demonstrate "a substantial threat of irreparable injury" if the injunction is not issued.

24

*Texas*, 809 F.3d at 150.  For injury to be "irreparable," plaintiffs need only show it cannot be undone through monetary remedies.  *Burgess v. Fed. Deposit Inc., Corp.*, 871 F.3d 297, 304 (5th Cir. 2017). Deprivation of a procedural right to protect its concrete interests is irreparable injury. *Texas*, 933 F.3d at 447.

Plaintiff States will incur the increased cost of training and of enforcing the Head Start Mandate, will be unable to enforce their laws, and will have their police power encroached. The Court finds that this would be an irreparable injury. The Plaintiff States' citizens will suffer irreparable injury by having a substantial burden placed on their liberty interests because they will have to choose between losing their jobs or taking the vaccine.  The Head Start local agencies and suppliers will be burdened with the task of tracking and enforcing the mandate or else face the loss of Head Start funding.  Two (2), three (3), and four (4) year-old children, will be required to wear a mask the majority of the day.

The Plaintiff States have shown irreparable injury.

### C.      The Balance of Equities and The Public's Interest

The Plaintiff States have satisfied the first two elements to obtain a permanent injunction. The final two elements they must satisfy are that the threatened harm outweighs any harm that may result to the Agency Defendants and that the injunction will not undermine the public interest.  *Valley v. Rapides Par. Sch. Bd.,* 118 F.3d 1047, 1051 (5th Cir. 1997).  These two factors overlap considerably.  *Texas,* 809 F.3d at 187.  In weighing equities, a court must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief.  *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24, 129 U.S. 365, 172 L. Ed. 2d 249 (2008).  The public interest factor requires the court to consider

what public interests may be served by granting or denying a preliminary injunction. *Sierra Club v. U.S. Army Corps of Engineers*, 645 F.3d 978, 997–98 (8th Cir. 2011).

This Court finds the balance of equities and the public interest favors the issuance of a permanent injunction. The public interest is served by maintaining the constitutional structure and maintaining the liberty of individuals who do not want to take the COVID-19 vaccine. This interest outweighs Agency Defendants' interests. The public has a liberty interest in not being required to take a vaccine or be fired from their jobs. The public interest must be taken into account before allowing Agency Defendants to mandate vaccines. Although vaccines arguably serve the public interest, the liberty interests of individuals mandated to take the COVID-19 vaccine outweigh any interest generated by the mandatory administration of vaccines.

## VI.   CONCLUSION

Because the Plaintiff States and Sandy Brick have satisfied all four elements required for a Permanent Injunction to issue, a Permanent Injunction is issued against the Agency Defendants enjoining and restraining the Agency Defendants from implementing the Head Start Mandate.

The geographic scope of the Permanent Injunction will be limited to the twenty-four Plaintiff States, Louisiana, Alabama, Alaska, Arizona, Arkansas, Florida, Georgia, Indiana, Iowa, Kansas, Kentucky, Mississippi, Missouri, Montana, Nebraska, North Dakota, Ohio, Oklahoma, South Carolina, South Dakota, Tennessee, Utah, West Virginia, and Wyoming.

This Court will additionally address security under FED. R. CIV. P. 65. The requirement of security is discretionary. *Kaepa, Inc. v. Achilles Corp.*, 76 F.3d 624, 628 (5th Cir. 1996). Plaintiffs are twenty-four (24) sovereign states. This Court will not require Plaintiff States or Sandy Brick to post security.

For the reasons set forth in this Court's ruling, Plaintiff States' Cross Motion for Summary Judgment [Doc. No. 100] is **GRANTED**. Additionally, Brick's Motion for Summary Judgment [Doc. No. 105] is **GRANTED**.  The Motion to Dismiss, or in the Alternative, Motions for Summary Judgment [Doc. No. 65 and Doc. No. 35 in Member case No. 2:21-cv-4396] filed by Agency Defendants are **DENIED**.  The United States Department of Health and Human Resources, the Administration for Children and Families, and the Office of Head Start, along with their Secretary, directors, administrators, and employees are hereby **ENJOINED** and **RESTRAINED** from implementing the Head Start Mandate as set forth in 86 Fed. Reg. 68052 (November 30, 2021), as to all Head Start staff, volunteers, contractors, students, and all others covered by said Head Start Mandate.

This Permanent Injunction order shall remain in effect pending the final resolution of this case, or until further orders from this Court, the United States Court of Appeals for the Fifth Circuit, or the Supreme Court of the United States.

The Court further finds an absence of any issue of disputed fact as to the issues addressed.  Therefore, no hearing is required.  *Kaepa, Inc.*, 76 F.3d at 628.

MONROE, LOUISIANA, this 21st day of September 2022.

TERRY A. DOUGHTY
UNITED STATES DISTRICT JUDGE